# UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF NEW YORK

**CROUSE HEALTH HOSPITAL, INC.,**
736 Irving Ave
Syracuse, NY 13210
    *Plaintiff,*

  **v.**

**UNITED STATES SMALL BUSINESS ADMINISTRATION**, 409 3rd St., SW, Washington, DC, 20416;

 *and*

**ISABELLA CASILLAS GUZMAN**, *in her official capacity as Administrator*, U.S. Small Business Administration, 409 3rd St., SW, Washington, DC, 20416

   *Defendants.*

**Case No.**  5:23-cv-00615 (BKS/ATB)

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Crouse Health Hospital, Inc. ("**Crouse**"), by and through its counsel, brings this Complaint against Defendants United States Small Business Administration ("**SBA**") and Isabella Casillas Guzman, in her official capacity as Administrator of the SBA ("**Administrator Guzman**" and, together with SBA, "**Defendants**").  As set forth in more detail below, the Complaint seeks an order under the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.* ("**APA**") vacating the final decision of the SBA ("**SBA Final Decision**") denying Crouse loan forgiveness under the Paycheck Protection Program ("**PPP**").  In the alternative, the Complaint seeks an order setting aside all SBA rules prohibiting nonprofit borrowers from establishing

1

eligibility under PPP because such rules are arbitrary, capricious, an abuse of discretion, and contrary to law, and because the SBA did not follow proper procedure in promulgating such rules.

## INTRODUCTION

1.      In March 2020, COVID-19 was spreading quickly across the country.  The President had declared a public health emergency and states and local governments were issuing stay-at-home orders.  Businesses across the country were on the brink of failure, and the economy on the verge of collapse.

2.      Crouse was not spared from the negative impacts of COVID.  Of course, as a community hospital, Crouse did not shut down, but remained open while its doctors and nurses tirelessly cared for the community during the worst parts of the pandemic.  But that does not mean that Crouse's financial viability was unaffected by the pandemic.  To the contrary, the pandemic exacerbated financial challenges that Crouse had been facing for years.

3.      On March 27, 2020, the President signed into law the Coronavirus Aid, Relief, and Economic Security Act ("**CARES Act**"), Pub. L. 116–136.  Title I of the CARES Act established the PPP, a loan program created under the Small Business Act's existing small business loan program.  Small Business Act of 1958, *as amended* ("**SB Act**") Section 7(a)(36). However, unlike other small business loans, PPP loans were available to nonprofits as well, and were intended to be forgiven.  Among the eligibility criteria for nonprofits to be eligible for a PPP loan were an employee size standard (*i.e.*, less than 500 employees) and an industry size standard (typically defined by a specified amount of annual receipts), in addition to the "alternative size standard" under the SB Act, which is based on an organization's net worth and net income.

4.  On July 27, 2020, Crouse, like other nonprofit hospitals in New York and around the country, applied for and received a PPP loan.  Crouse immediately used the $10 million loan proceeds to pay the wages and benefits for its employees, including its doctors and nurses.  The PPP loan proceeds were exhausted in less than 2 pay periods.

5.  Because Crouse used the PPP loan proceeds to pay wages and benefits, Crouse never expected to repay the loan.

6.  Crouse was therefore shocked to learn that the SBA denied Crouse's PPP loan on the grounds that, with more than 500 employees, Crouse does not meet the SB Act's size standards.  However, Crouse qualifies for a PPP loan under the "alternative size standard", which measures not an organization's employee count, but its net worth and net income.

7.  Even more stunning is that the SBA has **granted** PPP loan forgiveness to **similarly-situated nonprofit hospitals**.  Like Crouse, each of these nonprofit hospitals also had more than 500 employees, so could only be eligible for a PPP loan under the alternative size standard.

8.  Crouse appealed the SBA's decision to the Office of Hearings and Appeals ("**OHA**"), the office within SBA that, *inter alia*, adjudicates administrative appeals of SBA decisions.  OHA denied Crouse's appeal, as well as Crouse's petition for reconsideration.  The SBA's decision is now final.

9.  The APA was enacted to put in place guardrails to agency action "as a check upon administrators".  *United States v. Morton Salt Co.*, 338 U.S. 632, 644 (1950).  These guardrails include judicial review of final agency action that is alleged to be arbitrary and capricious, as well as a notice-and-comment rulemaking requirement.  *See* 5 U.S.C. §§ 553, 702, 706.

10. The SBA Final Decision should be vacated under the APA as contrary to law. Nothing in the CARES Act or corresponding regulations or SBA rules prohibit nonprofits from establishing eligibility for a PPP loan under the "alternative size standard".

11. Additionally, the SBA Final Decision should be vacated under the APA as arbitrary and capricious because the SBA granted PPP loan forgiveness to similarly-situated nonprofit hospitals. If those organizations are eligible for a PPP loan and forgiveness, so should Crouse.

12. Alternatively, SBA rules excluding nonprofits like Crouse from qualifying for a PPP loan under the alternative size standard violate the APA because such rules are contrary to law, and are arbitrary and capricious. Moreover, such rules were promulgated without observing the APA's required notice procedures.

