**UNITED STATES DISTRICT COURT OF THE
NORTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| **CROUSE HEALTH HOSPITAL, INC.**,<br>736 Irving Ave<br>Syracuse, NY 13210<br><br>    *Plaintiff,*<br><br>  **v.**<br><br>**UNITED STATES SMALL BUSINESS<br>ADMINISTRATION**, 409 3rd St., SW,<br>Washington, D.C. 20416;<br><br>   *and*<br><br>**ISABELLA CASILLAS GUZMAN**, *in her<br>official capacity as Administrator*, U.S. Small<br>Business Administration, 409 3rd St., SW,<br>Washington, D.C. 20416,<br><br>    *Defendants*. | Case No. 5:23-cv-00615 (BKS/ATB)<br><br><br>**ORAL ARGUMENT REQUESTED** |

**PLAINTIFF'S MEMORANDUM OF LAW
<u>IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT</u>**

**TABLE OF CONTENTS**

<u>Page</u>

PRELIMINARY STATEMENT ....................................................................................... 1

I.    FACTUAL BACKGROUND........................................................................................ 3

       A.    Crouse and the COVID-19 Pandemic.................................................................. 3

       B.    The CARES Act................................................................................................... 3

              1.    The SB Act and Section 7(a) Loans Pre-CARES Act. .............................. 4

              2.    The CARES Act and the PPP Expand Section 7(a)................................... 5

              3.    The subsequent amendments to the PPP.................................................... 6

       C.    SBA's Rules and Guidance Concerning the PPP ................................................ 7

              1.    The PPP IFRs.............................................................................................. 7

              2.    The PPP FAQs. ........................................................................................... 8

       D.    Crouse Obtains a PPP Loan, but is Denied Loan Forgiveness ........................... 10

              1.    Crouse receives and properly uses a $10,000,000 PPP loan..................... 10

              2.    SBA's loan forgiveness review process..................................................... 11

              3.    SBA's review of Crouse's PPP loan forgiveness application.................... 11

              4.    Crouse appeals the SBA's denial decision................................................. 12

              5.    OHA denies Crouse's appeal and reconsideration motion. ...................... 13

       E.    This Action, Procedural History, and the Expanded Record .............................. 13

              1.    The Court grants Crouse's first motion based on SBA's bad faith.......... 14

              2.    The Court grants Crouse's motion to compel due to SBA's bad
                    faith.    15

              3.    The expanded record confirms that SBA tried to cover-up
                    information concerning its treatment of similarly-situated
                    borrowers. ................................................................................................... 16

II.   LEGAL STANDARD................................................................................................... 17

III.  NONPROFIT ORGANIZATIONS ARE ELIGIBLE FOR section 7(a) PPP
      LOANS UNDER THE ALTERNATIVE SIZE STANDARD...................................... 20

       A.    The CARES Act Removed Pre-Existing Barriers for Nonprofits to Obtain
             Section 7(a) PPP Loans, but Preserved the Alternative Size Standard................ 20

              1.    Nonprofit Organizations were made eligible for PPP loans. ................... 21

              2.    The CARES Act did not eliminate the Alternative Size Standard........... 22

       B.    Nonprofit Applicants May Use the Alternative Size Standard for PPP
             Loans   24

       C.    SBA's Contrary Position is Inconsistent with the Law and Meritless................ 25

i

**TABLE OF CONTENTS**
(Continued)

**Page**

1.    PPP Loans are Section 7(a) loans, regardless of the borrower. .............. 26

2.    The CARES Act eliminated pre-existing Section 7(a) rules, for purposes of the PPP, that would have barred nonprofit organizations. ...................................................................................... 29

3.    The Alternative Size Standard is not limited to a "business concern." .............................................................................................. 30

4.    Section 7(a)(36)(D)(i) does not preclude the Alternative Size Standard. ........................................................................................... 31

IV.    THE SBA'S DENIAL DECISION WAS ARBITRARY AND CAPRICIOUS ............. 32

    A.    Crouse Identified Similarly Situated Nonprofit Borrowers ................................. 33

        1.    The five nonprofit hospitals Crouse identified in the OHA appeal. ........ 33

        2.    The OIG Borrowers are similarly situated to Crouse. ........................... 36

    B.    Similarly Situated Borrowers Received Forgiveness Without Explanation ........ 38

CONCLUSION ....................................................................................................................... 40

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ANR Storage Co. v. FERC*,
90 F.3d 1020 (D.C. Cir. 2018) ........................................................................34

*Balt. Gas & Elec. Co. v. FERC*,
954 F.3d 279 (D.C. Cir. 2020) .................................................................. *passim*

*Bowen v. Georgetown Univ. Hosp.*,
488 U.S. 204 (1988) ............................................................................28, 29, 30

*Burlington Truck Lines v. United States*,
371 U.S. 156 (1962) ........................................................................................35

*Cent. N.Y. Fair Bus. Ass'n v. Jewell*,
2015 U.S. Dist. LEXIS 38719 (N.D.N.Y. Mar. 26, 2015) ..........................17, 20

*Chevron U.S.A. Inc. v. Nat. Res. Defense Council, Inc.*,
467 U.S. 837 (1984) .................................................................................18, 29

*Colo. Interstate Gas Co. v. FERC*,
850 F.2d 769 (D.C. Cir. 1988) .......................................................................38

*Corley v. United States*,
556 U.S. 303 (2009) .................................................................................24, 25

*DACO Invs., LLC v. SBA*,
2024 U.S. Dist. LEXIS 33763 (W.D. La. Feb. 22, 2024) .................................34

*Defy Ventures, Inc. v. SBA*,
469 F. Supp. 3d 459 (D. Md. 2020) ................................................................20

*Diocese of Rochester v. SBA*,
466 F. Supp. 3d 363 (W.D.N.Y. 2020) ...................................................24, 27, 31

*DV Diamond Club of Flint, LLC v. SBA*,
459 F. Supp. 3d 943 (E.D. Mich. 2020) ...................................................20, 21, 25

*FCC v. Prometheus Radio Project*,
141 S. Ct. 1150 (2021) ...................................................................................19

*In re Gateway Radiology Consultants, P.A.*,
616 B.R. 833 (M.D. Fla. Bankr. 2020), *rev'd*, 983 F.3d 1239 (11th Cir. 2020) .............. *passim*

i

*Gorss Motels, Inc. v. Lands' End, Inc.*,
   997 F.3d 470 (2d Cir. 2021).................................................................................23

*Grayscale Invs., LLC v. SEC*,
   82 F.4th 1239 (D.C. Cir. 2023).................................................................... *passim*

*Guertin v. United States*,
   743 F.3d 382 (2d Cir. 2014)............................................................................17, 18

*INS v. Cardoza-Fonesca*,
   480 U.S. 421 (1987).............................................................................................30

*Kisor v. Wilkie*,
   588 U.S. 558 (2019).............................................................................................19

*Loper Bright Enters. v. Raimondo*,
   144 S. Ct. 2244 (2024)................................................................................18, 19, 29

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*,
   547 U.S. 71 (2006)...............................................................................................23

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983)...............................................................................................20

*NLRB v. Jam. Towing, Inc.*,
   602 F.2d 1100 (2d Cir. 1979)..............................................................................19

*NRDC v. FAA*,
   564 F.3d 549 (2d Cir. 2009).................................................................................19

*Perez v. Mortg. Bankers Ass'n*,
   575 U.S. 92 (2015)...............................................................................................18

*Pharaohs GC, Inc. v. SBA*,
   2020 U.S. Dist. LEXIS 112480 (W.D.N.Y. June 26, 2020),
   *aff'd*, 990 F.3d 217 (2d Cir. 2021)................................................................ *passim*

*SBA v. Weather King Heating & Air, Inc.*,
   648 B.R. 200 (N.D. Ohio 2023).......................................................................20, 31

*Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*,
   985 F.3d 472 (5th Cir. 2021) ..............................................................................36

*Westar Energy, Inc. v. FERC*,
   473 F.3d 1239 (D.C. Cir. 2007).........................................................32, 35, 36, 38

**Statutes**

5 U.S.C. § 706.........................................................................................18, 19, 32

15 U.S.C. § 632 ............................................................................................................... *passim*

15 U.S.C. § 636 ............................................................................................................... *passim*

CARES Act, Pub. Law 116-136, 134 Stat. 286, § 1102 ....................................................... *passim*

**Other Authorities**

13 C.F.R. § 120.100 ........................................................................................................... 4

13 C.F.R. § 120.110 ........................................................................................... 4, 9, 25, 26

13 C.F.R. § 121.105 ........................................................................................... *passim*

13 C.F.R. § 121.201 ........................................................................................... *passim*

13 C.F.R. § 134.1211 ........................................................................................................ 13

Plaintiff Crouse Health Hospital, Inc. ("Crouse") respectfully submits this Memorandum of Law in Support of its Motion for Summary Judgment. As set forth below, Crouse is entitled to summary judgment against Defendant United States Small Business Administration ("SBA") because its final agency actions against Crouse were unlawful and must be set aside.[1]

## PRELIMINARY STATEMENT

At the outset of the COVID-19 crisis, Congress stepped in to provide financial relief to struggling businesses, like Crouse, and enacted the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"). As part of the CARES Act, Congress created the Paycheck Protection Program ("PPP"), a forgivable loan program that used SBA's existing small business loan structure and made it available to more businesses, including nonprofits. PPP loans are "100 percent federally guaranteed" and, if "used to pay your employees, . . . [it] is no longer a loan." 116th Cong. Rec., Vol. 166-56, H1846 (Rep. McCarthy, R-CA). Hospitals and non-profits were top-of-mind when Congress created the PPP. *See id.* at H1836 (Rep. Hudson, R-NC) ("hospitals, and small businesses need immediate relief" to "put most of [their] employees back on the payroll using the SBA 7(a) loan program in this bill"). Crouse is one such nonprofit hospital that received a PPP loan during the height of the pandemic. It used the $10,000,000 loan to pay its doctors and nurses who provided life-saving care to patients in Central New York.

Although PPP loans were supposed to be "forgiven" when properly used, like Crouse's, to pay employee wages, SBA shockingly denied Crouse's forgiveness application, thwarting Congress' goal of helping nonprofits "to stay afloat." 116th Cong. Rec., Vol. 166-59, S2030 (Mar. 25, 2020) (Sen. Cardin, D-MD). Why? Because SBA decided that Crouse could not use an

---

[1] The Administrative Record is cited as "AR" and page numbers refer to the bolded "SBA___" number in the bottom, right of each page; the Joint Appendix of Discovery Materials (ECF No. 62-2) is cited as "JA" and page numbers refer to the PDF page number; Plaintiff's Rule 56.1 Statement of Material Undisputed Facts is cited as "SMF."

"Alternative Size Standard" to show eligibility for its loan *even though SBA expressly allowed other nonprofit borrowers to use that same standard to receive PPP loans and loan forgiveness*. Because of SBA's denial, Crouse faces financial challenges as it strains to repay the PPP loan it counted on as a "grant." SBA's double-standard was arbitrary, capricious, and unlawful.