13. Crouse does not have the money to repay the PPP loan, and if Crouse is forced to do so, it would be catastrophic for the organization and, more importantly, the community.[1] It is vital to the future of the organization for its PPP loan to be forgiven.

14. Crouse respectfully requests that the Court vacate the SBA decision denying Crouse's PPP loan forgiveness application. Alternatively, Crouse asks the Court to set aside SBA rules and regulations that prohibit nonprofits like Crouse from establishing eligibility for a PPP loan under the alternative size standard.

---

[1] Crouse's financial struggles have been exacerbated following the collapse of a potential merger with SUNY Upstate Medical University in a large part due to the Federal Trade Commission's opposition to the merger. *See* Statement of Elizabeth Wilkins, *available at* https://www.ftc.gov/news-events/news/press-releases/2023/02/statement-elizabeth-wilkins-director-ftcs-office-policy-planning-decision-suny-upstate-medical (last visited Mar. 26, 2023)

## PARTIES

15.    Plaintiff Crouse Health Hospital, Inc. is a not-for-profit hospital and a resident of New York, located at 736 Irving Avenue Syracuse, New York 13210.

16.    Defendant the Small Business Administration is an independent federal agency created and authorized pursuant to 15 U.S.C. § 633, *et seq.*  Its headquarters are located at 409 3rd Street, SW, Washington, District of Columbia, 20416.

17.    Defendant Isabella Casillas Guzman is the Administrator of the SBA, a Cabinet-level position, and is sued in her official capacity.  The SBA's headquarters are located at 409 3rd Street, SW, Washington, District of Columbia, 20416.

## JURISDICTION AND VENUE

18.    This case arises under the APA, 5 U.S.C. § 500 *et seq.* and seeks to set aside a final agency decision or final agency action.  Accordingly, jurisdiction is proper in this Court under 28 U.S.C. § 1331.

19.    Venue is proper pursuant to 28 U.S.C. § 1391(e)(1)(B) because a "substantial part of the events or omissions giving rise to the claim occurred" in this District.

## FACTUAL ALLEGATIONS

**A.    Crouse Health Hospital**

20.    Crouse is a nonprofit organized under Internal Revenue Code ("**Code**") section 501(c)(3).  Founded in 1887, Crouse has developed into an organization with a rich tradition of providing quality healthcare to generations of families.

21.    Crouse is a dedicated, trusted member of the Central New York community, providing a 506-bed and 57-bassinet hospital for patients to seek medical care.  The medical,

surgical, critical care and emergency services Crouse provides are invaluable.  For example, Crouse,

a.   Is designated by New York State Department of Health as a regional referral center, servicing 15 counties for high-risk maternity and neonatal intensive care services;

b.   Is the only regional provider of high-risk maternity and neonatal intensive care services, and delivers over 60% of the babies born annually in Onondaga County;

c.   Provides a full range of interventional and diagnostic cardiac services, including the region's only pediatric cardiac catheterization program;

d.   Operates the region's first Comprehensive Stroke Center, as certified by DNV Healthcare and the New York State Department of Health;

e.   Offers comprehensive women's health services, including breast care, obstetrics and gynecology, and cardiac care;

f.   Provides addiction treatment services to help in the fight against the opioid epidemic;

g.   Provides best-in-class surgical services, including bariatric and robotic surgery, and operates one of the longest-running outpatient surgery centers in the United States; and

h.   Is the community's trusted provider of emergency services – "Take me to Crouse" is the community truism when seeking emergency care.

22.    In recent years, even before the pandemic, Crouse, like many healthcare systems in central New York State and across the United States, has experienced significant financial challenges.  These financial difficulties include:

a. **Reimbursement cuts**.  For example, just prior to 2020, Medicaid—which comprises 29.5% of Crouse's payor mix—reduced rates by 2.1%, driving down patient revenue.  And Medicare reimbursements had fallen by 5.0% due to Affordable Care Act changes to Disproportionate Share Hospital reimbursements.

b. **Increasing costs of supplies and drugs**.  For example, the cost of medical supplies has increased 15% since 2020.  Costs have also increased due to the increasing number of federal and state reporting requirements and regulations.  As a result of the pandemic, New York state required Crouse to move from "just-in-time" inventory to a 90-day (now 60-day) supply on hand for critical PPE items, forcing Crouse to obtain storage facilities and source supplies during a supply chain meltdown.  These factors, as well as increased lead times and backorders on supplies, caused inventory holding to jump from $8.6 million on December 31, 2019 to $11.9 million on December 31, 2022, and reached a high of $12.3 million in 2020.

c. **Rising wages and salaries**.  An increase in wages and salaries was happening across the country, but hit Crouse particularly hard given the competition from other local hospitals.

23.     Each of these challenges led to thinner operating margins for Crouse.  Indeed, from 2015 - 2020, Crouse's operating income was negative.

24.     Throughout the COVID-19 pandemic, Crouse continued to provide best-in-class care to the community.  However, the pandemic exacerbated Crouse's financial challenges.  For example,

a. Patients postponed or canceled revenue-driving elective surgeries, resulting in a negative direct margin impact of $18.9 million for 2020 as compared to budget;

b. Emergency Department visits were reduced for many months, resulting in a negative direct margin impact of several million dollars;

c. Patient visits to Crouse's related private medical practice declined, requiring Crouse to provide additional funds to the medical practice to cover fixed costs during the pandemic.