In this matter, there is no dispute that: nonprofit organizations, in general, were eligible for PPP loans; Crouse met the net worth and net income prongs of the Alternative Size Standard; and Crouse properly used the proceeds of its PPP loan. The *only* question for the Court is whether Crouse, a nonprofit organization, was eligible for a PPP loan under the Alternative Size Standard. The answer is yes and SBA's decision was wrong.

Congress instructed SBA to "guarantee covered loans under the same terms, conditions, and processes as a loan made under" Section 7(a) "except as otherwise provided" in the CARES Act. While Congress "otherwise provided" that nonprofits could obtain PPP loans, it left intact other pre-existing Section 7(a) terms like the Alternative Size Standard, which treats "applicants for business loans under section 636(a) [i.e., section7(a)]" of the SB Act as "small business concerns" if they do not exceed certain net worth and net income thresholds. Crouse met those thresholds and accordingly relied on the Alternative Size Standard (and published SBA guidance) when it applied for, received, and used its PPP loan.

The record reveals, however, that SBA arbitrarily and capriciously applied restrictions to Crouse but not to other nonprofit organizations. In fact, SBA explicitly *granted* forgiveness to ▉ ▉ other nonprofit borrowers using the Alternative Size Standard, ▉▉▉ ▉ When Crouse confronted SBA with evidence of its disparate treatment, SBA brushed it aside without consideration and never bothered to explain why Crouse was different.

Worse, SBA repeatedly tried to hide this reality from coming to light, going as far as to deny that it happened, while advancing arguments against Crouse contrary to every position it'd taken prior.

No part of SBA's decision is sound. Its interpretation of the CARES Act is refuted by the statute's plain text, surrounding context, legislative purpose, and even by SBA's past interpretations. SBA's inexplicable, disparate treatment of Crouse is the epitome of arbitrariness and caprice. SBA created its "no nonprofits" rule after-the-fact, burying its first mention in a footnote to an SBA form that it issued months after Crouse obtained its PPP loan. SBA's decision to deny Crouse loan forgiveness, and the "rule" it is based on, are unlawful and must be set aside.

## I.  FACTUAL BACKGROUND

### A.  Crouse and the COVID-19 Pandemic

Crouse is a nonprofit, 501(c)(3) community hospital that remained open during the public health emergency caused by COVID-19 in 2020. (SMF ¶¶ 77-83, 88.) At that time, Crouse had more than 2000 employees, including doctors and nurses, whom Crouse competitively compensated as they tirelessly cared for patients at the height of the pandemic. (*See* AR3614, 3621.) Like other hospitals, Crouse faced financial challenges that were exacerbated by the pandemic—including an $18.9 million drop in operating margin. (SMF ¶ 81.) By summer 2020, Crouse sought financing to stop-gap its losses and continue to pay employees. (*See id.*, ¶¶ 84–87.)

### B.  The CARES Act

Congress adopted, and the President signed into law, the CARES Act, Public Law 116-136, on March 27, 2020. (SMF ¶ 1.) Congress established the PPP under the SB Act's existing small business loan program, Section 7(a). *See* CARES Act, Pub. Law 116-136, 134 Stat. 286, § 1102 (hereafter the "CARES Act"). Businesses could obtain a PPP loan and, if used to pay eligible expenses the loan would be completely forgiven—it would become a "grant." (SMF ¶ 2.) Congress

3

directed the SBA to administer PPP loans "under the same terms, conditions, and processes as a loan made under" Section 7(a) "except as otherwise provided" in the CARES Act. 15 U.S.C. § 636(a)(36)(B). Congress appropriated billions of dollars for SBA to make loan commitments and guarantee PPP loans. (*See* SMF ¶¶ 3-5.)

### 1. The SB Act and Section 7(a) Loans Pre-CARES Act.

Before the CARES Act, "Section 7(a) Loans" were generally available only to "small business concerns," not nonprofits. Specifically, Section 3, the SB Act's "Definitions" section, defines "small business concerns" "in general" as "one which is independently owned and operated and which is not dominant in its field of operation." 15 U.S.C. § 632(a)(1). SBA could have, and did, adopt industry-specific size standards "in addition to" the general definition in subpart (a)(1), "by which a business concern may be determined to be a small business concern for the purposes of" the SB Act. *Id.*, § 632(a)(2)(A); 13 C.F.R. §§ 120.100(d), 121.201. It also adopted rules that made "non-profit businesses" ineligible. *See* 13 C.F.R. §§ 120.110(a), 121.105(a).

Section 3(a)(5) provides another definition under the heading "Alternative Size Standard." 15 U.S.C. § 632(a)(5). There, Congress invited SBA to "establish an alternative size standard for applicants for business loans under section 636(a) [i.e., 7(a)] of this title . . . that uses maximum tangible net worth and average net income as an alternative to the use of industry standards." *Id.*, § 632(a)(5)(A)). Until SBA did so, Congress imposed an "interim" rule:

> Until the date on which the alternative size standard established under subparagraph (A) is in effect, an applicant for a business loan under section 636(a) of this title . . . may be eligible for such a loan if—
>
>> (i) the maximum tangible net worth of the applicant is not more than $15,000,000; and
>>
>> (ii) the average net income after Federal income taxes (excluding any carry-over losses) of the applicant for the 2 full fiscal years before the date of the application is not more than $5,000,000.

*Id.*, § 632(a)(5)(B) (the "Alternative Size Standard").[2]

### 2. The CARES Act and the PPP Expand Section 7(a).

Against this backdrop, the PPP was placed within Section 7(a). (SMF ¶¶ 17-33.) The PPP, however, "went beyond the traditional 7(a) eligibilities," as explained by the bill's co-sponsor, Senator Ben Cardin (D-MD). 116th Cong. Rec., Vol. 166-59, S2030. One expansion was to open Section 7(a) loans to nonprofit organizations, which Congress recognized at the time had been struggling to "stay afloat." *Id.*; *see also* 116th Cong. Rec., Vol. 166-57, S1930 (Mar. 23, 2020) (Sen. Lankford, R-OK) ("nonprofits are teetering" and "[t]his bill allows the nonprofits to be a part of this whole focus on small businesses being able to get a loan").

To achieve this, Congress adopted a definition of "nonprofit organization" for the PPP. *See* 15 U.S.C. § 636(a)(36)(A)(vii). Congress also listed nonprofit organizations among those with "[i]ncreased eligibility" for PPP loans. *Id.*, § 636(a)(36)(D)). As SBA later explained, by including "nonprofit organization[s]" in the PPP definitions in (36)(A)(vii), Congress "allow[ed] nonprofits to overcome the 13 CFR 120.110[(a)] restriction." *See* Sm. Bus. Admin., *Paycheck Protection Program Frequently Asked Questions*, FAQ 70 (publ. May 5, 2022) (hereafter "SBA FAQ").[3]

PPP loans were available to "eligible recipients," defined as "an individual or entity that is eligible to receive a covered loan." (SMF ¶ 20.) A "covered loan" was "a loan made under this paragraph during the covered period," and the "covered period" was "February 15, 2020 [to] June 30, 2021." (*Id.*, ¶ 21.) The CARES Act described "[i]ncreased eligibility for certain small businesses and organizations," including "any business concern, nonprofit organization, veterans organization, or Tribal business concern described in section [657a](b)(2)(C)," that "shall be eligible to receive a covered loan if [it] . . . employs not more than the greater of" either 500

---

[2] This was the rule in effect at all times relevant here. (*See* SMF ¶¶ 18–16.)
[3] Available at: https://www.sba.gov/document/support-faq-ppp-borrowers-lenders.

employees or "if applicable, the size standard in number of employees established by the Administration for the industry in which [it] operates." (*Id.*, ¶ 23.) The act does not state that this is an exclusive list of "eligible recipients" and the Alternative Size Standard makes "an applicant" for a Section 7(a) loan "eligible for such a loan" if the criteria are met. (*Id.*, ¶¶ 12, 24-26.)

PPP loans could be used to cover up to 8 weeks of payroll costs, employee compensation, or other defined expenses. (SMF ¶ 25.) The maximum loan amount is equal to the lesser of (1) $10,000,000 or (2) an amount derived from a formula using the "average total monthly payments by the applicant for payroll costs" during a set period. (*Id.*, ¶ 24.) If it is used for payroll and other allowable uses, the loan will be forgiven. (*See id.*, ¶ 26.) PPP loans are 100% guaranteed by SBA, without reference to borrower eligibility. (*See id.*, ¶¶ 27-28.)

In addition to extending the PPP to nonprofits, the CARES Act waived several pre-existing terms of Section 7(a) loans for purposes of PPP loans. For example, Congress "waived" SBA's rules "applicable to affiliations under section 121.103 of title 13, Code of Federal Regulations" for certain businesses, but expressly directed that those provisions "shall apply with respect to a nonprofit organization." (SMF ¶ 30.) Similarly, Congress provided that "the requirement that a small business concern is unable to obtain credit elsewhere, as defined in section 632(h) of this title, shall not apply to a covered loan." (*Id.*, ¶ 31.) Congress also waived certain fees, personal guarantee requirements, and collateral requirements. (*See* SMF ¶¶ 32-33.)

### 3. The subsequent amendments to the PPP.

The CARES Act originally only expanded eligibility to nonprofits organized as 501(c)(3) entities. (SMF ¶ 19.) To bridge the gap, Congress adopted the American Rescue Plan Act ("ARPA"), to expand PPP loan eligibility to "additional covered nonprofit entit[ies]" organized under Internal Revenue Code Section 501(c). (SMF ¶ 41.) ARPA also expanded eligibility to

6

include "a nonprofit organization [that] employs not more than 500 employees per physical location of the organization" (the "ARPA Location Rule"). (*Id.*, ¶ 42.)

Further, as part of the December 27, 2020 appropriations bill, Congress adopted the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act ("Economic Aid Act"). (SMF ¶ 34.) The Economic Aid Act appropriated additional funds to SBA for PPP loans and created "Second Draw" PPP loans.[4] (*See id.*, ¶ 36.) Congress clarified that "First Draw" PPP loans were only available to borrowers in operation on or before February 15, 2020. (*Id.*, ¶ 38.) Congress also created, or clarified, eligibility for several other types of borrowers. (*See id.*, ¶ 37.) Congress did not, however, direct that nonprofits could not use the Alternative Size Standard. (*See id.*, ¶ 39.)

### C.    SBA's Rules and Guidance Concerning the PPP

In connection with the PPP, SBA published several interim final rules ("IFR"). (SMF ¶ 44.) Additionally, SBA published guidance in the form of "Frequently Asked Questions" ("FAQs"). (SMF ¶ 45); *see also* SBA FAQ at 1.