25.    There was little Crouse could do to address these pandemic-related challenges, particularly since Crouse was required to treat COVID and other patients and provide competitive compensation to ensure retention of its staff or recruitment of traveling nurses.

26.    The challenges brought on by the pandemic compounded the secular challenges across the healthcare systems in the U.S., including those discussed above.

**B.    Small Business Loans under the SB Act**

27.    Prior to the CARES Act, small business loans were administered by the SBA pursuant to Section 7(a) of the SB Act (such loans, "**Section 7(a) Loans**").  Section 7(a) Loans generally were available only to "small business concerns" as defined in the SB Act.  Act Section 7(a).  Generally, nonprofits are not eligible for small business loans under the Act. 13 CFR § 120.110(a).

28.    The SB Act defines small business concerns eligible to receive small business loans largely in terms of industry size standards.  *See* Act Section 3(a); 13 CFR §§ 120.100(d); 121.201.  However, "an applicant for a business loan under section 636(a) of this title" (*i.e.*, Section 7(a) Loans) is permitted to use the "alternative size standard" as an alternative to the industry size standards that would otherwise be required under to determine eligibility for a

Section 7(a) Loan.  SB Act Section 3(a)(5).  Specifically, an applicant for a Section 7(a) Loan may be eligible if under the alternative size standard if:

> (i) the maximum tangible net worth of the applicant is not more than $15,000,000; and
>
> (ii) the average net income after Federal income taxes (excluding any carry-over losses) of the applicant for the 2 full fiscal years before the date of the application is not more than $5,000,000.

SB Act Section 3(a)(5)(B).

29.     The SB Act requires the SBA to "establish an alternative size standard" for Section 7(a) Loan applicants.  The SBA has not issued regulations establishing an alternative size standard, and instead relies on the statutory text.

30.     Section 3(a)(5) of the SB Act does not limit the alternative size standard to small business concerns.

### C.     Paycheck Protection Program

31.     The CARES Act created a new category of Section 7(a) Loans: low-interest loans PPP loans to certain organizations – including nonprofits – to cover up to 8 weeks of payroll costs and employee compensation (among other costs and expenses).  SB Act Section 7(a)(F)(i).  Congress intentionally created the PPP within the existing structure under Section 7(a) of SB Act.  *Pharaohs GC, Inc. v. United States Small Bus. Admin.*, 990 F.3d 217, 224 (2d Cir. 2021).

32.     Critically, the CARES Act also provides that PPP loans would be more broadly available than other SBA Loans, and the organizations eligible to receive a PPP loan would include not just small business concerns but also nonprofits, among others.  Specifically, the SB Act provides:

> **(D)** Increased eligibility for certain small businesses and organizations.—
> **(i)** In general.—During the covered period, in addition to small business concerns, any business concern, nonprofit organization, housing cooperative, veterans

> organization, or Tribal business concern described in section 657a(b)(2)(C) of this title shall be eligible to receive a covered loan if the business concern, nonprofit organization, housing cooperative, veterans organization, or Tribal business concern employs not more than the greater of—
>
>> **(I)**  500 employees; or
>>
>> **(II)**  if applicable, the size standard in number of employees established by the Administration for the industry in which the business concern, nonprofit organization, housing cooperative, veterans organization, or Tribal business concern operates.

SB Act Section 7(a)(36)(D).

33.     While under the CARES Act only nonprofits organized under Code section 501(c)(3) were eligible for a PPP loan, Congress, recognizing the need provide relief to more struggling non-profits,[2] further expanded the availability of PPP loans to "additional covered nonprofit entit[ies]" organized under Code Section 501(c), through the American Rescue Plan Act ("**ARPA**").  An additional covered nonprofit entity is eligible for a PPP loan if the entity has "not more than 300 employees per physical location of the entity or organization."  SB Act Section 7(36)(D)(iii)(III)(bb).

34.     While the CARES Act and ARPA provide size standards for nonprofits seeking a PPP loan, nothing in the plain language of either the CARES Act or ARPA alters the applicability of the "alternative size standard" that applicants for Section 7(a) Loans – which, post-CARES Act, includes PPP loans – can rely on to establish eligibility for such loans.  Indeed, the SBA has recognized the availability of the industry size standard by revenue Crouse and

---

[2] *See* Remarks for Senator Ben Cardin, 167 Cong. Rec. S1219-02, 167 Cong. Rec. S1219-02, S1226 ("We provide $7.25 billion for nonprofits, expanding eligibility, and for the digital news platforms that need help. Johns Hopkins University has done a study, and it has shown that the employment level in our nonprofit community has dropped 1 million jobs since COVID-19 occurred. We know the great work that they do, how they step up and help us anytime, but particularly during a pandemic and during a national crisis. They need help, and they should be eligible to be able to receive the help under the Small Business PPP program. This bill will provide that flexibility so they can get the help that they need-another reason we have to pass the American Rescue Plan.").

other PPP borrowers, and the alternative size standard for business concerns and other types of

nonprofit entities, notwithstanding that neither the CARES Act nor ARPA explicitly provide

these as eligibility criteria.