#### 1.    The PPP IFRs.

SBA's first IFR was adopted on April 2, 2020 and published in the Federal Register on April 15, 2020 (the "First IFR"). *See* 85 FR 20811. The First IFR, in pertinent part, restated the contents of the CARES Act regarding "increased eligibility" for PPP loans. (*See* SMF ¶ 47.) It also identified four business characteristics that cause a borrower to be "ineligible even if [it] meet[s] the eligibility requirements," and referred businesses to 13 CFR § 120.110 to identify ineligible businesses other than nonprofits. (SMF ¶ 48-49.) The First IFR does not state that being "for profit" was an eligibility requirement, nor does it mention the Alternative Size Standard. (*Id.*, ¶¶ 47-53.)[5]

---

[4] Crouse's PPP loan is a "First Draw" loan; Second Draw PPP loans are not at issue here.

[5] In a separate IFR published the same day, SBA acknowledged that although "only for-profit business concerns" were eligible for Section 7(a) loans before the CARES Act, the CARES Act eliminated that for PPP loans. *See* 85 FR 20817, 20819 (Apr. 15, 2020) (the "Affiliation IFR").

No IFR states that "nonprofit organizations," defined in Section 7(a)(36)(A)(vii), could not establish eligibility for a PPP loan under the Alternative Size Standard. (SMF ¶ 63.) SBA did, however, adopt IFRs in which it decided that tax-exempt entities under section 501(c)(12) of the Internal Revenue Code were eligible for PPP loans, including under the Alternative Size Standard, though such entities are not included in the CARES Act. (*See* SMF ¶¶ 58-59.)

In January 2021, SBA published a "consolidated" IFR, combining prior IFRs into a single rule with new rules to implement the Economic Aid Act (the "Consolidated IFR"). (SMF ¶ 64.) Although SBA claimed the Consolidated IFR did not "substantively alter or affect PPP rules that were" unaffected by the Economic Aid Act, *for the first time*, SBA revised the First IFR to add that "small business concerns" could use the Alternative Size Standard. (SMF ¶¶ 65-66.)[6] The Economic Aid Act, however, does not mention the Alternative Size Standard. (*See id.*, ¶ 39.)

### 2.    The PPP FAQs.

As the PPP evolved, SBA issued FAQs to "provide timely additional guidance to address borrower and lender questions concerning the" PPP. SBA FAQ at 1. SBA invited reliance on these, stating "Borrowers and lenders may rely on the guidance provided in this document as SBA's interpretation of the [CARES Act] . . . and of the [PPP] Interim Final Rules." *Id.* SBA promised to "not challenge lender PPP actions that conform to this guidance," but also warned that FAQs do "not carry the force and effect of law independent of the statutes and regulations." *Id.* at 1 & n.1.

In FAQ 2, SBA answered whether "small business concerns (as defined in section 3 of the [SB Act]) [are] required to have 500 or fewer employees to be eligible borrowers for First Draw PPP Loans." (SMF ¶ 70.) It answered "No" and explained that "[s]mall business concerns can be eligible . . . even if they have more than 500 employees, as long as they satisfy the existing statutory

---

[6] By this time (January 2021), Crouse had already applied for, received, and used its PPP loan. (*See* SMF ¶¶ 92-94.)

and regulatory definition of a 'small business concern' under section 3 of the [SB Act]," including if it "meets the SBA employee-based or revenue-based size standard" for the business's primary industry. (*Id.*) SBA went on to explain that "a business can qualify for a First Draw PPP Loan as a small business concern if it met both tests in SBA's 'alternative size standard' as of March 27, 2020: (1) maximum tangible net worth of the business is not more than $15 million; and (2) the average net income after Federal income taxes (excluding any carry-over losses) of the business for the two full fiscal years before the date of the application is not more than $5 million." (*Id.*)

In FAQ 3, SBA answered whether "my business ha[s] to qualify as a small business concern (as defined in section 3 of the [SB Act]) in order to receive a First Draw PPP Loan." (SMF ¶ 71.) Again, SBA answered "No," explaining that "[i]n addition to small business concerns, a business is eligible for a First Draw PPP Loan if the business has 500 or fewer employees or the business meets the SBA employee-based or revenue-based size standard for the industry in which it operates." (*Id.*)[7] SBA also added that nonprofit organizations, among others, "that have 500 or fewer employees or meet the SBA employee-based size standards for the industry in which they operate" were eligible. (*Id.*) FAQ 3 does not mention the Alternative Size Standard, though elsewhere in the FAQs SBA acknowledged that other organizations, not identified in the CARES Act, could be eligible for PPP loans using the Alternative Size Standard. (*See* SMF ¶¶ 72-73.)

SBA issued two other pertinent FAQs regarding nonprofits. In FAQ 70, published May 5, 2022, SBA acknowledged that "nonprofit lenders were confused as to their eligibility" for PPP loans. (SMF ¶ 74.) SBA explained that "lenders" were typically not eligible under 13 C.F.R. § 120.110(b) and SBA had understood that the CARES Act did not change that, even for nonprofit lenders. (*See id.*) But because of confusion, the Administrator "exercis[ed] her broad discretion . .

---

[7] "Revenue-based" size standards are not included within the CARES Act. *See* 15 U.S.C. § 636(a)(36)(D)(i).

. to decline to enforce the . . . rule providing for denial of forgiveness to" ineligible 501(c)(3) nonprofit lenders. (*Id.*) In FAQ 71, published July 8, 2022, SBA decided that if a borrower obtained a loan before March 11, 2021 and "submits a forgiveness application on or after" that date, it may rely on the ARPA Location Rule. (*Id.*, ¶ 75.)

No FAQ stated that nonprofit organizations, defined in section 7(a)(36)(A)(iv), could not establish eligibility under the Alternative Size Standard. (*Id.*, ¶ 76.)

**D.     Crouse Obtains a PPP Loan, but is Denied Loan Forgiveness**

In July 2020, Crouse learned that fellow 501(c)(3) nonprofit hospital, Erie County Medical Center ("ECMC"), applied for and received a $10 million PPP loan under the Alternative Size Standard. (SMF ¶ 86.) Crouse consulted its lender, People's United Bank (now M&T Bank) ("People's") and followed in ECMC's footsteps. (SMF ¶ 87.)

**1.     Crouse receives and properly uses a $10,000,000 PPP loan.**

Crouse completed its application on August 6, 2020. (AR3615.) Crouse identified itself as a "501(c)(3) nonprofit." (SMF ¶ 88.)[8] Crouse indicated that it had more than 2,000 employees at the time of its application. (*Id.*, ¶ 88.)[9] Crouse also calculated its tangible net worth as of March 27, 2020 as negative $17,737,024 and its average net income as $1,848,063. (*Id.*, ¶ 90.) It therefore met the Alternative Size Standard criteria found in Section 3(a)(5)(B). *(Id.*, ¶ 91.) People's approved, and disbursed, a $10,000,000 PPP loan to Crouse on August 7, 2020. (*Id.*, ¶ 92.) Crouse used the loan to pay for doctors' and nurses' salaries, and employment benefits. (*Id.*, ¶¶ 93-94.) Crouse timely applied for loan forgiveness on November 23, 2021. (*Id.*, ¶ 96.)

---

[8] Crouse's lender, however, identified Crouse as a "C-Corp." (AR3619.)
[9] Crouse's NAICS code is 622110, for which there is no employee-based size standard. *See* 13 C.F.R. § 121.201.

### 2.    SBA's loan forgiveness review process.

SBA used a two-step process to review forgiveness applications: (1) automated screening for all loans and (2) manual review of certain loans that were marked in automated review with "hold" flags. (*Id.*, ¶¶ 97-98.) SBA also manually reviewed a random sample of all other loans and any loans for which SBA had received a law enforcement tip. (*Id.*, ¶ 99.) SBA's review considered the borrower's PPP loan application, forgiveness application, and any other documentation that SBA requested. (*Id.*, ¶ 100.) If hold flags could not be cleared, forgiveness was denied. (*Id.*, ¶ 101.)

### 3.    SBA's review of Crouse's PPP loan forgiveness application.

Crouse's forgiveness application was flagged because of Crouse's affiliates and routed to manual review. (*See* AR3597, AR3599.) SBA notified People's by letter dated November 26, 2021 and requested supporting information, which Crouse (through People's) provided. (*See* AR3597; AR515–3275.) SBA made several subsequent requests for information, which Crouse provided. (AR3599–3600, AR3603; *see* AR2950, AR2426–2947.)

In May 2022, SBA requested that Crouse fill out SBA Form 3511, an "Affiliation Worksheet." (SMF ¶ 107.) Crouse provided, and SBA received, the completed form on June 7, 2022, in which Crouse cited FAQ 2 and demonstrated that, as of March 27, 2020, its tangible net worth and average net income in the prior two years met the Alternative Size Standard. (*Id.*, ¶¶ 111-12.) Crouse also noted that Form 3511 stated, in a footnote, that the Alternative Size Standard "is available only to for-profit borrowers, not non-profit organizations." (AR3595; AR503 n.3.) Crouse correctly pointed out that this Form was only adopted in December 2020—after Crouse was approved for, received, and used its PPP loan. (AR3595; *see also* SMF ¶¶ 107-13.)

On July 25, 2022, SBA notified People's that Crouse's forgiveness application may be denied because Crouse had more than 500 employees. (AR3610.) SBA cited the First IFR, asserting that Crouse, as a nonprofit organization, could not use the Alternative Size Standard.

(AR3611–12). SBA further stated that the FAQs do not "carry the force and effect of law." (*Id.*) On August 4, 2022, Crouse replied that it met the Alternative Size Standard and referred (again) to FAQ 2. (*See* AR3276.) Crouse also noted that SBA made the Alternative Size Standard available to other entities in the IFRs and never stated it was inapplicable to nonprofits. (*See id.*)

On October 6, 2022, SBA denied Crouse's forgiveness application because Crouse "exceeds the maximum allowable number of employees and the SBA small business size standards" and "a Non-Profit is ineligible for the Alternative Size standard." (AR498–99.)

### 4.    Crouse appeals the SBA's denial decision.

Crouse timely appealed to SBA's Office of Hearings and Appeals ("OHA") on November 7, 2022. (AR1; AR477 n.1.) Crouse argued that it was eligible under the Alternative Size Standard, and that neither the SB Act nor the CARES Act prohibited use of the Alternative Size Standard. (*See* AR4–7.) Crouse also argued that SBA's decision was arbitrary and capricious because Crouse had identified five nonprofit hospitals that received PPP loans and loan forgiveness. (AR7–8.) Crouse attached, as evidence, IRS Form 990s for each of the five nonprofit hospitals, which showed more than 500 employees for each hospital at the relevant time. (AR9, AR29–471.)