35.     In the CARES Act, Congress directed the SBA to issue regulations within 15 days

of enactment  relating to the PPP.  Pub. L. No. 116-136, § 1114 (codified at 15 U.S.C. § 9012).

Due to the 15 day deadline that Congress gave the SBA, which would be impossible to comply

with and also comply with the APA notice and comment requirements, Congress dispensed of

the APA's notice and comment requirements for those initial regulations.  *Id.*

36.     SBA issued the first interim final rule ("**IFR**") on April 15, 2020.[3]  Subsequently,

the SBA issued several additional IFRs effective on dates between April 20, 2020 and September

16, 2021.

37.     In its IFRs, the SBA recognized that small business concerns and electric and

telephone cooperatives exempt from taxation under Code section 501(c)(12) can be eligible for a

PPP loan under the alternative size standard.  85 FR 29847, 29848 (May 19, 2020) (electric

cooperatives); 85 FR 35550, 35552 (June 11, 2020) (telephone cooperatives); 86 FR 15083,

15085 (small business concerns) (March 22, 2021); 86 FR 3692, 3696-97 (January 12, 2021)

(electric and telephone cooperatives).  Nothing in the CARES Act or ARPA addresses the

applicability of the alternative size standard to these entities or expressly permits those entities to

establish eligibility under the alternative size standard.

38.     The SBA has not issued regulations excluding nonprofits from establishing

eligibility under the alternative size standard.

---

[3] The SBA published links on its website to the Federal Register containing the IFRs.
https://www.sba.gov/funding-programs/loans/covid-19-relief-options/paycheck-protection-program/ppp-lender-information (last visited Mar. 26, 2023).

39.    In addition to the IFRs, the SBA published Frequently Asked Questions ("**FAQs**") for PPP borrowers and lenders.[4]  In the FAQs, the SBA acknowledged that small business concerns;[5] agricultural producers, farmers, and ranchers;[6] are eligible for PPP loans under the alternative size standard, which is not expressly provided for under the CARES Act or ARPA.  The SBA has also acknowledged in the FAQs that borrowers that meet the SBA's revenue-based industry size standard are eligible for a PPP loan, which is also not expressly provided for under statute.[7]

40.    On July 8, 2022, the SBA published FAQ 71 that stated that nonprofits exempt from taxation under Code section 501(c)(3) with more than 500 employees may be eligible for PPP loan forgiveness if they have 500 or fewer employees per physical location (a change made by ARPA).[8]

41.    Neither FAQ 71 nor any other FAQ addressed the applicability of the alternative size standard to Code section 501(c)(3) organizations.

---

[4] FAQ for PPP Borrowers and Lenders, *available at* https://www.sba.gov/document/support-faq-ppp-borrowers-lenders (last visited Mar. 26, 2023).

[5] FAQ 2 published as of June 25, 2020, *available at* https://www.sba.gov/sites/default/files/2020-06/Paycheck-Protection-Program-Frequently-Asked-Questions%20062520-508.pdf (last visited Mar. 26, 2023).

[6] FAQ 34, published as of June 25, 2020, *available at* https://www.sba.gov/sites/default/files/2020-06/Paycheck-Protection-Program-Frequently-Asked-Questions%20062520-508.pdf (last visited Mar. 26, 2023).

[7] FAQ2 (a business that is not a small business concern can qualify for a PPP loan under the SBA employee-based or revenue based size standard); FAQ 34 (agricultural producers, farmers, and ranchers qualify for a PPP loan if the business has 500 or fewer employees or meets the revenue-based size standard).

[8] FAQ 71, published as of July 8, 2022, *available at* https://www.sba.gov/sites/default/files/2022-07/FAQ%20PPP%20for%20Borrowers%20and%20Lenders%20Questions%201-71%20V12%20%28FINAL%207-8-22%29-508.pdf (last visited Mar. 26, 2023).

42.    None of the FAQs were published in the Federal Register.

**D.    Crouse is Denied PPP Loan Forgiveness**

43.    In July 2020, Crouse became aware that another community hospital in the region, Erie County Medical Center ("**ECMC**"), applied for and received a $10 million PPP loan based on the alternative size standard.

44.    After consulting with People's United Bank (now M&T Bank) ("**People's**"), Crouse's lender, Crouse followed in ECMC's footsteps and in the summer of 2020 applied for and received a $10 million PPP loan.  Crouse was eligible for the PPP loan under the alternative size standard.  Crouse used the PPP loan proceeds solely to cover wages and benefits for Crouse employees.

45.    On November 23, 2021, People's submitted Crouse's PPP Loan for full forgiveness.  The SBA commenced a review of Crouse's loan, including requesting information regarding the number of Crouse employees.

46.    In response to an SBA request, on June 6, 2022, Crouse submitted SBA Form 3511, Affiliation Worksheet (effective December 2020), indicating its eligibility under the alternative size standard.

47.    Footnote 3 to the SBA Form 3511 (Footnote 3 to the Form 3511, together with the FAQs and any other similar guidance, "**Disputed SBA Guidance**") states, without citation, that "[t]he alternative size standard is only available to for-profit borrowers, not non-profit organizations."