SBA opposed, claiming the CARES Act, Section 7(a)(36)(D)(i), defined the only size standards for PPP eligibility—contrary to its position in litigations nationwide. (AR3954–55.) Further, SBA argued that a pre-CARES Act regulation (13 C.F.R. 121.105(a)(1)) defines a "business concern" as "organized for profit," so Crouse, a nonprofit, could not use the Alternative Size Standard. (AR3955–56.) Notably, SBA *did not* rely on this basis when it first denied Crouse's forgiveness application. (*See* AR498–500.) Finally, for the five nonprofit hospitals Crouse identified, SBA dismissed this as "speculative at best." (AR3958.) According to SBA, Crouse

12

"failed to provide any evidence of the circumstances surrounding the alleged forgiveness" of those five analogue hospitals, though SBA provided no evidence of its own. (*See id.*).[10]

### 5.   OHA denies Crouse's appeal and reconsideration motion.

OHA adopted the SBA's positions wholesale. (AR3961–74.) The ALJ agreed with SBA that, as an SBA employee, the ALJ was bound by SBA's interpretation of the CARES Act and PPP. (AR3972–74.) Thus, the ALJ concluded that the Alternative Size Standard was not available to nonprofit organizations, noting that a nonprofit "is not a business operating for profit." (AR3973.) The ALJ also adopted SBA's claim that Crouse's argument about similarly situated hospitals was "not supported by any evidence in the record" though it did not discuss or cite to Crouse's evidence. (AR3974.) Further, the ALJ stated that "decisions regarding appeals of other PPP loans are not binding in this matter, as they have no precedential value." (*Id.*)

Crouse sought reconsideration on January 18, 2023. (AR3975.) Crouse argued that the ALJ failed to cite any section of the CARES Act, or a rule, that barred a nonprofit from using the Alternative Size Standard, and failed to address the substantial evidence concerning the five similarly situated hospitals. (AR3982–86.) OHA denied Crouse's petition on February 16, 2023, adopting the same reasoning as its initial decision. (AR4008–11.)

### E.   This Action, Procedural History, and the Expanded Record

SBA's denial of Crouse's loan forgiveness application became SBA's final agency action on March 20, 2023. *See* 13 C.F.R. § 134.1211(c)(2). Crouse commenced this lawsuit under the APA by filing its Complaint on May 19, 2023. (ECF No. 1.) SBA filed its Answer on August 31, 2023 (ECF No. 18) and the administrative record on September 1, 2023. (ECF No. 20.)

---

[10] The Court would later conclude that SBA's resistance to disclosing such information was "bad faith" conduct to conceal "evidence that might contradict" SBA's position with respect to Crouse. (Dec. 20, 2023 Hrg. Tr. at 50:7-9.)

By Stipulation and Order entered September 25, 2023, the Court provided Crouse an opportunity to review the administrative record for completeness and accuracy and, if it desired, to file a motion for leave to obtain discovery and supplement the administrative record. (ECF No. 24.) Crouse ultimately filed such a motion and later filed a motion to compel. (ECF Nos. 27, 49.) In deciding both, the Court (Baxter, M.J.) agreed with Crouse, and found that SBA had engaged in "bad faith" conduct. (Dec. 20, 2023 Hrg. Tr. at 49:21–50:9; June 10, 2024 Hrg. Tr. at 11:3-8.)

### 1.    The Court grants Crouse's first motion based on SBA's bad faith.

Crouse moved for discovery on November 2, 2023. (ECF No. 27.) Crouse sought information concerning the SBA's decision with respect to the five nonprofit hospitals described in its OHA appeal. (*See* ECF No. 27-1 at 14–15.) Crouse argued that discovery was necessary to supplement the record before the Court because (i) SBA's position in the OHA appeal indicated that SBA considered, but withheld from the record, information concerning the five nonprofit borrowers which SBA used to rebut Crouse's arguments; and (ii) SBA's denial of Crouse's application was contrary to SBA's published PPP loan data concerning nonprofit organizations and SBA was withholding information concerning the five nonprofit borrowers. (*See id.* at 18–20.) This, Crouse argued, constituted "unusual circumstances" and bad faith. (*See id.*)

In opposition, SBA claimed the information was irrelevant and submitted the Declaration of Martin Andrews (*see* ECF No. 28-1) in which it attempted to distinguish the five nonprofit hospitals from Crouse. (*See* ECF No. 28.) In doing so, Mr. Andrews claimed, among other things, that it was "incorrect" that ECMC obtained loan forgiveness based on the Alternative Size Standard. (*See* ECF No. 28-1, ¶ 19.) This was false. ███████████████████████ ██████████████████████████████████████████. (*See* JA129.)

At oral argument on December 20, 2023, the Court concluded that "Crouse has set forth a prima facie case that the SBA has excluded from the administrative record documents that are

14

inconsistent with its decision that no hospital, no nonprofit hospital could rely on the net worth/net income alternative size standard." (Dec. 20, 2023 Hrg. Tr. at 49:16-20.) The Court found:

> [SBA] offer[ed] selective evidence trying to establish that the other nonprofits, including hospitals identified by Crouse, were not really 'comparable,' without providing Crouse or the court with documentation of whether SBA actually approved loan forgiveness for nonprofits . . . based on the [Alternative Size Standard] . . . [that] helps to demonstrate the SBA's bad faith in trying to avoid disclosure of evidence that might contradict the position it has taken.

(*Id.* at 49:21–50:9.) The Court ordered that Crouse earned discovery on (i) the five hospitals identified by Crouse in the OHA appeal; (ii) documents relied on by SBA to oppose Crouse's motion; and (iii) documents concerning other nonprofit organizations that underwent SBA's manual forgiveness review and received loan forgiveness, as referenced in a September 26, 2022 Report of the SBA Inspector General (Report No. 22-21).[11] (*See* Dec. 21, 2023 Text Minute Entry.)

SBA made a production in early 2024. (*See* SMF ¶ 164.) For borrowers referenced in the OIG Report, SBA stated that "only two" were "subject to manual review and had no employee-based size standard applicable."[12] (*Id.*, ¶ 166.) That statement, however, proved false (again). *See, infra*, Section IV.A.2. Worse, SBA refused to produce documents concerning any other nonprofit borrowers from the OIG Report. Thus, Crouse filed a motion to compel. (*See* ECF No. 49.)

### 2. The Court grants Crouse's motion to compel due to SBA's bad faith.

SBA refused to produce documents concerning nonprofit borrowers identified in the OIG Report that (i) were subject to manual forgiveness review and (ii) had more than 500 employees and did not meet any other industry-specific size standard (the "OIG Borrowers"). (*See* ECF No. 49.) SBA did so ostensibly under a new interpretation of the ARPA Location Rule, even though the OIG Borrowers (i) received loans before March 11, 2021, (ii) submitted a forgiveness

---

[11] The September 26, 2022 Report of the SBA Office of the Inspector General (hereafter "OIG Report") is available at: https://www.sba.gov/document/report-22-21-paycheck-protection-program-eligibility-nonprofit-organizations.
[12] The "two" were ████████████████████████████████████████████████

application before the ARPA Location Rule cut-off date on March 11, 2021, and (ii) received loan

forgiveness in 2021. (*See* SMF ¶¶ 169-70.) SBA argued that the OIG Borrowers

and therefore rendered any documents

about them irrelevant to this case. (*See* ECF No. 52 at 3–4.)

Crouse moved to compel production of documents concerning SBA's ████████ of

the OIG Borrowers' forgiveness applications submitted ████████████████

████████ (*See* ECF No. 49.) This information would reveal whether SBA granted these nonprofit

borrowers forgiveness based on the Alternative Size Standard, while denying it to Crouse at the

same time. (*See id.*) Such information was relevant and reflected the then-status quo when SBA

wrongly denied Crouse's application in October 2022. (*See id.* at 4–5.)

At oral argument on June 10, 2024, the Court again agreed with Crouse. Specifically, the

Court found that "SBA's continuing efforts to resist disclosure of documents that are contrary to

its litigation position, in that they may reflect reliance on the [Alternative Size Standard], are in

my view reflective of bad faith." (June 10, 2024 Hrg. Tr. at 11:3-8.) SBA was ordered to produce

documentation concerning SBA's ██████████████ forgiveness for the OIG Borrowers;

and the Court advised that all the discovery materials "should be available for [the Court's]

consideration" at summary judgment. (*See id.*; ECF No. 54.) SBA made the required production

and the parties filed a Joint Appendix containing all discovery materials. (ECF No. 62-2.)

> **3.    The expanded record confirms that SBA tried to cover-up information concerning its treatment of similarly-situated borrowers.**

SBA's productions demonstrate a consistent pattern whereby, even under manual review,

SBA approved forgiveness for nonprofit organizations that did not meet the two criteria in Section

16

7(a)(36)(D)(i)—the criteria SBA insists are the only eligibility options for nonprofits. These fell generally into two categories: (1) forgiveness ██████████████████████████████████; or (2) forgiveness ██████████████████████████████. The SBA data shows the forgiveness for the relevant nonprofit organizations break-down as follows:



(*See also* SMF ¶¶ 235-69.) SBA's records also indicate that ███████████████████ ████████████████████████████████████████ (*See* SMF ¶¶ 186, 227, 233-34, 242.) Further, SBA produced records of a "Higher Authority Review" it conducted in October 2023 in response to this litigation. (SMF ¶ 165.) In that *post hoc* review, ████████ ████████████████████████████████████████ ███████████████████████████ (*See* SMF ¶¶ 195, 204.)

## **ARGUMENT**

## II.    **LEGAL STANDARD**

The familiar Rule 56 standard applies in APA cases. *See Guertin v. United States*, 743 F.3d 382, 385 (2d Cir. 2014); *Cent. N.Y. Fair Bus. Ass'n v. Jewell*, 2015 U.S. Dist. LEXIS 38719, at *10-11 (N.D.N.Y. Mar. 26, 2015). Crouse is entitled to summary judgment, after resolving all reasonable inferences in favor of the non-movant, "'if [it] shows that there is no genuine dispute

as to any material fact and [it] is entitled to judgment as a matter of law.'" *Guertin*, 743 F.3d at 385 (quoting Fed. R. Civ. P. 56(a)).

In an APA case, the "reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. § 706. Thus, in reviewing agency action at summary judgment, the Court must "decide legal questions by applying [its] own judgment" when resolving questions of statutory interpretation. *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2261 (2024).

The Supreme Court overruled *Chevron U.S.A. Inc. v. Nat. Res. Defense Council, Inc.*, 467 U.S. 837 (1984). *See Loper Bright*, 144 S. Ct. at 2273.[13] Thus, the *Chevron* "two-step" deference framework is inapplicable here; even if the Court believes the CARES Act is ambiguous, it may not defer to SBA's interpretation, regardless whether it is a "permissible" or "reasonable" one. *Id.* at 2261. It is for "courts, not agencies, [to] decide '*all* relevant questions of law' arising on review of agency action—even those involving ambiguous laws—and [to] set aside any such action inconsistent with the law as they interpret it." *Id.* (emphasis in original, citation omitted). There is "no deferential standard for courts to employ." *Id.* Rather, it is "'the responsibility of the court to decide whether the law means what the agency says.'" *Id.* (quoting *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 109 (2015) (Scalia, J., concurring in judgment)).