48.    The SBA Form 3511 was not approved by the Office of Management and Budget until December 2020.  *See generally* https://omb.report/icr/202012-3245-001.

49.     By Letter dated July 25, 2022 ("**July 25 Letter**"), SBA notified Crouse (through People's), that it was considering recommending a full denial of the loan forgiveness application based on the fact that Crouse has more than 500 employees.  The July 25 Letter referenced published guidance and FAQ 2.  The SBA acknowledged that "the Frequently asked Question document 'does not carry the force and effect of law' . . . ."  Crouse responded to the SBA's July 25 Letter on August 9, 2022.

50.     By letter dated October 6, 2022 ( "**Denial Letter**"), Crouse was notified, through People's, that the SBA determined that Crouse was ineligible for the PPP loan on the grounds that "the Borrower business, or together with its affiliates, exceeds the maximum allowable number of employees and the SBA small business size standards."  The SBA further stated that "a Non-Profit is ineligible for the Alternative Size standard".  The SBA advised that $0 of the PPP loan would be forgiven and that Crouse must repay the loan on or before the maturity date of August 6, 2025.

### E.     Crouse Appeals to OHA

51.     On November 7, 2022, Crouse timely filed with OHA an appeal ("**Appeal**") of the SBA's determination, as set forth in the Denial Letter, that Crouse was never eligible for the PPP loan and its denial of Crouse's forgiveness application.

52.     In the Appeal, Crouse argued:

a.     The SBA's determination that Crouse was never eligible for a PPP loan was wrong because nothing in the Act, the CARES Act, or ARPA limits the ability of a nonprofit like Crouse to establish its eligibility under the alternative size standard under Act section 3(a); and

b.  The SBA's position that nonprofits are not eligible for PPP loans under the alternative size standard is not entitled to deference because (1) the law is clear that nonprofits can establish eligibility under the alternative size standard; (2) the position is not based on consistent with the law; and (3) the SBA has not issued regulations addressing the applicability of the alternative size standard to nonprofits.

53.     Crouse further argued that a final agency action denying Crouse's loan forgiveness application would be arbitrary and capricious because SBA has **granted** PPP loan forgiveness applications of organizations similarly situated to Crouse.  *See infra* at ¶¶ 64-72.  In support, Crouse attached publicly-available information relating to those similarly-situated organizations, such as the organizations' Form 990s, and referred to the SBA's own publicly-available data on PPP borrowers.[9]

54.     In opposing Crouse's appeal, the SBA argued, *inter alia*, that (1) OHA cannot invalidate SBA's regulations or interpretations of law, and (2) nonprofits are not permitted to use the alternative size standard to establish eligibility for PPP loans.  In support of the latter argument, the SBA pointed to the first IFR, noting that it "did not provide for an alternative size standard for non-profit entities."  The SBA also pointed to FAQ 2, which advises that small business concerns can be eligible PPP borrowers under the "alternative size standard", and FAQ 3, which describes the eligibility for other PPP borrowers.

55.     With regard to Crouse's argument that the SBA granted loan forgiveness to similarly-situated nonprofits, the SBA argued it was "speculative at best" and that Crouse "failed

---

[9] PPP loan data is available on the SBA's website at https://data.sba.gov/dataset/ppp-foia (last visited Mar. 26, 2023).

to provide any evidence of the circumstances surrounding the alleged forgiveness of the 'similarly situated' organizations . . . ."

### F.    OHA Denies Crouse's Appeal

56.    On January 10, 2023, OHA denied Crouse's Appeal on the grounds that, as a nonprofit with over 500 employees, Crouse was not eligible for a PPP loan.[10] In the denial, OHA pointed to Act section 7(a)(36)(D) and FAQ 2.

57.    The OHA Administrative Judge also concluded that Administrative Judges are "bound by all policy directives and rules promulgated by their agency, including the agency's interpretations of those policies and rules."

58.    OHA further dismissed Crouse's argument that similarly-situated organizations received loan forgiveness as "not supported by any evidence in the record."

### G.    Crouse Files a Petition for Reconsideration

59.    On January 18, 2023, Crouse timely filed a petition for reconsideration ("**PFR**") of OHA's initial decision under 13 CFR § 134.1211(c)(1), arguing that that OHA's decision was based on clear error of law.

60.    In the PFR, Crouse reiterated that Crouse, as a borrower of loan under Act section 7(a), is entitled to use the alternative size standard to establish eligibility for a PPP loan, and nothing in the CARES Act, ARPA, or SBA regulations provides otherwise.  Additionally, because no SBA regulations prohibit non-profits from eligibility under the alternative size

---

[10] Crouse also filed an objection to the administrative record, noting that certain documents that Crouse and/or People's provided to the SBA in connection with the PPP loan and forgiveness application were missing.  These documents included the (1) 2018 Form 990 for Crouse Health Hospital, Inc. and audited financial statement; and (2) 2019 Form 990 for Crouse Health System, Inc.  OHA denied Crouse's objection.

standard, OHA is not bound by SBA's interpretation of the law, and would not need to invalidate any regulation to rule for Crouse.