In discharging this responsibility, the Court may pay "[c]areful attention to the judgment of the Executive Branch," but it must not "mechanically afford *binding* deference to agency interpretations," especially "those that have been inconsistent over time." *Id.* at 2265, 2273 (emphasis in original). And the court cannot "defer to an agency interpretation of the law simply because [the] statute is ambiguous." *Id.* at 2273. The court must employ "the traditional tools of

---

[13] This Court is, therefore, not bound by any prior decisions in which a court deferred to the SBA's interpretation of the CARES Act under *Chevron*; the Court must chart its own path. *See Loper Bright*, 144 S. Ct. at 2261.

18

statutory construction . . . to resolve statutory ambiguities" and arrive at an interpretation of the statute that "the court, after applying all relevant interpretive tools, concludes is best." *Id.* at 2266 ("if it is not the best, it is not permissible"). Such tools include, *inter alia*, the text, structure, history, and purpose of the statute, together with any Executive Branch interpretations "issued contemporaneously with the statute" that "have remained consistent over time." *Id.* at 2262; *see id.* at 2271 (statutes have "a best meaning, necessarily discernable by a court deploying its full interpretive toolkit"); *see also Kisor v. Wilkie*, 588 U.S. 558, 575 (2019).

After deciding what "the law means" under *Loper Bright*, the Court shall "hold unlawful and set aside agency action, findings and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction, authority or limitations or short of statutory right;" or "without observance of procedure required by law." 5 U.S.C. §§ 706(2)(A), (C)–(D). The "inquiry must be searching and careful." *NRDC v. FAA*, 564 F.3d 549, 555 (2d Cir. 2009) (quotation and citation omitted). Within this framework, "[i]t is a fundamental principal of administrative law that agencies must treat like cases alike." *Grayscale Invs., LLC v. SEC*, 82 F.4th 1239, 1242 (D.C. Cir. 2023); *see also NLRB v. Jam. Towing, Inc.*, 602 F.2d 1100, 1105 (2d Cir. 1979); *Balt. Gas & Elec. Co. v. FERC*, 954 F.3d 279, 286 (D.C. Cir. 2020) (this is "black letter administrative law"). "[D]issimilar treatment of evidently identical cases is the quintessence of arbitrariness and caprice." *Grayscale*, 82 F.4th at 1245 (quotation omitted). The Court must assess "whether the agency's decision was 'reasonable and reasonably explained,'" and, if not, it must be vacated. *Id.* (quoting *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021)). The Court must also set aside agency action "if the agency has relied on factors which Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the

19

agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Jewell*, 2015 U.S. Dist. LEXIS 38719, at \*12 (citing *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

### III.    NONPROFIT ORGANIZATIONS ARE ELIGIBLE FOR SECTION 7(a) PPP LOANS UNDER THE ALTERNATIVE SIZE STANDARD

The Alternative Size Standard is a part of the existing Section 7(a) loan paradigm into which Congress added the PPP. Congress did not alter, waive, or even mention the Alternative Size Standard in the CARES Act. Accordingly, Congress did not prohibit the use of the Alternative Size Standard and, instead, intended it to apply to PPP loans. Indeed, the SBA had, until now, invited nearly every other borrower to use it.

For Crouse, however, SBA changed its mind. SBA resists the text of both the CARES Act and the SB Act, it ignores or mutates its own IFRs and FAQs, and it has even abandoned its long-held interpretation that Section 7(a)(36)(D)(i), the "CARES Act's eligibility language" is "neither exhaustive nor restrictive."[14] For the first time, SBA now claims that this section *is exclusive*. SBA was right then and wrong now. As set forth below, consistent with the purpose of the CARES Act: the Alternative Size Standard is open to *any* PPP loan applicant, including nonprofits.

#### A.    The CARES Act Removed Pre-Existing Barriers for Nonprofits to Obtain Section 7(a) PPP Loans, but Preserved the Alternative Size Standard

The CARES Act labels the PPP as Section 7(a)(36) within the SB Act. *See* CARES Act, § 1102 ("Section 7(a) of the [SB Act] is amended" by "adding at the end the following: '(36)

---

[14] *SBA v. Weather King Heating & Air, Inc.*, 648 B.R. 200, 214 (N.D. Ohio 2023). SBA has similarly advocated an unrestrained interpretation of 7(a)(36)(D)(i) to nearly every other court considering the CARES Act. *See, e.g.*, *Pharaohs GC, Inc. v. SBA*, 2020 U.S. Dist. LEXIS 112480, at \*8 (W.D.N.Y. June 26, 2020), *aff'd*, 990 F.3d 217 (2d Cir. 2021); *In re Gateway Radiology Consultants, P.A.*, 616 B.R. 833, 848 (M.D. Fla. Bankr. 2020), *rev'd*, 983 F.3d 1239 (11th Cir. 2020); *DV Diamond Club of Flint, LLC v. SBA*, 459 F. Supp. 3d 943, 958 (E.D. Mich. 2020); *Defy Ventures, Inc. v. SBA*, 469 F. Supp. 3d 459, 465-66 (D. Md. 2020).

Paycheck Protection Program'"). The CARES Act then provides, within the PPP paragraph (36), as follows: "Except as otherwise provided in this paragraph, the Administrator may guarantee covered loans under the same terms, conditions, and processes as a loan made under this subsection." *Id.*, § 1102(a)(2)(36)(B). Unless "otherwise provided in" 7(a)(36), PPP loans are subject to "the same terms, conditions, and processes as" other Section 7(a) loans. *See DV Diamond*, 960 F.3d at 747 (this "constitutes a catch-all governing procedures otherwise unaffected by the mandate of the CARES Act and the PPP") (quotation omitted). Said another way, because Congress enacted the PPP "on the foundation of the SBA's 7(a) loan program," the existing Section 7(a) statutory infrastructure applies to the PPP unless Congress overrode it *in* the CARES Act. *Pharaohs*, 990 F.3d at 227; *Gateway*, 983 F.3d at 1256 (PPP not "a standalone program but was added into the existing § 7(a) program, which subjects it to existing conditions and regulations").

The traditional ineligibility of nonprofit organizations for Section 7(a) loans and the Alternative Size Standard are part of the Section 7(a) "foundation" on which the PPP was enacted. The CARES Act, however, provides two different results: suspending in all respects the former, while preserving in all respects the latter.

### 1.    Nonprofit Organizations were made eligible for PPP loans.

In the CARES Act, Congress eliminated prohibitions on nonprofits obtaining SBA business loans for purposes of PPP loans. Before that, two SBA rules precluded nonprofit organizations from participating in Section 7(a) loans. *See* 13 C.F.R. § 120.110(a); 13 C.F.R. § 121.105(a). In Section 7(a)(36)(B), Congress "otherwise provided" that "nonprofit organizations" could obtain PPP loans. *See, e.g.*, *Pharaohs*, 990 F.3d at 227 ("CARES Act expressly included nonprofit organizations—the very first type of business excluded under existing 7(a) program rules"); *DV Diamond*, 960 F.3d at 747 (it was "necessary to specify non-profits because they are [otherwise] not businesses"). Congress eliminated SBA's prior prohibitions on nonprofit

21

businesses by providing, in Section 7(a)(36)(A)(vii), a definition for "nonprofit organizations," at the time, limited it to "501(c)(3)" tax-exempt entities. CARES Act, Pub. Law 115-136, § 1102(a)(2)(36)(A)(vii). This definition sufficed to eliminate the SBA's pre-existing rules for purposes of the PPP. *See Pharaohs*, 960 F.3d at 227 (citing "§ 636(a)(36)(A)(vii)"); SBA FAQ at 30–31 (FAQ 70) ("CARES Act specifically authorized nonprofit organizations defined at 15 U.S.C. § 636(a)(36)(A)(vii) to be eligible for PPP loans"). This was the "sole exception to the adoption of 7(a)'s [prior] eligibility restrictions," *Pharaohs*, 990 F.3d at 224, and thus, the SBA's rules that would bar nonprofits from obtaining PPP loans are inapplicable.

### 2.    The CARES Act did not eliminate the Alternative Size Standard.

Unlike other traditional Section 7(a) terms, the CARES Act made no change to the Alternative Size Standard. There simply is *no* provision in the CARES Act that "otherwise provided" that the Alternative Size Standard was inapplicable to PPP loans, or any subset of PPP borrowers. Where Congress "did not similarly clarify its intent" to suspend the Alternative Size Standard, "[t]his strongly suggests that Congress deliberately chose not to" suspend it for the PPP. *Pharaohs*, 990 F.3d at 227; *see also Gateway*, 983 F.3d at 1257 ("Congress knew how to suspend or render inapplicable to PPP loans the traditional § 7(a) requirements"). The text of both the Alternative Size Standard and the CARES Act confirms this.

The Alternative Size Standard set forth in Section 3(a)(5) of the SB Act states:

> (A) In general,
> The Administrator shall establish an alternative size standard for applicants for business loans under section 636(a) of this title . . . as an alternative to the use of industry standards.
>
> (B) Interim rule.
> . . . [A]n applicant for a business loan under section 636(a) of this title . . . may be eligible for such a loan if—
>
> > (i) the maximum tangible net worth of the applicant is not more than $15,000,000; and

22

> (ii) the average net income after Federal income taxes (excluding any carry-over losses) of the applicant for the 2 full fiscal years before the date of the application is not more than $5,000,000.

15 U.S.C. § 632(a)(5). This makes "eligible for [a Section 7(a)] loan" "an applicant for a business loan" under that section. *See id.*

The CARES Act uses substantially identical language. For example, an "eligible recipient" is defined as an "entity that is *eligible to receive* a covered loan," where a "covered loan" is merely "a loan made under this paragraph." CARES Act, §§ 1102(a)(2)(36)(A)(ii), (iv) (emphasis added). That is, an "eligible recipient" is an "entity that is eligible to receive a [Section 7(a)(36)] loan." *Id.* at § 1102(a)(2)(36)(iv). This closely mirrors the Alternative Size Standard. *See* 15 U.S.C. § 632(a)(5)(B). Similarly, the CARES Act refers to "the applicant" or "an applicant" for a PPP loan—not unlike the reference in the Alternative Size Standard to "an applicant for a business loan." *See* CARES Act, § 1102(a)(2)(36)(E). The parallels between the statutory language support the conclusion that Congress intended the Alternative Size Standard to be available for "applicants" to become "eligible recipients" of PPP loans. *See, e.g.*, *Gorss Motels, Inc. v. Lands' End, Inc.*, 997 F.3d 470, 478 (2d Cir. 2021) ("when Congress uses the same words in two different portions of the same statute, we presume that they have the same meaning in both") (citing *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 86 (2006)).