61.     Crouse also argued in the PFR that OHA's position that Crouse did not provide evidence of similarly-situated organizations that received PPP loan forgiveness is plainly wrong. Crouse pointed to the five New York State nonprofit hospitals with over 500 employees that Crouse identified in the Appeal, as well as the SBA's own publicly-available data on PPP borrowers that confirms such hospitals are in the same industry as Crouse and do not meet the SBA's industry size standards – in other words, the hospitals are, in fact, similarly situated to Crouse.

### H.     OHA Denies Crouse's Petition for Reconsideration

62.     On February 16, 2023, OHA denied Crouse's PFR, largely on the same grounds described in its January 10 denial.

63.     Thirty days after service of OHA's denial of Crouse's PRF – on March 20, 2023 – the SBA's decision denying Crouse's application for PPP loan forgiveness became the final agency decision ("**SBA Final Decision**"). 13 C.F.R. § 134.1211(c)(2).

### I.     SBA Granted PPP Loan Forgiveness to Similarly-Situated Organizations

64.     The SBA's position is that a nonprofit is *only* eligible for PPP loans if it has 500 or fewer employees or it meets the industry size standard.[11]

---

[11] The SBA appears to have argued in the OHA proceeding that Crouse also did not meet the eligibility under the industry size standard by revenue.  The CARES Act provides that certain organizations, such as nonprofits, are eligible for a PPP loan if they have 500 or fewer employees *or* meet the industry size standard by number of employees.  SB Act Section 7(a)(36)(D)(i). However,  as discussed above, the SBA provided that PPP borrowers can meet the industry size standard by revenue, as well.

65.     The SBA denied Crouse's PPP loan forgiveness application on the grounds that it "exceeds the maximum allowable number of employees and the SBA small business size standards."

66.     The SBA's industry size standards are set forth in 13 C.F.R. § 121.201 and available on its website at https://www.sba.gov/document/support-table-size-standards.

67.     According to the data regarding PPP borrowers published on SBA's website ("**SBA PPP Data Table**"),[12] Crouse's industry is General Medical and Surgical Hospitals (NAICS Code 622110).  An organization in this industry must have $47 million or less in annual receipts to qualify under the SBA's industry size standard.  13 C.F.R. § 121.201.  There is no industry employee size standard for General Medical and Surgical Hospitals.

68.     The SBA has granted PPP loan forgiveness applications of numerous nonprofits in the General Medical and Surgical Hospitals industry that have over 500 employees.  For example, based on the SBA PPP Data Table, the following organizations have received PPP loan forgiveness:

   a.   **Erie County Medical Center Corporation** (Buffalo, NY) – ECMC is a nonprofit that applied for and, on June 9, 2020, received a $10 million PPP Loan under the alternative size standard.  ECMC's industry is General Medical and Surgical Hospitals (NAICS Code 622110).  According to publicly available information, including ECMC's 2020 Annual Report, ECMC has 3,881 employees and total operating revenue in excess of $638 million.  On July 23, 2021, the entire amount of ECMC's PPP loan (plus interest) was forgiven.

---

[12] The applicable SBA PPP Data Table is available at https://data.sba.gov/dataset/ppp-foia (file name "public_150k_plus_230101.csv") (last visited Mar. 26, 2023).

c. **Eastern Niagara Hospital** ("**ENH**") (Lockwood, NY) – ENH is a nonprofit that applied for and, on June 24, 2020, received a $5,853,436 PPP Loan.  ENH's industry is General Medical and Surgical Hospitals (NAICS Code 622110).  According to publicly-available information, including ENH's 2019 Form 990, ENH employed 790 employees in 2019 and had total revenue in excess of $55 million.  Notably, at the time ENH applied for and received the PPP Loan, ENH was a debtor under Chapter 11 of the United States Bankruptcy Code (Case No. 19-12342-CLB (Bankr. W.D.N.Y.)).  ENH's bankruptcy was dismissed on June 24, 2020 "to allow ENH to obtain a forgivable [PPP loan]."[13]  EHN filed for bankruptcy again on July 8, 2020, Case No. 20-10903-MJK (W.D.N.Y.).  On August 2, 2021, the entire amount of its loan (plus interest) was forgiven, notwithstanding an SBA rule prohibiting debtors in bankruptcy from being eligible for a PPP loan.[14]

d. **Brooks-TLC Hospital System, Inc.** ("**Brooks-TLC**") (Dunkirk, NY) – Brooks-TLC is a nonprofit that applied for and, on April 27, 2020, received a $4,080,721 PPP Loan.  Brooks-TLC's industry is General Medical and Surgical Hospitals (NAICS Code 622110).  According to publicly-available information, including Brooks-TLC's 2019 Form 990, Brooks-TLC employed 688 employees and had

---

[13] Decl. of Anne E. McCaffrey in Support of Chapter 11 Petition and First Day Motions, Case No. 20-10903, ECF 5, ¶ 13.