Further, where Congress intended to "otherwise provide," it said so. The CARES Act contains several explicit waivers of pre-existing Section 7(a) requirements, including those rooted in Section 3 of the SB Act where the Alternative Size Standard is located. (*See* SMF ¶¶ 29-30.) Notably, Congress waived "the requirement that a small business concern is unable to obtain credit elsewhere, as defined in section 632(h) of this title." (SMF ¶ 31.) Section 632(h) defines "credit elsewhere" just a few paragraphs after the Alternative Size Standard in the SB Act's definitions section. *See* 15 U.S.C § 632(h). Surely if Congress intended to alter the Alternative Size Standard,

23

contained in the same section of the statute in which Congress did waive a related concept, it would say so. *Gateway*, 983 F.3d at 1257. That Congress had no intent to affect the Alternative Size Standard is only fortified by its silence while explicitly waiving other Section 7(a) rules. *See id.*

### B.    Nonprofit Applicants May Use the Alternative Size Standard for PPP Loans

As shown in Section III.A, the CARES Act and the Alternative Size Standard provide a simple formula when read together: a PPP loan is a "business loan under section [7(a)]," "an applicant" for a PPP loan is "eligible for such a loan" if it meets the Alternative Size Standard criteria, and, because the CARES Act eliminates barriers to nonprofit organizations obtaining PPP loans, nonprofits may be eligible for PPP loans under the Alternative Size Standard. This construction is sound for several reasons.

First, no provision of the CARES Act contradicts, or is rendered meaningless by, this construction. Courts try hard to interpret statutes "so that effect is given to all its provisions, so that no part will be inoperative or superfluous." *Corley v. United States*, 556 U.S. 303, 314 (2009) (quotation omitted). But the Court need not work too hard here. The CARES Act, as SBA has long advanced, does not establish exclusive eligibility requirements that foreclose all others, like the Alternative Size Standard. *See Diocese of Rochester v. SBA*, 466 F. Supp. 3d 363, 375 (W.D.N.Y. 2020) (Section 7(a)(36)(D)(i) "is properly understood not as setting forth the exclusive criteria for participation in the PPP"). The Alternative Size Standard is simply *an* "*alternative*," a word that ordinarily means "offering or expressing a choice." MERRIAM-WEBSTER DICTIONARY, "Alternative" (Online Ed. 2024).[15] Thus, nonprofits have several options to qualify for a PPP loan: (1) 500 of fewer employees, (36)(D)(i)(I); (2) an SBA employee-based industry size standard,

---

[15] SBA has long understood the Alternative Size Standard as simply one "option" among several. *See* SBA, Information Notice 5000-1175 at 2 ("applicants can utilize the new statutory alternative size standard (*or* the industry-based size standard set forth in 13 CFR 121.201)") (emphasis added).

(36)(D)(i)(II); (3) the ARPA Location Rule, (36)(D)(iii)(III); or (4) the Alternative Size Standard. Nothing "inoperative or superfluous" results. *Corley*, 556 U.S. at 314 (quotation omitted).[16]

Second, the text of the Alternative Size Standard is also consistent. Indeed, it is agnostic as to who or what the "applicant" is and does not require that the applicant be a "business concern" or "organized for profit." 15 U.S.C. § 632(a)(5)(B). An "applicant" need only meet the monetary thresholds; profit, or *no* profit, is irrelevant. *See id.*

Third, this construction does not yield absurd results for other Section 7(a) loans. A nonprofit organization that seeks a non-PPP, Section 7(a) loan will be rejected, even if the Alternative Size Standard is met, because *but for* the CARES Act, a nonprofit business is ineligible for SBA loans. *See* 13 C.F.R. §§120.110(a), 121.105(a). It is *only* because the CARES Act eliminates those barriers for the PPP that nonprofits may use the Alternative Size Standard. *See* CARES Act, § 1102(a)(2)(36)(A)(vii); *Pharaohs*, 990 F.3d at 227. Non-PPP loans are unaffected.

Finally, this construction aligns with the purpose of the PPP: "to protect the employment and livelihood of employees" within various entities. *DV Diamond*, 960 F.3d at 747; 116th Cong. Rec., Vol. 166-59 at S2030 ("we are also allowing nonprofits to be able to get into this program so that they will also be able to stay afloat.").

The text, structure, and purpose of the CARES Act confirm that nonprofit organizations may use the Alternative Size Standard to establish eligibility for a PPP loan.

## C.    SBA's Contrary Position is Inconsistent with the Law and Meritless

SBA resists the idea that a nonprofit organization can use the Alternative Size Standard to establish eligibility for the PPP loan. SBA claims that "the plain language of the CARES Act provides only two options for nonprofit organizations," citing Section 7(a)(36)(D)(i), and that 13

---

[16] Thus, SBA is wrong that Congress had "scant reason to define specific employee size criteria . . . for nonprofits in § 636(a)(36)(D)(i) if" nonprofits "could bypass th[em]" with the Alternative Size Standard. (ECF No. 28 at 16.)

C.F.R. 121.105(a) defines business concerns as "organized for profit," which "does not include non-profit organizations and, per 13 C.F.R. 120.110(a) non-profit organizations are not eligible under SBA's 7(a) (non-PPP) loan program." (AR3955.) This theory rests on three flawed premises: (1) that, for nonprofit organizations *only*, PPP loans are not part of the broader Section 7(a) loan program; (2) that Congress, through the CARES Act, did not override SBA's regulations in Sections 120.110(a) and 121.105(a) with respect to PPP loans; and (3) that Section 7(a)(36)(D)(i) is exclusive. Each of these premises crumbles under minimal scrutiny.

### 1. PPP Loans are Section 7(a) loans, regardless of the borrower.

The CARES Act does not treat nonprofits as second-class citizens. Nothing in the text or structure of the CARES Act indicates that Congress intended to preserve pre-existing Section 7(a) terms for some borrowers, but not for nonprofit organizations. And the legislative history and SBA's prior interpretations of the PPP confirm this.

Subparagraph (36)(B) mentions neither borrowers, nor nonprofits, and instead simply applies pre-existing Section 7(a) terms to the PPP unless Congress provided otherwise. That is, "covered loans" are guaranteed "under the same terms, conditions, and processes" as Section 7(a)—unless "otherwise provided." CARES Act, § 1102(a)(2)(36)(B). SBA's contrary claim that Congress intended to apply pre-existing Section 7(a) terms *differently* depending on the nature of the borrower ***without ever saying so*** is spurious: "Congress knew how to" speak to "render inapplicable . . . traditional § 7(a) requirements." *Gateway*, 983 F.3d at 1257.

In fact, Congress *did* differentiate treatment of nonprofits from other types of borrowers under pre-existing Section 7(a) terms when it wanted to. *See* CARES Act, §§ 1102(a)(2)(36)(D)(iv), (vi). Specifically, Congress suspended SBA's pre-existing affiliation rules "under section 121.103 of title 13" of the CFR, but only for three types of business concerns, *id.*, § 1102(a)(2)(36)(D)(iv), and explicitly distinguished nonprofit organizations from these other

26

borrowers: "section 121.103 of title 13, Code of Federal Regulations . . . shall apply with respect to a nonprofit organization." *Id.*, § 1102(a)(2)(36)(D)(vi). This is the *only* distinct treatment of nonprofits in the CARES Act.

SBA has claimed that Section 7(a)(36)(D)(i) "distinguished [nonprofit organizations] from 'small business concerns'" because that section states "in addition to small business concerns, any business concern, nonprofit organization, . . . shall be eligible to receive a covered loan." (AR3955 (quoting 7(a)(36)(D)(i)).) This, however, does not support SBA's broad claim that nonprofits are treated differently from other borrowers for purposes of *every* pre-existing Section 7(a) term. Instead, it is "properly understood not as setting forth the exclusive criteria for participation in the PPP, but merely as expanding the size limitations." *Diocese of Rochester*, 466 F. Supp. 3d at 375. This understanding makes good sense in context: before the PPP, small business concerns in various industries were capped at thresholds *less than* 500 employees or were subject only to revenue-based size standards. *See* 13 C.F.R. § 121.201 (e.g., subsectors 423–425, 522–813). This language merely added, for small businesses and other PPP borrowers alike, another option.

The context and legislative history of the CARES Act also refutes the SBA's position. Co-author of the bill, Senator Ben Cardin, observed: "[f]or the first time under 7(a)s, we are also allowing nonprofits to be able to get into this program so that they will be able to stay afloat . . . They are eligible." 116th Cong. Rec., Vol. 166-59 at S2030. Congress was concerned about all types of businesses that employ workers but were on the brink of sending employees home without pay. *See, e.g.*, *id.*, Vol. 166-61 at H1832 (Rep. Haaland, D-NM) (PPP would "aid small businesses and nonprofits . . . to maintain their existing workforce"). And indeed, Congress recognized small businesses as "including nonprofits" in the context of the CARES Act and PPP. *Id.*, Vol. 166-57

at S1967 (Mar. 23, 2020) (Sen. Kaine, D-VA) ("small businesses—including nonprofits, cultural, and service organizations—have significant challenges.").

Moreover, SBA's claimed distinction between "small business concerns" and the other entities listed in subparagraph (36)(D)(i) is disingenuous: SBA invokes it here in contradiction of SBA's longstanding interpretations of the CARES Act. For example, the CARES Act states "the requirement that a *small business concern* is unable to obtain credit elsewhere, as defined in section 3(h), shall not apply to a covered loan." CARES Act, § 1102(a)(2)(36)(I) (emphasis added). If SBA's claimed distinction were sincere, then none of the business concerns, nonprofit organizations, veterans organizations, or Tribal business concerns mentioned in subparagraph (36)(D)(i) benefit from this "credit elsewhere" waiver because they are not "small business concerns." (*See* AR3955.) But that has never been the case, as SBA, in the First IFR, determined that "When evaluating an applicant's eligibility lenders will not be required to apply the 'credit elsewhere test.'" 85 FR at 20816; *see also* SBA FAQ at 15 (FAQ 31) (credit elsewhere requirement suspended for all "borrowers"). SBA's current interpretation cannot be squared with its prior interpretation; it is simply a "convenient litigating position" offered to deprive Crouse of loan forgiveness. *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 213 (1988).

SBA has also claimed that "nothing in the [CARES Act] specified that the 'alternative size standard' . . . is available to nonprofits." (*See* ECF No. 28 at 13.) This is untrue. Subparagraph (36)(B) preserves the Alternative Size Standard for the PPP, which includes nonprofit organizations. *See* CARES Act, § 1102(a)(2)(36)(B). SBA has consistently told courts that (36)(B) imported pre-existing Section 7(a) terms to the PPP, unless Congress said otherwise. *See, supra*, n.14. Congress has not said otherwise about the Alternative Size Standard, so it applies to the PPP.

28

That the statute suddenly stopped functioning in that way, but only for Crouse,[17] is "entirely inappropriate" and absurd. *Bowen*, 488 U.S. at 213. The CARES Act easily refutes SBA's premise that nonprofit organizations are subject to a different, unstated, standard for pre-existing Section 7(a) rules like the Alternative Size Standard.