[14] The SBA Interim Final Rule issued on April 28, 2020 states, "[i]f the applicant or the owner of the applicant is the debtor in a bankruptcy proceeding, either at the time it submits the application or at any time before the loan is disbursed, the applicant is ineligible to receive a PPP loan." 85 FR 23450, 23451; *see also* SBA Interim Final Rule issued Jan. 12, 2021, 86 FR 3692, 3698.

total revenue in excess of $62 million.  On August 9, 2021, the entire amount of Brooks-TLC's PPP loan (plus interest) was forgiven.

e. **Carthage Area Hospital** ("**CAH**") (Carthage, NY) – CAH is a nonprofit that applied for and, on April 14, 2020, received a $5,448,200 PPP Loan.  CAH's industry is General Medical and Surgical Hospitals (NAICS Code 622110).  According to publicly-available information, including CAH's 2020 Form 990, CAH employed 572 employees and had total revenue in excess of $50 million.  On October 19, 2021, the entire amount of CAH's PPP loan (plus interest) was forgiven.

f. **Memorial Hospital of William F and Gertrud F Jones** ("**Memorial**") (Wellsville, NY) – Memorial is a nonprofit that applied for and, on April 16, 2020, received a $4,541,220 PPP Loan.  Memorial's industry is General Medical and Surgical Hospitals (NAICS Code 622110).  According to publicly-available information, including Memorial's 2019 Form 990, Memorial employed 511 employees in 2019 and had total revenue in excess of $50 million.  On July 22, 2021, the entire amount of Memorial's PPP loan (plus interest) was forgiven.

69.    Additionally, based on the PPP Data Table, it appears there are at least 385 nonprofits with over 500 employees received SBA loan forgiveness.

70.    Upon information and belief, none of the organizations above would have been eligible for a PPP loan under either the employee size or industry size standards; they are only eligible under the alternative size standard.

71.    These examples establish that the PPP is being administered inconsistently.  The United States Government Accountability Office ("**GAO**") flagged the risk of inconsistent

administration in its July 2021 report, criticizing the lack of policies and procedures for senior-level review of PPP loans.  *See* GAO Paycheck Protection Program, *SBA Added Program Safeguards, but Additional Actions Are Needed*, at 43, *available at* https://www.gao.gov/assets/gao-21-577.pdf (last visited Mar. 26, 2023) ("Until SBA finalizes and documents policies and procedures for conducting senior-level reviews, there could be increased risk of SBA making inconsistent or incorrect determinations in reviewing borrower eligibility and loan forgiveness applications, including potentially denying forgiveness to eligible borrowers.").

72.    The SBA does not deny that the decision to deny Crouse loan forgiveness is inconsistent with its decisions to grant loan forgiveness for similarly-situated borrowers.  Rather, the SBA argues that Crouse "has failed to provide any evidence of the circumstances surrounding the alleged forgiveness of the alleged 'similarly situated' organizations . . . ."

## CAUSES OF ACTION

### COUNT I
**(SBA Final Decision Is Not In Accordance With Law  – 5 U.S.C. § 706(2)(A); Declaratory Judgment Act, 28 U.S.C § 2201)**

73.    Plaintiff repeats and incorporates by reference each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

74.    Under the APA, a court shall "hold unlawful and set aside agency action, findings, and conclusions found to be. . . not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

75.    The SBA Final Decision is a final agency action, finding, or conclusion subject to review under the APA.

76.    The SBA Final Decision is not in accordance with law because Crouse is eligible for a PPP loan under the alternative size standard and used the PPP loan proceeds for permitted purposes under the Act.

77.    Congress was clear that PPP loans are administered pursuant to the existing SBA loan structure under Act Section 7(a).  And the Act is clear that borrowers under Section 7(a) can establish eligibility under the alternative size standard.  Act 3(a)(5).  Nothing in the Act, the CARES Act, or ARPA, or any SBA rules or guidance in effect at the time Crouse's PPP loan was approved, prohibits Crouse from establishing eligibility for a PPP loan under the alternative size standard.

78.    Therefore, the SBA Final Decision is contrary to the clear intent of Congress.  *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984) (if the intent of Congress is clear, the court must give effect to that congressional intent).

79.    For the same reasons, the SBA Final Decision is not permissible under the law. *See Chevron*, 467 U.S. at 843 (if Congress has not directly addressed the issue, the court must consider whether the agency's interpretation of the law is permissible).  Excluding Crouse from eligibility under the alternative size standard while permitting other Section 7(a) borrowers – not only small business concerns – from using that standard is arbitrary and capricious.

80.    Alternatively, to the extent the Disputed SBA Guidance is not set aside as under the APA, such guidance was issued after Crouse applied for and received the PPP loan, and cannot be applied to Crouse retroactively.  *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208–09 (1988) ("Retroactivity is not favored in the law. . . . Even where some substantial justification for retroactive rulemaking is presented, courts should be reluctant to find such authority absent an express statutory grant").

<u>COUNT II</u>
**(The SBA Final Decision Is Arbitrary, Capricious, and an Abuse of Discretion –
5 U.S.C. § 706(2)(A); Declaratory Judgment Act, 28 U.S.C § 2201)**

81.     Plaintiff repeats and incorporates by reference each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

82.     Under the APA, the court shall set aside any agency action that is arbitrary, capricious, or an abuse of discretion. 5 U.S.C. § 706(2)(A).

83.     Agency action "would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The agency "must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.*

84.     The SBA denied Crouse's application for PPP loan forgiveness on the grounds that Crouse did not meet the size standards of less than 500 employees or the industry size standard.