**2.    The CARES Act eliminated pre-existing Section 7(a) rules, for purposes of the PPP, that would have barred nonprofit organizations.**

Crouse illustrated above (*see, supra*, Section III.A.1) that SBA's prior Section 7(a) rules prohibiting nonprofits from obtaining Section 7(a) loans were eliminated by Congress solely for purposes of PPP loans. *See* CARES Act, § 1102(a)(2)(36)(A)(vii). SBA's reliance on those very rules to deny Crouse eligibility is ineffective and improper. *See Pharaohs*, 990 F.3d at 227.[18]

It is also inconsistent, again, with SBA's prior interpretations of the CARES Act. First, the "credit elsewhere" waiver, as discussed above, would not apply to nonprofit organizations if the "organized for profit" rule (13 C.F.R. § 121.105(a)) applied to nonprofit organizations under the PPP. *See, supra*, Section III.C.1. Second, the Affiliation IFR expressly acknowledged that, while "only for-profit small business concerns" were eligible for Section 7(a) loans *before* the CARES Act, the CARES Act changed that and made "nonprofit organizations . . . eligible for the PPP." (SMF ¶ 55.) This is an acknowledgement that Section 121.105(a) does not apply here. Third, SBA's FAQs cast serious doubt on the force of SBA's new-found appreciation for the "organized for profit" rule. In FAQ 2, SBA advised PPP borrowers that "a *business* can qualify for a First Draw PPP Loan as a small business concern if it met both tests in [the Alternative Size Standard] as of March 27, 2020," concerning "the tangible net worth of *the business*" and "the average net income . . . *of the business*." (SMF ¶ 70 (emphasis added).) In other words, a "business"—*not* a

_____

[17] *See* Section IV, *infra*.

[18] The Second Circuit construed the CARES Act this way as part of its *Chevron* step-one analysis where it found the CARES Act unambiguous. *See id.* That is binding on this Court, as *Loper Bright* only overruled *Chevron* step-two.

29

"business concern"—can use the Alternative Size Standard. SBA has long included nonprofits within the meaning of the word "business." *See, e.g.*, 13 C.F.R. § 120.110(a).[19] So, a nonprofit "business" can use the Alternative Size Standard as stated in FAQ 2.

Finally, SBA's claim that nonprofits cannot use other size standards because Section 121.105(a) defines "business concern or concern" as "organized for profit," is contradicted by SBA's practices. As discussed *infra*, SBA regularly approved forgiveness for nonprofit organizations based on SBA's revenue-based industry size standards. █████████████████ Yet those standards, codified at 13 C.F.R. § 121.201, only provide "for *a concern* and its affiliates to be considered small" (emphasis added). Section 121.105(a) defines "concern" as an entity "organized for profit." 13 C.F.R. § 121.105(a). Thus, if SBA was right, nonprofit borrowers could not use revenue-based size standards. But that has not been the case and SBA's current interpretation is simply incompatible with its past approach. *See Bowen*, 488 U.S. at 213; *cf. INS v. Cardoza-Fonesca*, 480 U.S. 421, 446 n. 30 (1987) (rejecting agency position, in part, because of "inconsistency [with] the positions the BIA has taken through the years").

### 3. The Alternative Size Standard is not limited to a "business concern."

SBA's position that Section 121.105(a) is dispositive is also circular. SBA has asserted that Section 3(a) of the SB Act "governs eligibility of 'small business concerns,' which are defined to *exclude* nonprofits." (ECF No. 28 at 13 (emphasis original).) The problem is that Section 3 is the "Definitions" section of the SB Act, with subparagraph (a) providing several different definitions for a "small business concern." *See* 15 U.S.C. §§ 632(a)(1)–(9). Under SBA's theory, a "small business concern" based on the Alternative Size Standard definition must already be a "small

---

[19] The specific reference to "nonprofits" in FAQ 3 does not suggest that SBA's generic use of "business" in FAQ 2 has a narrower meaning. FAQ 2 states how a "business" may use the Alternative Size Standard, whereas FAQ 3 explains that a borrower need not always be a small business concern. They are not mutually exclusive.

business concern." This fails basic logic and the text of the statute. Section 121.105(a) defines "business concern or concern" (13 C.F.R. § 121.105(a)), but, as noted above (*see, supra*, Section III.B), Section 3(a)(5)(B) does not use either term. To illustrate, compare Section 3(a)(2) authorizing SBA to create industry specific size standards, with 3(a)(5) creating the Alternative Size Standard—the former refers to "a business concern," whereas the latter broadly references "applicants for business loans under [Section 7(a)]." 15 U.S.C. §§ 632(a)(2), (5). They are ships in the night. Of course, had SBA *wanted* the Alternative Size Standard to include more tailored language, such as "business concern," it would have done so. *See* 15 U.S.C. § 632(a)(5)(A). Tellingly, it made no such change during the duration of the PPP.[20]

### 4.    Section 7(a)(36)(D)(i) does not preclude the Alternative Size Standard.

SBA's claim that 7(a)(36)(D)(i) is exclusive (*See* AR3955) is as new as it is baseless. SBA has never before advanced this position and ignored it in all prior IFRs and PPP guidance. In fact, SBA has proffered the opposite interpretation to the Second, Sixth, and Eleventh Circuits and to a variety of district courts, including as recently as last year. *See, supra*, n.14. SBA's position was unequivocal: "the CARES Act's eligibility language is neither exhaustive nor restrictive." *Weather King*, 648 B.R. at 214; *see also Diocese of Rochester*, 466 F. Supp. 3d at 375; *Pharaohs*, 990 F.3d at 227–28. Crouse agrees: Section 7(a)(36)(D)(i) is neither exhaustive nor restrictive, and it surely is not the "only" eligibility option. (*See* AR3955.) In practice, SBA has declined to treat Section 7(a)(36)(D)(i) as exclusive, permitting all types of borrowers to use the Alternative Size Standard for years. (*See* SMF ¶¶ 58-59, 61, 68-73, ███████████████████████

███████████████████████████████████████████

---

[20] Only *this year*, SBA published a "not retroactive," final rule that codifies a size standard based on Section 3(a)(5)(B) and uses the term "business concern." (SMF ¶ 14.) That change comes too late and confirms that SBA knew, as Crouse has shown, that the Alternative Size Standard previously did not require an "applicant" to be a "business concern."

█████████████████████████████████████████████████[21] If Section 7(a)(36)(D)(i) truly was exclusive, that would not have occurred.

Based on the foregoing, SBA's denial of Crouse's forgiveness application is contrary to law and must be vacated. *See* 5 U.S.C. § 706(2).

## IV.    THE SBA'S DENIAL DECISION WAS ARBITRARY AND CAPRICIOUS

Nonprofit organizations like Crouse could obtain PPP loans using the Alternative Size Standard. Notwithstanding this, SBA denied Crouse's forgiveness application and claimed that no nonprofit could use the Alternative Size Standard. That was untrue, as SBA had approved forgiveness for several other nonprofit organizations, each of which was similarly situated to Crouse. Worse, SBA declined to explain the disparate treatment when Crouse challenged it in the OHA appeal, instead falsely claiming that Crouse's argument was "not supported by any evidence in the record." (AR3974; *see also* AR3958.) SBA was so wedded to its arbitrary enforcement, that it even resisted discovery in bad faith in this Court, proffering misleading testimony,[22] and sought repeatedly to cover-up information showing it had singled-out Crouse for disparate treatment.

"Dissimilar treatment of evidently identical cases is the quintessence of arbitrariness and caprice." *Grayscale*, 82 F.4th at 1245 (quotation omitted). Whether applying a rule or granting an exception, the agency "must either make an exception in a similar case or point to a relevant distinction between the two cases." *Westar Energy, Inc. v. FERC*, 473 F.3d 1239, 1241 (D.C. Cir. 2007). Comparator cases need only be "similar," not identical *Grayscale*, 82 F.4th at 1251. If a party "received inconsistent treatment under the same rule" there must be a "reasonable and coherent explanation," or the decision must be vacated. *Balt. Gas & Elec.*, 954 F.3d at 286.

---

[21] SBA also disregarded the exclusivity of Section 7(a)(36)(D)(i) by allowing borrowers to use revenue-based size standards. (*See* SMF ¶¶ 71-72 ██████████████

[22] Mr. Andrews stated that it was "incorrect" that ECMC received loan forgiveness under the Alternative Size Standard (ECF No. 28-1, ¶ 19), but ████████████████████ Mr. Andrews' testimony that is "incorrect." ████████

Here, the evidence confirms that similarly situated nonprofit organizations received loan forgiveness under the Alternative Size Standard, while Crouse was denied. The record also shows that SBA granted other similar nonprofit borrowers loan forgiveness under standards not authorized by the CARES Act. Finally, the record confirms that SBA has made *no* effort to explain this, such that its decision as to Crouse must be vacated.

### A.    Crouse Identified Similarly Situated Nonprofit Borrowers

The record confirms that SBA approved loan forgiveness for nonprofit organizations at the same time as, or just prior to, denying Crouse's forgiveness application. These nonprofit organizations are similarly situated to Crouse under the "relevant regulatory factors."[23]

A borrower is eligible for forgiveness if they were eligible for a PPP loan and used the proceeds to pay for covered expenses. CARES Act, § 1106(b) (codified at 15 U.S.C. § 636m); *see also* Consolidated IFR, 86 FR at 3706; SBA Form 3508 (Forgiveness Application).[24] Therefore, the relevant regulatory factors are eligibility and proper use of loan proceeds.

### 1.    The five nonprofit hospitals Crouse identified in the OHA appeal.

Crouse identified five borrowers that, based on publicly available data, were similarly situated to Crouse. (AR7–8, AR29–471.) Specifically, Crouse submitted evidence that each borrower was a 501(c)(3) nonprofit hospital, like Crouse. (AR7–8.) Further, each hospital had more than 500 employees and, being NAICS code 622110, had no other employee-based size standard. (*See* AR7–8, AR29–471.) Crouse also demonstrated, with SBA's data (AR3990), that each hospital received loan forgiveness in 2021, when Crouse applied. (AR7–8.) Under "the relevant regulatory factors," these hospitals were similar to Crouse but treated differently.

---

[23] The "relevant regulatory factors" are those which the agency, by statute or rule, must consider in reaching a decision. *See Grayscale*, 82 F.4th at 1245.
[24] Available at: https://www.sba.gov/document/sba-form-3508-ppp-loan-forgiveness-application-instructions.