85.     Yet, the SBA granted the PPP loan forgiveness applications of at least five similarly-situated nonprofit organizations in New York alone in the same industry as Crouse and with over 500 employees and that did not meet the industry size standard by revenue. Like Crouse, those organizations qualified for PPP loans under the alternative size standard.

86.     The SBA has offered no reason for the disparate treatment or any explanation for why Crouse's PPP loan forgiveness application was denied while the loan forgiveness applications of similarly-situated borrowers were granted.

87.     The PPP loan program is being administered arbitrarily and inconsistently.

88.     SBA's Final Decision was arbitrary, capricious, and otherwise not in accordance with law, and in excess of DOL's statutory jurisdiction, authority, or limitations, and is therefore "unlawful and [shall be] set aside." 5 U.S.C. §§ 706(2)(A), (C).

## <u>COUNT III</u>
**(Failure to Engage in Notice and Comment Rulemaking Under 5 U.S.C. §§ 553, 706 – FAQs)**

89.     Plaintiff repeats and incorporates by reference each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

90.     A court shall set aside agency rules issued "without observance of procedure required by law . . . ." 5 U.S.C. § 706(2)(D); *see* 5 U.S.C. § 551(13) (agency action includes an agency rule).

91.     While the CARES Act dispensed of the *advanced* notice and comment requirements for the SBA regulations that Congress directed the SBA to issue within 15 days of enactment, the CARES Act did not do away with the APA's notice and comment requirements for subsequent regulations.

92.     The FAQs, including FAQ 71, constitute "rules" as defined in 5 U.S.C. § 551(4) because they are "agency statement[s] of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy . . . ."

93.     Accordingly, SBA was required to use notice and comment rulemaking to implement the FAQs.  *See* 5 U.S.C. § 553(b).  SBA failed to do so.  The SBA did not even publish the FAQs in the Federal Register, as it did with each of the IFRs.

94.     SBA has not alleged or demonstrated that the required notice and comment procedures under the APA are "impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B).

95.     Therefore, to the extent the SBA Final Decision relies on any FAQ as an agency rule, such FAQ(s), and the SBA Final Decision that relies on the FAQ(s), should be set aside.

## Count IV
### (Disputed SBA Guidance Is Arbitrary, Capricious, An Abuse of Discretion, And Not In Accordance with Law – 5 U.S.C. § 706(2)(A))

96.     Plaintiff repeats and incorporates by reference each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

97.     A court shall set aside agency rules that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); *see* 5 U.S.C. § 551(13) (agency action includes an agency rule).

98.     The Disputed SBA Guidance constitute "rules" as defined in 5 U.S.C. § 551(4) because they are "agency statement[s] of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy . . . ."

99.     The Disputed SBA Guidance is arbitrary, capricious, an abuse of discretion, and contrary to law because it prohibits nonprofits from establishing eligibility for a PPP loan under the Act's alternative size standard, in contravention of the plain language of the Act and Congress' intent that the PPP loans be administered under the same rules and procedures – such as the alternative size standard – that apply to other loans under Section 7(a) of the Act.

100.    Additionally, the Disputed SBA Guidance is arbitrary, capricious, an abuse of discretion, and contrary to law because it singles out nonprofits as prohibited from being eligible for a PPP loan under the alternative size standard, while permitting other organizations –small business concerns and electric and telephone cooperatives exempt from taxation under Code section 501(c)(12) – to use the alternative size standard, even when the CARES Act did not specifically address whether the alternative size standard could be applied to those other entities.[15]

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in its favor and grant the following relief:

A.    Declare the SBA Final Decision unlawful under Act Section 7 (a)(36) and 5 U.S.C. § 706(2)(A).

B.    Declare Crouse is eligible for PPP loan forgiveness under Act Section 7(36);

C.    Vacate and set aside the SBA Final Decision under 5 U.S.C. § 706(2)(A), and remand to the SBA for further proceedings consistent with the order;

D.    Permanently enjoin the SBA and its officers, employees, and agents from applying and enforcing the SBA Final Decision;

E.    Declare the SBA Disputed Guidance as unlawful pursuant to 5 U.S.C. § 706(2)(A), (D).

F.    Vacate and set aside the Disputed SBA Guidance pursuant to 5 U.S.C. § 706(2)(A);

---

[15] Similarly, the SBA has permitted other employers – such as farmers and business organizations – to use the revenue-based industry size standards, even though the statute does not expressly provide for eligibility under those standards.

G.      Permanently enjoin the SBA and its officers, employees, and agents from applying and enforcing the Disputed SBA Guidance;

H.      Enter such other declaratory and/or injunctive relief as Plaintiff may specifically request hereafter;

I.      Award Plaintiff its reasonable costs, litigation expenses, and attorney's fees associated with this litigation; and

J.      Award any other relief the Court deems just and proper.


Dated: May 19, 2023                         Respectfully submitted,

                                            s/ Katherine B. Kohn
                                            Katherine B. Kohn, Esq., Bar No. 704499
                                            GROOM LAW GROUP, CHARTERED
                                            1701 Pennsylvania Ave., NW
                                            Washington, DC 20006
                                            T: (202) 861-2607
                                            kkohn@groom.com
                                            *Counsel to Crouse Health Hospital, Inc.*