Below, SBA should have explained why Crouse received different treatment and discharged its duty to "'give a reasoned analysis to justify disparate treatment of [PPP borrowers] that seem similarly situated.'" *DACO Invs., LLC v. SBA*, 2024 U.S. Dist. LEXIS 33763, at *41–42 (W.D. La. Feb. 22, 2024) (quoting *ANR Storage Co. v. FERC*, 90 F.3d 1020, 1024 (D.C. Cir. 2018)). Instead, SBA withheld information and Crouse had to seek a Court order, which was granted because of SBA's bad faith. *See, supra*, Section I.E.1. The information SBA produced under Court order largely confirmed what Crouse knew:

| Borrower | Crouse's Evidence | SBA Production |
|---|---|---|
| Erie County Medical Center ("ECMC") | Nonprofit hospital that received $10 million loan, forgiven July 23, 2021; reported 3,881 employees in 2020. (AR7, AR50.) | Nonprofit hospital ███████ |
| Eastern Niagara Hospital ("ENH") | Nonprofit hospital that received $5.8 million loan while a bankruptcy debtor, forgiven August 2, 2021; reported 790 employees in 2019. (AR8, AR200.)<br><br>Bankruptcy debtors are ineligible for PPP loans. *See Dioceses of Rochester*, 466 F. Supp. 3d at 371–72. | Nonprofit hospital ███████ |
| Brooks-TLC Hospital System, Inc. ("Brooks") | Nonprofit hospital that received $4.08 million loan, forgiven August 9, 2021; reported 688 employees in 2019. (AR8, AR280.) | Nonprofit hospital ███████ |

| | | | |
|---|---|---|---|
| Carthage Area Hospital ("Carthage") | Nonprofit hospital that received $5.4 million loan, forgiven October 19, 2021; reported 572 employees in 2020. (AR8, AR353.) | <u>Nonprofit hospital</u> ███████████████ | |
| Memorial Hospital ("Memorial") | Nonprofit hospital that received $4.5 million loan; reported 511 employees in 2019. (AR8, AR401.) | <u>Nonprofit hospital</u> ███████████████ | |

Crouse correctly identified ECMC, ENH, and Brooks as "similar" borrowers that received loan forgiveness. SBA's records ███████████████████████████ ████████████████████ for which there is no alternative employee-based size standard. *See* 13 C.F.R. § 121.201. In the case of ECMC, █████████████ ████████████████████████████████████ ██████████████████████████████████

Further, while SBA's records ██████████████████████ ██████████████████████████████, Crouse provided IRS records to OHA (which OHA ignored) indicating otherwise. (*See* AR353, AR401.) Given that SBA failed to articulate any of this at the agency level, SBA's explanation now "comes too late." *Westar*, 473 F.3d at 1243 (rejecting explanation for disparate treatment agency offered "for the first time" during APA litigation); *Burlington Truck Lines v. United States*, 371 U.S. 156, 168–69 (1962) (rejecting "counsel's *post hoc* rationalizations for agency action").

SBA also offered another, untimely *post hoc* explanation in opposition to Crouse's discovery motion. It asserted that the five hospitals were not similar to Crouse but *not* because of any characteristic of the hospitals; rather, because some of them purportedly went through different

35

levels of SBA's forgiveness review process. (*See* ECF No. 28 at 18; ECF No. 28-1, ¶¶ 15–20.) This explanation is also "too late." *Westar*, 473 F.3d at 1243.

Worse than "too late," it is a falsehood SBA wielded to *hide* the truth from Crouse and the Court. SBA claimed "Crouse's loan was manually reviewed and had a hold code," and "[n]o other purported comparator"—i.e., none of the five hospitals—"was similarly situated in that regard." (ECF No. 28 at 18.) Not so. SBA's witness, Mr. Andrews, admitted that four of the hospitals (ECMC, Brooks, ENH, and Carthage) "underwent manual review." (ECF No. 28-1, ¶¶ 16–18, 20.) He then claimed those loans were "not flagged with any hold codes" and were part of a "random sample." (*Id.*, ¶¶ 16–18.) Again, not so. ███████████████████████

██████████████████████████████████████████████

Thus, not only are "manual review" and "hold codes" not "relevant regulatory factors" insofar as they have no bearing on the qualifications of a CARES Act borrower (*see Grayscale*, 82 F.4th at 1246; *see also Westar*, 473 F.3d at 1242–43), at least four of the hospitals indeed went through manual review, just like Crouse. That SBA was less thorough for some versus others does not make them dissimilar. *Cf. Balt. Gas & Elec.*, 954 F.3d at 286 (rejecting claim that agency can avoid explaining disparate outcomes where prior outcome was "uncontested or unreasoned"). Indeed, if that were the standard, an agency could circumvent arbitrary and capricious review by purposely being *less* thorough. *See Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*, 985 F.3d 472, 480 (5th Cir. 2021) ("agency cannot hide behind the fact-intensive nature" of adjudications to justify "irrational distinctions between like cases" otherwise it "could give free passes to its friends and hammer its enemies"). That is not the law.

### 2.    The OIG Borrowers are similarly situated to Crouse.

SBA also granted loan forgiveness to the similarly situated OIG Borrowers. Crouse only discovered this after the Court, again, found SBA had acted in bad faith. *See, supra*, Section I.E.2.

36

The records SBA was ordered to produce confirm that these borrowers were also nonprofits, with more than 500 employees, and ineligible under any other employee-based size standard:



| Borrower | SBA's Records[25] |
|---|---|
| ████ | Nonprofit ████ |
| ████ | Nonprofit ████ |
| ████ | Nonprofit ████ |
| ████ | Nonprofit ████ |
| ████ | Nonprofit ████ |
| ████ | Nonprofit ████ |

---

[25] For each NAICS Code cited, there is only a revenue-based size standard. *See* 13 C.F.R. § 121.201.

SBA's documents confirm that, in addition to the five hospitals identified by Crouse, these nonprofits are also similarly situated. They are nonprofit organizations, with more than 500 employees, and had no applicable alternative employee-based size standard. (*See* ECF No. 49 at 3; June 10, 2024 Hrg. Tr. at 9:3-6 (these borrowers "did not qualify . . . based on employee-based size standards").) The OIG Borrowers even satisfy SBA's manual review "requirement" for similarity. (SMF ¶¶ 224, 231, 240, 250, 260, 267.) And, importantly, each of them received loan forgiveness *before* SBA denied Crouse's forgiveness application. (SMF ¶¶ 121, 170.)

SBA has argued ████████████████████████████████████████████████

████████████████████████████████████████████████ (*See* ECF No. 52 at

4.) But if ever there were a *post hoc* rationalization, that is it. *See, Westar*, 473 F.3d at 1243. The

SBA adopted a new interpretation of the ARPA Location Rule ████████████████

████████████████████████████████████████████████

████████████████████████ Moreover, it is irrelevant ████████████████

████ What matters is that, at the time SBA denied Crouse's application, ████████████

████████████████████ (like Crouse)[26] and were therefore in the same position as

Crouse. *See, e.g.*, *Balt. As & Elec. Co.*, 954 F.3d at 283–84 (considering decisions "prior" to decision challenged by petitioner); *Grayscale*, 82 F.4th at 1246 (same).

### B. Similarly Situated Borrowers Received Forgiveness Without Explanation

Crouse need only identify *one* similarly situated borrower to obtain relief under the APA, *see, e.g., Westar*, 473 F.3d at 1241; *Colo. Interstate Gas Co. v. FERC*, 850 F.2d 769, 774 (D.C. Cir. 1988), and it has easily met its burden because there are ████████ similarly situated nonprofit borrowers that received loan forgiveness, while Crouse was denied. ████ received loan forgiveness

---

[26] Borrowers had to submit a forgiveness application "on or after March 11, 2021" (SMF ¶ 75), ████████

████████████████████████████████████

based on the Alternative Size Standard—the exact standard under which Crouse sought forgiveness. The others received forgiveness under circumstances SBA now claims are unauthorized, illustrating SBA's arbitrary and capricious approach to PPP loan forgiveness.

SBA purposely granted forgiveness █████████ under the Alternative Size Standard.



████████████████████████████████████████████

████████████████ In each instance, ████████████████████████

████████████████████████████████████████████

It was no accident that these ███ borrowers received forgiveness based on the Alternative

Size Standard, ████████████████████████████████████

████████████ For example, ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████ That is, SBA adopted a ████████████

████████████████████████████████████████████

██████ Elsewhere, SBA's records ████████████████████████

████████████████████████████████████████████

SBA may claim, as it did in the OHA appeal, that decisions as to other borrowers "are not binding." (AR3974.) But that is beside the point. Whether a decision is "binding" or not is no license to discriminate and engage in arbitrary and capricious decision-making. *See Balt. Gas & Elec.*, 954 F.3d at 284 ("Neither the APA nor our precedents distinguish between binding orders" "for purposes of arbitrary and capricious review"). Though ████████ these borrowers were not

directly named below,[27] the fact remains that SBA granted them forgiveness under the same standard that Crouse should have. SBA has no reasonable explanation, ██████████████ ████████████████████████████████████████████████

Separately, SBA forgave the loans of ██████████████ borrowers either under a revenue-based industry size standard or for no discernible reason. Either way, these borrowers did not meet the supposedly "exclusive" Section 7(a)(36)(D)(i) criteria. Moreover, SBA misrepresented the facts regarding these OIG Borrowers, falsely claiming, in response to a Court Order, that "only two" OIG Borrowers had "no employee-based size standard applicable to them," thus implying that the remainder had applicable employee-based size standards. (SMF ¶ 166.) But the record is otherwise: in addition to the "only two," ████████████████████████ ██████████████████████████████ no employee-based size standard exists. SBA's attempt to cover-up this information is significant because revenue-based size standards apply only to "concerns," which must be "organized for profit." 13 C.F.R. §§ 121.201, 121.105(a). Yet SBA told the Court that the "for profit" rule bars nonprofits from using a standard outside Section 7(a)(36)(D)(i). (ECF No. 28 at 13.) Apparently not; no wonder SBA vigorously resisted disclosure.

There is substantial evidence that Crouse was eligible under the Alternative Size Standard but was treated differently from similarly situated nonprofit borrowers. SBA's unexplained, contrary decision must be vacated.

## CONCLUSION[28]

For these reasons, the Court should enter summary judgment in favor of Crouse.

---

[27] They were all listed in SBA's published loan data, which Crouse submitted to OHA. (*See* AR3990.)

[28] SBA has claimed that the Appropriations Clause bars relief for Crouse. (*See* ECF No. 28 at 14–16.) This is incorrect. Setting aside that Crouse is eligible, the Appropriations Clause only bars monetary relief against the government if Congress has not appropriated funds. Here, Congress appropriated over $800 billion for "guaranteed loans" which SBA guaranteed irrespective of borrower eligibility. (SMF ¶¶ 3, 5.) The Appropriations Clause is no bar here. (*Id.*)

Dated: New York, New York
      September 20, 2024

Respectfully submitted,

**THOMPSON HINE LLP**

/s/ *Brian P. Lanciault, Jr.*
Brian P. Lanciault, Jr.
NDNY Bar No. 704585
Riccardo M. DeBari
NDNY Bar No. 704602
300 Madison Avenue, 27th Floor
New York, New York 10017
Tel.: (212) 344-5680
Fax: (212) 344-6101
Brian.Lanciault@ThompsonHine.com
Riccardo.DeBari@ThompsonHine.com

*Attorneys for Plaintiff Crouse Health Hospital, Inc.*

41