## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

**CROUSE HEALTH HOSPITAL, INC.**,
736 Irving Ave
Syracuse, NY 13210

    *Plaintiff*,

  v.

**UNITED STATES SMALL BUSINESS
ADMINISTRATION**, 409 3rd St., SW,
Washington, DC, 20416;

   *and*

**ISABELLA CASILLAS GUZMAN**, *in her
official capacity as Administrator*, U.S. Small
Business Administration, 409 3rd St.,
SW, Washington, DC, 20416

    *Defendants*.

Civil Action No.: 5:23-CV-00615
(BKS/ATB)

---

### MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
### CROSS-MOTION FOR SUMMARY JUDGMENT
### AND RESPONSE IN OPPOSITION TO
### PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

---

CARLA B. FREEDMAN
United States Attorney
Northern District of New York

By:  EMER M. STACK
Assistant United States Attorney
100 South Clinton Street
Syracuse, New York 13261

**TABLE OF CONTENTS**

Preliminary Statement.................................................................................................1

Background ..................................................................................................................4

    I.       SBA's Section 7(a) Loan Program ...............................................................4

    II.      The CARES Act and the PPP .......................................................................7

    III.    Launching the PPP and the First PPP IFR.................................................9

    IV.    The Affiliation IFR, Electric Cooperatives IFR, and Telephone Cooperatives IFR ...11

    V.      The Economic Aid Act and Consolidated IFR .........................................14

    VI.    The American Rescue Plan Act ..................................................................15

    VII.   SBA's "Frequently Asked Questions" Guidance Regarding the PPP .........................16

    VIII.  Forgiveness and SBA Review of PPP Loans.............................................19

    IX.    Crouse's PPP Loan and Proceedings before the Agency............................22

           A.     Crouse Obtains a PPP Loan From its Lender ...................................22

           B.     Crouse's Loan Forgiveness Application and Subsequent Review by SBA.....22

           C.     SBA's Final Loan Decision and Subsequent Appeals by Crouse....................23

    X.      Crouse's Claims and Proceedings in this Court.........................................25

           A.     The Purported Comparators Nonprofit Hospitals' Loans...............................26

           B.     The OIG Borrowers ...........................................................................28

                1.  The OIG Report Regarding Nonprofits' Eligibility.................................28

                2.  ARPA-Eligible OIG Borrowers.............................................................29

                3.  Additional OIG Borrowers: ██████████████████ ████████████████████.....................................29

Standard of Review ...................................................................................................30

Argument ...................................................................................................................32

    I.       SBA Reasonably Determined that Crouse Does Not Qualify for a PPP Loan............32

           A.     The Plain Language of the Statute and its Context Make Clear that Nonprofits Qualify for PPP Loans Only as Explicitly Provided by the CARES Act ........32

           B.     SBA's Consistent Interpretation of the CARES Act Reinforces that the Alternative Size Standard Does Not Apply to Nonprofits...............................35

           C.     Crouse's Remaining Arguments are Meritless ...............................................37

i

1.       SBA's Litigation Positions are Consistent ........................................37

2.       The Language of the "Credit Elsewhere" Provision is Inapposite ......37

II.      The Court Should Not Consider the Extra-Record Materials Generated in Discovery ....................................................................................................38

III.     SBA's Treatment of the Comparator Hospitals Does Not Render Crouse's Denial of PPP Loan Forgiveness Arbitrary and Capricious ........................................39

         A.       Any Mistake SBA May Have Made in Giving Other Nonprofits PPP Loan Forgiveness Distinguishes Them from Crouse and Does Not Entitle Crouse to a PPP Loan It Is Otherwise Ineligible to Receive.......................................40

         B.       Certain OIG Borrowers are Distinguishable Because They Are Eligible under the ARPA Per Location Rule..............................................................44

IV.      Remand is the Only Appropriate Remedy ....................................................46

Conclusion .............................................................................................................49

Defendants U.S. Small Business Administration ("SBA") and Isabella Casillas Guzman, in her official capacity as Administrator of the SBA (collectively, "Defendants"), cross-move for summary judgment under Federal Rule of Civil Procedure 56 and respond in opposition to the motion for summary judgment filed by Plaintiff Crouse Health Hospital, Inc. ("Crouse"), *see* Dkt. 67-1. The grounds for this motion are set forth in this memorandum of law, the accompanying Declaration of Martin Andrews ("Andrews Decl."), and the certified administrative record underlying this action.[1]

## PRELIMINARY STATEMENT

In the throes of an economic crisis induced by the coronavirus pandemic, Congress issued a mandate to the Small Business Administration ("SBA") to make hundreds of billions of dollars in Paycheck Protection Program ("PPP") loans available to certain American small businesses without delay. SBA rose to the occasion, and almost $350 billion in PPP loans were disbursed in less than two weeks. Congress also instructed SBA that PPP loans could be made available under the same terms and conditions as SBA's traditional "Section 7(a)" business loans, except insofar as Congress had by legislation directed otherwise.  15 U.S.C. § 636(a)(36)(B).

One way in which PPP loans differed from other loans under Section 7(a) was that the CARES Act specifically authorized SBA to guarantee loans to certain nonprofit entities, which

---

[1] Defendants also rely on the joint appendix of discovery materials insofar as necessary to respond to Crouse's arbitrary enforcement argument, but, as explained herein, Defendants maintain that it is neither appropriate nor necessary to consider the extra-record materials contained in the joint appendix in order for the Court to apply its requisite "narrow standard of review" and "assess only whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment" in this APA matter. *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 16 (2020) (internal quotations and citations omitted); *see also Camp v. Pitts*, 411 U.S. 138, 142 (1973) ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.").

had long been excluded by SBA regulation from receiving traditional Section 7(a) loans.  *Compare* 15 U.S.C. § 636(a)(36)(D)(i), *with* 13 C.F.R. §§ 120.110(a), 121.105(a)(1).  Although the CARES Act authorized SBA to guarantee PPP loans to nonprofit organizations, those nonprofits were eligible *only if* they "employ[ed] not more than the greater of . . . 500 employees," or "if applicable, the size standard in number of employees established by the Administration for the industry in which the . . . nonprofit organization . . . operates." *Id.* § 636(a)(36)(D)(i)(I)-(II).

Crouse is a nonprofit hospital that employs over 2,000 employees. Crouse applied for and received a $10 million PPP loan from its lender. SBA later denied forgiveness of Crouse's loan, reasoning that Crouse was statutorily ineligible for the PPP as a nonprofit organization employing over 500 employees. Crouse now contests SBA's final decision denying Crouse loan forgiveness. Crouse concedes that it did not qualify under either component of the size limitation for nonprofits set by the CARES Act itself.  Instead, it maintains—incorrectly—that it was eligible for a PPP loan under a completely separate statutory provision: the "Alternative Size Standard" found in the definition of "small business concerns."[2]  *See generally* Dkt. 67-1; *see* 15 U.S.C. § 632(a)(5). Crouse further asserts that SBA's decision on its forgiveness application was arbitrary and capricious because SBA forgave the loans of certain other nonprofit borrowers to which Crouse maintains it is similarly situated.  *See generally* Dkt. 67-1.

Crouse's APA challenge to SBA's denial of loan forgiveness fails. The statutory scheme does not permit Crouse to receive forgiveness for the PPP loan because it was not eligible to receive

---

[2] The Alternative Size Standard provides that a small business concern may be eligible for a Section 7(a) loan if "the maximum tangible net worth of the applicant is not more than $15,000,000" and "the average net income after Federal income taxes (excluding any carry-over losses) of the applicant for the 2 full fiscal years before the date of the application is not more than $5,000,000." 15 U.S.C. § 632(a)(5)(B)(i)-(ii).

that loan in the first instance. Crouse's arguments to the contrary—based on the "Alternative Size Standard"—lack merit. The Alternative Size Standard provides the definition for and, thus, is available only to an eligible "small business concern," which, by definition, is a "business entity organized *for profit*." 13 C.F.R. § 121.105(a)(1) (emphasis added). Accordingly, that standard is not available to Crouse, a nonprofit entity.

To resolve this case, the Court need look no further than the statutory scheme, SBA's longstanding regulations, and the administrative record that was actually before SBA when it denied loan forgiveness to Crouse. The statute, SBA's rules, and the administrative record (which included information and records pertaining *only* to Crouse) together provide ample support for that denial, as they demonstrate that Crouse had well over 500 employees. As such, the Court should not consider records pertaining to the so-called "comparators" that Crouse obtained in discovery, given ordinary and well-established record review principles in APA matters, which confine judicial review to the administrative record before the agency.

But even if the Court did entertain Crouse's arbitrary enforcement arguments and consider the records of the so-called comparators, Crouse's arguments still fail. The circumstances surrounding the loan forgiveness review for each of the comparators distinguish them from Crouse and provide no basis for the relief Crouse seeks. SBA explains that the comparators are not, in fact, similarly situated to Crouse, for various reasons. Some qualify for a PPP loan under the ARPA Per Location Rule,[3] a basis for eligibility unavailable to Crouse. Others may have received a loan in

---

[3] As explained herein, the American Rescue Plan Act, *see* Pub. L. No. 117-2, 135 Stat. 4 (March 11, 2021) ("ARPA") provided for increased eligibility of certain nonprofits, amending 15 U.S.C. § 636(a)(36) to allow nonprofit organizations that employ no more than 500 employees *per physical location* of the organization to be eligible for a PPP loan ("ARPA Per Location Rule"). *See* ARPA § 5001(a)(1)(B)(i) (amending 15 U.S.C. § 636(a)(36)(D)(iii)(III)(aa)).

error, which will prompt SBA to review those loans again and seek recovery of any unwarranted loans. Courts have held that benefitting from a decisional mistake, as certain of these borrowers may have done, is itself a distinguishing circumstance to justify the agency's differential treatment of seemingly similar entities—although such mistake need not be perpetuated by the agency, as Crouse would have SBA do for its benefit and in contravention of the statutory scheme.

For those reasons and the reasons outlined in more detail below, the Court should deny summary judgment to Crouse, grant summary judgment in favor of Defendants, and dismiss Crouse's claims with prejudice.

In any event, even if there were some material error in the SBA's reasoning, the proper remedy would be to remand Crouse's forgiveness application for further agency proceedings. Congress has barred injunctive relief against the SBA, and the Court should not declare Crouse entitled to full forgiveness before SBA has had an opportunity to consider the issue on remand.

## BACKGROUND

### I.       SBA's Section 7(a) Loan Program

The Small Business Act of 1958, Pub. L. No. 85–536, 72 Stat. 384, confers "extraordinarily broad powers" on SBA to provide a wide variety of technical, managerial, and financial assistance to small-business concerns. 15 U.S.C. § 631(a); *SBA v. McClellan*, 364 U.S. 446, 447 (1960). As pertinent here, Section 7(a) of the Act, 15 U.S.C. § 636(a), "empower[s]" SBA to guarantee general-purpose loans to "qualified small business concern[s]."[4]   15 U.S.C. § 636(a).   In performing this function, SBA is further empowered to "establish general policies" governing the

---

[4] Such general-purpose business loans are commonly known as "Section 7(a) loans," for the section of the Small Business Act from which they originate.

"granting and denial" of financial assistance; to "make such rules and regulations as [it] deems necessary to carry out the authority vested in [it];" and to "take any and all actions . . . [it] determines . . . are necessary or desirable in making . . . loans." *Id.* §§ 633(d)[5]; 634(b)(6), (7).

The Small Business Act also "grants the SBA broad authority to craft general criteria for establishing which entities qualify as small business concerns, as well as to make particularized size assessments." *DSE, Inc. v. United States*, 169 F.3d 21, 25 (D.C. Cir. 1999). The Act provides a general definition of a small business concern—"one which is independently owned and operated and which is not dominant in its field of operation"—but delegates to SBA the power to "specify detailed definitions or standards by which a business concern may be determined to be a small business concern." 15 U.S.C. § 632(a)(1)-(2)(A).

In 2010, Congress amended the Act's definition of "small business concerns," instructing SBA to adopt an "[a]lternative size standard" that uses "maximum tangible net worth and average net income as an alternative" to SBA's industry-specific size standards, which are usually stated in terms of the aggregate number of employes or average annual receipts of the applicant and its affiliates. *Compare Small Business Jobs Act of 2010*, Pub. L. No. 111-240*, §* 1116, 124 Stat. 2504, 2509 (codified at 15 U.S.C. § 632(a)(5)), *with* 13 C.F.R. §§ 121.101, 121.201; 121.301. At the same time, Congress also set a default alternative size standard—still in place at the time of the PPP—that provided that:

> [A]n applicant for a business loan under section 636(a) of this title . . . may be eligible for such loan if (i) the maximum tangible net worth of the applicant is not more than $15,000,000; and (ii) the average net income after Federal income taxes

---

[5] The authority under § 633(d) was originally vested in a Loan Policy Board including the SBA Administrator and the Secretaries of the Treasury and Commerce, *see id.*, but was transferred to the Administrator alone by Reorganization Plan No. 4 of 1965, *see* 5 U.S.C. App., Reorg. Plan No. 4 of 1965, §§ 11(b), 13(a), pursuant to the Reorganization Act of 1949, 5 U.S.C. § 901 *et seq.*

(excluding any carry-over losses) of the applicant for the 2 full fiscal years before the date of the application is not more than $5,000,000.

15 U.S.C. § 632(a)(5)(B) ("Alternative Size Standard").[6]

Ordinarily, to qualify for a Section 7(a) loan, an applicant must satisfy the statutory and regulatory criteria for determining what counts as an eligible small business concern. This includes, among other requirements, both SBA's size standards, *see* 15 U.S.C. § 632(a)(1), (2); 13 C.F.R. §§ 120.100(d), 121.101, 121.201, 121.301), and SBA's definition of an eligible "business concern," *see* 13 C.F.R. § 121.105.[7] SBA defines a "business concern" that is "eligible for assistance from SBA as a small business" (provided it satisfies SBA's other eligibility requirements) as one that is "*organized for profit*," has a place of business in the United States, and operates primarily in the United States or "makes a significant contribution to the U.S. economy." 13 C.F.R. § 121.105(a)(1) (emphasis added). The requirement that a business entity be "organized for profit" to be eligible for a typical Section 7(a) loan is repeated elsewhere in SBA's regulations, including in 13 C.F.R. § 120.110, which lists businesses that are ineligible for Section 7(a) loans, and in 13 C.F.R. § 120.100, which lists basic eligibility requirements for all

---

[6] The Alternative Size Standard found in 15 U.S.C. § 632(a)(5)(B)—expressed in terms of an applicant's "maximum tangible net worth" and "average net income" is not to be confused with the SBA's industry-specific size standards, which are usually stated in terms of the aggregate number of employes or average annual receipts of the applicant and its affiliates. *Compare* 15 U.S.C. § 632(a)(5)(B), *with* 13 C.F.R. §§ 121.101, 121.201; 121.301. While the Alternative Size Standard and the industry-specific size standards may provide different ways for certain eligible borrowers to qualify for an SBA loan, each one is distinct.

[7] Other typical eligibility criteria include that an applicant must be a U.S.-based operating business, 13 C.F.R. § 120.100(a), (c), demonstrate that the desired credit is not available elsewhere on reasonable terms, *see* 15 U.S.C. § 632(h); 13 C.F.R. §§ 120.100(e), 120.101, and not be among the categories of businesses that SBA has determined to be ineligible, *see* 13 C.F.R. § 120.110(a).

6

applicants for Section 7(a) loans.  *See* 13 C.F.R. §§ 120.100(b) (requiring an applicant to "[b]e organized for profit" to be eligible for an SBA business loan), 120.110(a) (stating "[n]on-profit businesses" are "ineligible"); *Pharaohs GC, Inc. v. United States Small Bus. Admin.*, 990 F.3d 217, 227 (2d Cir. 2021) (noting that nonprofits are "the very first type of business excluded under the existing 7(a) program rules").

SBA's determination that nonprofits are ineligible for traditional Section 7(a) loans dates back decades.  *See* 61 Fed. Reg. 3226, 3288 (Jan. 31, 1996) (final rule).  Indeed, the exclusion can be traced to a 1954 loan policy statement that provided, *inter alia*, that "[f]inancial assistance will not be granted" by SBA "[i]f the effect of granting of the financial assistance . . . will be inconsistent with the American System of free competitive enterprise." 13 C.F.R. § 101.4(d)(9) (1954); *see* SBA, Final Rule, 19 Fed. Reg. 5440, 5441 (Aug. 26, 1954). As SBA explains in Standard Operating Procedure ("SOP") 50-10(4)(E), Loan Processing, "Section 2(a) of the Small Business Act directs the Agency to assist businesses which preserve free, competitive enterprise. Therefore, the Agency may not make loans to charitable institutions or other non-profit enterprises." SOP 50-10(4), Loan Processing, Subpart A, Chap. 2, ¶ 8(a), at 28, *available at* https://www.sba.gov/sites/default/files/files/serv_sops_50104e_1_3.pdf.  Since its establishment, SBA has repeatedly reiterated that its "primary focus is to provide financial assistance to *for-profit* small businesses that can contribute to job growth and economic development in the United States." *See* 60 Fed. Reg. 64,356, 64,360 (Dec. 15, 1995) (proposed rule) (emphasis added).

## II.      The CARES Act and the PPP

In March 2020, Congress passed the CARES Act to provide emergency assistance to individuals, families, businesses, and other entities affected by the COVID-19 pandemic. *See* Pub. L. No. 116-136, § 1102, 134 Stat. 281, 286–94 (2020) (codified at 15 U.S.C. § 636(a)); *see also*

Business Loan Program Temporary Changes; Paycheck Protection Program, Interim Final Rule, 85 Fed. Reg. 20,811, 20,811-12 (Apr. 15, 2020) ("First PPP IFR"); *Pharaohs GC, Inc.*, 990 F.3d at 224 (summarizing the CARES Act and PPP). Among the CARES Act's measures was the PPP, which was enacted to extend relief to small businesses experiencing economic hardship because of the pandemic. *See* First PPP IFR, 85 Fed. Reg. at 20,811.

CARES Act § 1102(a)(2) temporarily expanded SBA's business-loan authority by adding a new paragraph to Section 7(a): 15 U.S.C. § 636(a)(36). Section 636(a)(36)(B) states that SBA "may guarantee [PPP] loans," issued by private lenders, "under the same terms, conditions, and processes as [other] loan[s] made under" Section 7(a) "*[e]xcept as otherwise provided*" by the CARES Act.  15 U.S.C. § 636(a)(36)(B) (emphasis added).  The statute then detailed the discrete ways in which PPP loans were to differ from other Section 7(a) loans. *Id.* § 636(a)(36)(D)-(W).

Directly relevant here, the CARES Act provided that "*in addition to small business concerns*," nonprofit organizations—defined as tax-exempt 501(c)(3) organizations—were eligible to receive PPP loans "*if*" they "employ[ed] not more than the greater of . . . 500 employees," or "if applicable, the size standard in number of employees established by the Administration for the industry in which . . . nonprofit organization . . . operates."[8] 15 U.S.C.

---

[8] The second component of the size standard for nonprofits provided by the CARES Act—"*if applicable*, the size standard in number of employees established by the Administration for the industry in which . . . nonprofit organization . . . operates," 15 U.S.C. § 636(a)(36)(D)(i)(II) (emphasis added)—is not at issue in this case because such a size standard does not apply to Crouse, given its industry. *See generally* Dkt. 1.  SBA sets small business size standards according to industries described in the North American Industry Classification System ("NAICS").  *See* 13 C.F.R. § 121.201.  Those size standards are expressed in either annual receipts or in number of employees. *See id.* Crouse's NAICS code is 622110, for General Medical and Surgical Hospitals, and is expressed only in annual receipts. *See id.*  Thus, there is no "applicable . . . size standard in number of employees established by the Administration for the industry in which" Crouse operates. 15 U.S.C. § 636(a)(36)(D)(i)(II).

8

§ 636(a)(36)(A)(vii), (D)(i)(I)-(II) (emphasis added).  The CARES Act did not reference the Alternative Size Standard—which is distinct from the CARES Act's industry-specific standard described above—in the statutory definition of "small business concerns," nor did it purport to change what counted as an eligible "small business concern" under SBA's long-standing regulations.  Rather, nonprofits were required to comply with the size standard "provided" by the CARES Act itself.  *See* 15 U.S.C. § 636(a)(36)(B).

### III.    Launching the PPP and the First PPP IFR

Congress also gave several indications in the CARES Act that it intended SBA to extend relief to American small businesses without delay. *See, e.g.*, Andrews Decl. ¶ 4. *First*, Congress initially authorized SBA to guarantee up to $349 billion in PPP loans by June 30, 2020—just three months after the CARES Act was signed into law. CARES Act § 1102(b)(1); 15 U.S.C. § 636(a)(36)(A)(ii)-(iii), (B). *Second*, to facilitate that task, Congress not only situated the PPP within SBA's pre-existing Section 7(a) infrastructure as discussed above, but it also simultaneously streamlined Section 7(a) loan-origination requirements for PPP borrowers. For example, borrower collateral and personal loan-guarantee requirements were eliminated for PPP borrowers. *See* 15 U.S.C. § 636(a)(36)(J). *Third*, Congress directed SBA to permit additional qualified lending institutions that were not already accredited Section 7(a) lenders to participate in the PPP, and mandated that all PPP lenders be given "delegated authority" to make and approve PPP loans *without* prior SBA review. *Id.* § 636(a)(36)(F)(ii)(I), (iii). *Fourth*, Congress instructed SBA to issue regulations implementing the PPP within just 15 days of the CARES Act's enactment. *See* 15 U.S.C. § 9012. One court described that 15-day directive as "warp speed for regulatory action" that "undoubtedly sprang from the felt need for quick action in light of the burgeoning economic crisis stemming from the pandemic." *In re Gateway Radiology Consultants, P.A.*, 983 F.3d 1239,

1262 (11th Cir. 2020). To make that feat of agency decision-making possible, Congress also instructed SBA to bypass APA notice-and-comment procedures for rulemaking. 15 U.S.C. § 9012 (citing 5 U.S.C. § 553(b)).

Pursuant to 15 U.S.C. § 9012 and Congress's directive, SBA (in conjunction with the Department of the Treasury) exercised emergency rulemaking authority to issue the First PPP IFR less than a week after the CARES Act's enactment on March 27, 2020, posting the rule on its website on April 2, 2020. *See Seville Indus. LLC v. U.S. Small Bus. Admin.*, No. 6:22-CV-06229, 2024 WL 697592, at *2 (W.D. La. Feb. 20, 2024). The First PPP IFR was the first of several interim final rules promulgated by the SBA to "carry out" the PPP.  *See Pharaohs GC, Inc.*, 990 F.3d at 224.

The First PPP IFR set forth borrower eligibility and application requirements for PPP loans, 85 Fed. Reg. at 20,812-15, and lenders' responsibilities under the streamlined PPP underwriting process, *id.* at 20,815-16. As relevant here, the rule stated that except for non-profits organized under Section 501(c)(3) of the Tax Code, businesses "identified in 13 CFR 120.110" are "not eligible for PPP loans[,]" *Id.* at 20,812 .  The First PPP IFR also stated that a borrower is eligible for a PPP loan if it has "500 or fewer employees whose principal place of residence is in the United States, or are a business that operates in a certain industry and meet the applicable SBA employee-based size standards for that industry," and was either a "small business concern" *or* one of the additional categories of entities listed in the CARES Act, including "nonprofit organization[s]". *Id.*

The PPP launched the day after announcement of the First PPP IFR, on April 3, 2020. *See* SBA Press Release No. 20-30, *available at* https://www.sba.gov/article/2020/apr/03/sbas-paycheck-protection-program-small-businesses-affected-coronavirus-pandemic-launches. In light

of Congress's clear intent and the needs of small businesses for immediate assistance, SBA also established a highly streamlined PPP loan-origination process based on borrower self-certifications of eligibility. *See* 85 Fed. Reg. at 20,812, 20,814–16; *see also* SBA003614-18.[9] Because borrowers' applications and supporting documentation were maintained by lenders, not sent to SBA, *see* 85 Fed. Reg. at 20,814, SBA did not (and as a practical matter could not) make independent determinations regarding borrower eligibility or compliance with program rules at the loan-origination stage.

Although the program's termination date was June 30, 2020, the demand for PPP financing was so great that the entire $349 billion authorized by Congress was exhausted in less than two weeks' time, by April 16, 2020. *Compare* CARES Act § 1102(b), *with* SBA Press Release No. 20-32, *available at* https://www.sba.gov/article/2020/apr/16/statement-secretary-mnuchin-administrator-carranza-paycheck-protection-program-economic-injury. Congress authorized another $310 billion in PPP loans on April 24, 2020. *See* Paycheck Protection Program and Health Care Enhancement Act, Pub. L. No. 116-139, § 101(a)(1), 134 Stat. 620 (2020).

IV.    **The Affiliation IFR, Electric Cooperatives IFR, and Telephone Cooperatives IFR**

Over the next three months, SBA published three additional interim final rules that further clarified that while entities that qualified as eligible business concerns could qualify for a PPP loan by virtue of being "small" under the Alternative Size Standard set out in the statutory definition of "small business concerns," nonprofits were required to comply with the size standard set out in the CARES Act.

---

[9] Citations to "SBA____" refer to the Certified Administrative Record.

*First*, on April 15, 2020—nearly *four months before* Crouse applied for its PPP loan—SBA published an additional interim final rule concerning affiliation. In the main, the Affiliation IFR supplemented the First PPP IFR by providing additional guidance regarding the application of certain affiliation rules applicable to SBA's implementation of CARES Act §§ 1102 and 1106, *see* Business Loan Program Temporary Changes; Paycheck Protection Program, Interim Final Rule, 85 Fed. Reg. 20,817 ("Affiliation IFR"), but the Affiliation IFR also reiterated that nonprofit organizations may qualify for PPP loans *only if* they met the conditions in § 636(a)(36)(D)(i)(I) or (II). In explaining how the SBA's affiliation rules affected eligibility to borrowers under the PPP, the Affiliation IFR distinguished between entities that are considered "small business[es]" under 15 U.S.C. § 632, and those that are nonprofit organizations:

> An entity generally is eligible for the PPP if it, combined with its affiliates, is a small business as defined in . . . (15 U.S.C. § 632), *or* (1) has 500 or fewer employees whose principal place of residence is in the United States or is a business that operates in a certain industry and meets applicable SBA employee-based size standards for that industry, *and* (2) is a tax-exempt nonprofit organization . . . .

*Id.* at 20,818-19 (emphasis added); *see also id.* at 20,820 (reiterating that a nonprofit's PPP eligibility turned on the size standard set out in 15 U.S.C. 636(a)(36)(D)(i)).

*Second*, on May 19, 2020—nearly *three months* before Crouse applied for a PPP loan— SBA published another IFR concerning the eligibility of electric cooperatives for a PPP loan. *See* Business Loan Program Temporary Changes; Paycheck Protection Program—Eligibility of Certain Electric Cooperatives, Interim Final Rule, 85 Fed. Reg. 29,847 ("Electric Cooperatives IFR"). The Electric Cooperatives IFR explained that "[e]xisting SBA regulations define a 'business concern' as a 'business entity organized for profit,' subject to certain limitations." *Id.* (quoting 13 C.F.R. § 121.105(a)(1)). The Electric Cooperatives IFR then recognized an "unusual" characteristic of electric cooperatives which had led to uncertainty regarding eligibility to receive

12

a PPP loan: "they may be exempt from taxation or organized under state nonprofit statutes in certain jurisdictions, while they operate as businesses." *Id.* Given that unique duality of electric cooperatives, the Electric Cooperatives IFR provided that, "for purposes of the PPP, an electric cooperative that is exempt from Federal income taxation under section 501(c)(12) of the Code also *will be considered to be 'a business entity organized for profit'* under 13 C.F.R. § 121.105(a)(1). As a result, such electric cooperatives are eligible PPP borrowers, as long as other eligibility requirements are met." *Id.* (emphasis added).

Moreover, because electric cooperatives were deemed "business entit[ies] organized for profit" for PPP purposes, electric cooperatives could qualify under the Alternative Size Standard (in addition to the employee-based size standard established in the CARES Act or SBA's employee-based size standard corresponding to its primary industry, if higher). *Id.* at 29,848-49. The Electric Cooperatives IFR specified that the Alternative Size Standard was available to electric cooperatives only because they were considered "business entit[ies] organized for profit" and could therefore qualify as "small business concern[s]" under the Alternative Size Standard for small business concerns set out in § 632(a)(5)(B). *Id.* at 29,849 n.1.

*Third*, on June 11, 2020—nearly *two months* before Crouse applied for its PPP loan—SBA published another IFR concerning the eligibility of telephone cooperatives for a PPP loan. *See* Business Loan Program Temporary Changes; Paycheck Protection Program—Eligibility of Certain Telephone Cooperatives, Interim Final Rule, 85 Fed. Reg. 35,550 ("Telephone Cooperatives IFR"). The Telephone Cooperatives IFR recognized that telephone cooperatives have the same unusual dual quality as electric cooperatives, as they "may be exempt from taxation or organized under state nonprofit statutes in certain jurisdictions, while they operate as businesses," which created "uncertainty about their eligibility to receive PPP loans." *Id.* at 35,550. Thus, using

13

the same rationale as outlined above for electric cooperatives, SBA deemed certain telephone cooperatives as "business entit[ies] organized for profit" for PPP purposes, which in turn, entitled them to be eligible under not only the employee-based size standard established in the CARES Act or SBA's employee-based size standard corresponding to its primary industry, if higher, but also under SBA's Alternative Size Standard. *Id.* at 35,552. SBA again explained that the Alternative Size Standard applied to telephone cooperatives only because they were "business ent[ities] organized for profit" and could therefore qualify as "small business concern[s]" under the Alternative Size Standard. *Id.* at 35,552 at n.1.

## V.    The Economic Aid Act and Consolidated IFR

The PPP expired on August 8, 2020. *See* Act of July 4, 2020, Pub. L. No. 116-147, 134 Stat. 660. However, the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act, (Consolidated Appropriations Act, 2021, Div. N, Title III, Pub. L. No. 116-260, 134 Stat. 1182, 1993-2052) (Dec. 27, 2020)) (the "Economic Aid Act," or "EAA"), reauthorized and extended the program to March 31, 2021, and added another $147.5 billion in loan authority. EAA § 323(a)(1). The EAA authorized SBA to guarantee so-called "second draw" PPP loans to certain businesses that obtained PPP loans under the CARES Act ("first-draw" PPP loans). *See* EAA § 311(a) (adding a new section to the Section 7(a) program: 15 U.S.C. § 636(a)(37)). The EAA's definition of "entit[ies]" eligible for second-draw PPP loans expressly excluded any type of business disqualified for SBA loans under § 120.110, other than nonprofits and faith-based businesses described in §§ 120.110(a) and (k). 15 U.S.C. § 636(a)(37)(A)(iv)(III)(aa). The Economic Aid Act also renewed SBA's authority to guarantee "first-draw" loans under CARES Act § 1102, which had expired. EAA § 323(a)(1)(B).

14

On January 14, 2021, the SBA published an IFR that consolidated 19 of its prior IFRs (including those outlined above) for ease of reference and incorporated the EAA amendments. *See* Business Loan Program Temporary Changes; Paycheck Protection Program as Amended by Economic Aid Act, Interim Final Rule, 86 Fed. Reg. 3,692 (Jan. 14, 2021) ("Consolidated IFR"). The Consolidated IFR underscored what was already clear from the statutory scheme and multiple prior IFRs: nonprofits could qualify for a PPP loan only in the two ways provided by the CARES Act, and only eligible "small business concerns"—which includes only for-profit entities—may use the Alternative Size Standard.  The Consolidated IFR underscored those facts in multiple ways:

- The Consolidated IFR explained that a borrower may be eligible if it is "[a] small business concern under the applicable revenue-based size standard established by SBA in 13 CFR 121.201 for [its] industry or under the SBA alternative size standard," or— *separately*—if it is "a tax-exempt nonprofit organization . . . and [it] employ[s] no more than the greater of 500 employees, or, if applicable, the size standard in number of employees established by SBA in 13 C.F.R. § 121.201," *id.* at 3695.

- The Consolidated IFR—like multiple IFRs before it—reiterated that only a "business concern" may use the Alternative Size Standard. *See id.* at 3,695 n.5, 3,697 n.18 & n.20.

- The Consolidated IFR reiterated that electric and telephone cooperatives may qualify not only under "the employee-based size standard established in the CARES Act" or "SBA's employee-based size standard corresponding to its primary industry, if higher," but also "both tests in SBAs 'alternative size standard'"—*only* because they had been deemed to be "business entities organized for profit" for purposes of 13 C.F.R. § 121.105(a)(1).  *See id.* at 3,696-97; *see also id.* at 3,697 n.18 & n.20.

## VI.    The American Rescue Plan Act

The American Rescue Plan Act, *see* Pub. L. No. 117-2, 135 Stat. 4 (March 11, 2021) ("ARPA") authorized SBA to guarantee first- and second-draw PPP loans to entities described in § 501(c) of the Internal Revenue Code that previously were not eligible, designated by ARPA as "additional covered nonprofit entit[ies]." ARPA § 5001(a)(1)(A), (B) (amending 15 U.S.C. § 636(a)(36)(A), (D)); *id.* § 5001(a)(2), (b)(2) (amending 15 U.S.C. § 636(a)(37)(A)(i), (iv)(II)).

15

Among other provisions, ARPA provided for increased eligibility of certain nonprofits, amending § 636(a)(36) to allow nonprofit organizations that employ no more than 500 employees *per physical location* of the organization to be eligible for a PPP loan ("ARPA Per Location Rule"). *See* ARPA § 5001(a)(1)(B)(i) (amending 15 U.S.C. § 636(a)(36)(D)(iii)(III)(aa)).

Congress ultimately authorized SBA to guarantee more than $813 billion in PPP loans and extended the termination date of the program to June 30, 2021.[10]  By June 2020, the number of PPP loans that had been approved by lenders already neared 5 million, and, by the time the program came to a close in June 2021, the number had grown to nearly 12 million. Andrews Decl. ¶ 10.

## VII.    SBA's "Frequently Asked Questions" Guidance Regarding the PPP

Throughout the period in which SBA was administering the PPP loan program, SBA published guidance entitled "Frequently Asked Questions" ("FAQs") and provided updates to the FAQs. *See* Paycheck Protection Program Loans: FAQs for Borrowers and Lenders, *available at* https://www.sba.gov/document/support-faq-ppp-borrowers-lenders. SBA stated that "[b]orrowers and lenders may rely on the guidance provided in this document as SBA's interpretation of the CARES Act and of the [PPP] Interim Final Rules," but further represented that "[t]his document does not carry the force and effect of law independent of the statutes and regulations on which it is based."  *See* FAQs at 1 n.1.  Five FAQs are relevant to the issues in this case.

---

[10] *See* Paycheck Protection Program and Health Care Enhancement Act, Pub. L. No. 116-139, 134 Stat. 620, § 101(a)(1) (adding $310 billion); Economic Aid Act, § 323(a)(1)(D) (adding $147.45 billion); American Rescue Plan Act, Pub. L. No. 117-2, 135 Stat. 4, § 5001(d)(1) (adding $7.25 billion); *see also* Extending Authority for Commitments for the PPP and Separate Amounts Authorized, Pub. L. No. 116-147, 134 Stat. 660 (extending deadline to 8/8/20); PPP Flexibility Act, Pub. L. No. 116–142, 134 Stat. 641 § 3(a) (extending deadline to 12/31/20); EAA § 343(a) (extending deadline to 3/31/21); PPP Extension Act, Pub. L. No. 117-6, 135 Stat 250, § 2(a) (extending deadline to 6/30/21)).

*First*, FAQ #2 answered whether "small business concerns (as defined in section 3 of the Small Business Act, 15 U.S.C. 632)"—meaning for-profit entities, given longstanding regulations such as § 121.105(a)—are "required to have 500 or fewer employees to be eligible borrowers for First Draw PPP Loans." *See* FAQ #2. SBA answered "[n]o," and explained that "[s]mall business concerns can be eligible . . . even if they have more than 500 employees, as long as they satisfy the existing statutory *and regulatory* definition of a 'small business concern' under section 3 of the Small Business Act, 15 U.S.C. 632." *Id* (emphasis added). SBA's FAQ #2 went on to explain that the Alternative Size Standard is available for small business concerns. *Id.*

*Second*, FAQ #3 answered whether a "business ha[s] to qualify as a small business concern (as defined in section 3 of the Small Business Act, 15 U.S.C. 632) in order to receive a First Draw PPP Loan." SBA answered "[n]o," explaining that 501(c)(3) nonprofits and other entities may receive First Draw PPP loans if they "have 500 or fewer employees or meet the SBA employee-based size standards for the industry in which they operate." *Id.*

*Third*, FAQ #34, published April 24, 2020, and later revised as it pertained to second-draw PPP loans on March 3, 2021, answered whether "agricultural producers, farmers, and ranchers" are eligible for PPP loans. *See* FAQ #34. FAQ #34 answered yes, stating that such entitles are eligible if they are businesses employing 500 or fewer employers, or the applicable revenue-based size standard under 13 C.F.R. § 121.201. *Id.* Alternatively, FAQ #34 explained that such entitles "can qualify . . . *as a small business concern* if their business meets SBA's 'alternative size standard.'" *Id.* (emphasis added).

*Fourth*, FAQ #70 answered whether "501(c)(3) nonprofit lenders are eligible for PPP loan forgiveness." *See* FAQ #70. FAQ #70 answered "[y]es, provided that the 501(c)(3) nonprofit lender has complied with all applicable PPP rules, other than 13 C.F.R. 120.110(b) as incorporated into

17

the PPP rules." *Id.* SBA explained that it "initially interpreted the CARES Act to mean that 13 CFR 120.110 was incorporated into the PPP requirements, except to the extent of any conflict with the statute," and that regulation provided that both "non-profit businesses" and "financial businesses primarily engaged in the business of lending" are ineligible for SBA business loans. *Id.* SBA further explained that "[a]lthough the CARES Act specifically authorized *nonprofit organizations defined at 15 U.S.C. § 636(a)(36)(A)(vii)* to be eligible for PPP loans, it was silent as to financial businesses/lenders." *Id.* SBA then interpreted the CARES Act's inclusion of certain nonprofits, yet silence as to financial businesses/lenders, "as allowing nonprofits to overcome the 13 CFR 120.110 restriction, but not lenders." *Id.* SBA acknowledged that 501(c)(3) nonprofit lenders were "confused as to their eligibility for a PPP loan," and determined that such nonprofit lender borrowers "reasonably relied on the CARES Act's nonprofit authority regarding their eligibility for a PPP loan." *Id.* As a result, the SBA Administrator exercised her "broad discretion" under 15 U.S.C. § 634(b)(7) to decline to enforce an IFR rule providing for denial of forgiveness to such borrowers, as long as they had complied with all applicable PPP rules. *See id.*

*Fifth*, FAQ #71 answered whether "501(c)(3) nonprofit organizations with more than 500 employees [are] eligible" for PPP loan forgiveness. *See* FAQ #71. SBA answered that, in general, "the CARES Act provided that 501(c)(3) nonprofit organizations with a total of 500 or fewer employees were eligible to receive a First Draw PPP Loan," but ARPA, enacted on March 11, 2021, had increased the size eligibility standard for nonprofits "from a total of 500 or fewer employees to no more than 500 employees per physical location of the 501(c)(3) nonprofit

18

organization." *Id.* SBA further explained that an ALJ, in an OHA initial decision,[11] had determined that the ARPA Per Location Rule applied to borrowers who received their loan before March 11, 2021, but applied for forgiveness after that date. *Id.* SBA acknowledged that "initial decisions rendered by OHA are not precedential," according to 86 Fed. Reg. 51,589.[12] *Id.* Nevertheless, the SBA Administrator again exercised her "broad discretion" to determine that a nonprofit who received a loan before March 11, 2021, but submits a forgiveness application on or after March 11, 2021, will not be ineligible for forgiveness on the basis that they have more than 500 employees in multiple physical locations, and thus could benefit from the ARPA Per Location Rule. *Id.*

## VIII.   Forgiveness and SBA Review of PPP Loans

CARES Act § 1106, as amended, allows eligible recipients of PPP loans to obtain forgiveness of their loans in whole or in part. 15 U.S.C. § 636m(b)-(d). Such forgiveness "is neither automatic nor guaranteed." *Springfield Hosp., Inc. v. Guzman*, 28 F.4th 403, 424 (2d Cir. 2022). To obtain forgiveness, an eligible borrower submits an application and supporting documentation to its lender; the lender then determines if the borrower is entitled to forgiveness under the CARES Act, and, if so, submits a request for payment to SBA. 15 U.S.C. § 636m(g); SBA, Business Loan Program Temporary Changes; Paycheck Protection Program—Revisions to Loan Forgiveness and Loan Review Procedures, Interim Final Rule, 85 Fed. Reg. 38,304, 38,306 (June 26, 2020). SBA then remits the appropriate amount to the lender—subject, however, to any SBA review of the loan. 15 U.S.C. § 636m(c)(3); 85 Fed. Reg. at 38,306.

---

[11] The Initial Decision was the *Appeal of Lawndale Christian Health Center*, Docket No. PPP-5819168004.

[12] *See also* 13 C.F.R. § 134.1211(e) ("Neither initial nor final decisions rendered by OHA under this subpart are precedential.").

The simplified underwriting process that SBA had to rely on to make the PPP function as needed, combined with the large number of first-time SBA borrowers and lenders, created a heightened risk of loans being erroneously sought by borrowers and approved by lenders. Andrews Decl. ¶ 6. To maintain the PPP's fiscal integrity, SBA implemented a system of PPP loan review, and if it determines during a review that the borrower was ineligible for its PPP loan, it directs the lender to deny the borrower's forgiveness application. *See* SBA, Business Loan Program Temporary Changes; Paycheck Protection Program-SBA Loan Review Procedures and Related Borrower and Lender Responsibilities, 85 Fed. Reg. 33,010, 33,012 (June 1, 2020)); Andrews Decl. ¶ 9.

However, SBA lacked the personnel resources to manually review, at the forgiveness stage the millions of loans for which loan forgiveness was sought. *See* Andrews Decl. ¶ 10. As a result, the SBA implemented a two-step process involving automated screening of all loans, followed by manual forgiveness review of select loans. Andrews Decl. ¶ 11.

The first step involved automated screening of all loans by a contractor to identify anomalies and attributes that could be indicative of non-compliance with some, but not all, eligibility requirements. *Id.* ¶ 12. The purpose of the automated screening process was to maximize program integrity and optimize use of SBA's limited loan-review resources by taking a risk-based approach to detect then-known and suspected patterns of widespread noncompliance, fraud, and abuse. *Id*. To prepare its analysis, the contractor gathered information from various internal and public databases, including information concerning borrower eligibility. *Id.* ¶ 15. If after the automated screening a loan was identified as potentially having an unresolved issue of ineligibility, including that the borrower may have affiliates, SBA then placed a "hold code" or "flag" on the

loan. *Id.*; *see also id.* ¶ 16 (identifying certain hold codes relevant to purported comparator borrowers).

At the second step of the process, the loans flagged during the automated screening, as well as loans selected using a statistically valid random sample of all loans, and loans for which the agency receives credible tips from law enforcement, inspectors general, whistleblowers, or the media, undergo manual forgiveness reviews. *Id.* ¶ 13. A manual forgiveness review is based on the borrower's PPP loan and forgiveness applications and supporting documentation, and if necessary, additional documentation such as financial statements, tax records, or other records requested from the borrower through the lender. *Id.* If, during the manual review, the borrower was found in fact to be ineligible, the forgiveness application was denied. *Id.* ¶ 15.

When conducting a manual review of a PPP forgiveness application, the SBA reviewer generally focuses solely on the information relevant to that borrower's PPP loan. *Id.* ¶ 18. Information pertaining to other borrowers is considered only if SBA has reason to believe that the borrowers may be affiliated, such that they should be treated as a single entity for the purpose of determining size eligibility, *see* 13 C.F.R. § 121.301(f), or that the borrowers may be majority-owned by a common parent and thus subject to the aggregate maximum loan amount for members of a single corporate group, *see* 85 Fed. Reg. 26,324-25 (May 4, 2020). *Id.* Information concerning other borrowers that is not relevant to the loan under review for eligibility for forgiveness is not considered. *Id.*

For PPP loans not flagged during automated screening or otherwise chosen for manual forgiveness review, SBA remitted the forgiveness payment in the amount requested by the lender in its forgiveness decision submitted to SBA.  That process is referred to as "auto review." *Id.* ¶ 17.

### IX.  Crouse's PPP Loan and Proceedings before the Agency

#### A.  Crouse Obtains a PPP Loan From its Lender

Crouse applied to its lender for a PPP loan of $10 million on August 6, 2020, describing itself as a "501©(3) nonprofit" with 2,212 employees. *See* SBA003614-18. Crouse's lender—in contrast to Crouse's description as a nonprofit—indicated Crouse was a "C-Corp" on the lender's application form. *See* SBA003619. Crouse, through Kevin Randall, its Chief Financial Officer, certified that Crouse "employ[ed] no more than the greater of 500 or employees or, if applicable, the size standard in number of employees established by the SBA in 13 C.F.R. § 121.201 for [Crouse's] industry."[13] SBA003615; *see also* SBA003619. That statement—that Crouse employed no more than 500 employees (and all others made on the application)—was certified as "true and accurate in all material respects," and Mr. Randall further certified his understanding that "knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law." SBA003615. Crouse's lender approved the loan on August 6, 2020, and disbursed the $10 million to Crouse. SBA000508-14.

#### B.  Crouse's Loan Forgiveness Application and Subsequent Review by SBA

Crouse completed a PPP Loan Forgiveness Application on November 23, 2021, requesting full forgiveness of the loan. *See* SBA003621-25. Crouse's loan was flagged for an in-depth manual review at the forgiveness stage, due to a hold code regarding potential affiliation and eligibility issues. *See* Andrews Decl. ¶ 24; *see also* SBA000483 (referencing "affiliation hold code flag(s)" not being cleared, and in turn, noting that the loan "will be processed as a denial"), SBA000494-96 (Internal Notes referencing hold codes on Crouse's loan).

---

[13] As discussed, Crouse had no employee-based size standard available to it, based on its industry.

22

SBA then reviewed Crouse's loan and solicited additional information about Crouse, including its affiliates, number of locations, and number of persons it employed per location. *See* SBA003599-3610. As to the number of persons employed by Crouse per location, Crouse confirmed that it had more than 500 employees in one location (Crouse Hospital – Main Campus) and so it could not benefit from the ARPA Per Location Rule. *See* SBA003633.

Given the potential issue with affiliates, SBA requested Crouse complete a PPP Affiliation Worksheet (SBA Form 3511), the purpose of which was to collect information from a borrower who may have affiliates, in order to evaluate eligibility for a PPP loan. *See* SBA000501. In a footnote, the Affiliation Worksheet Form reiterated the existing statutory and regulatory parameters for PPP loan eligibility:

> An applicant can be eligible for a PPP loan under the employee-based size standard of it has no more than 500 employees or if it satisfies the statutory and regulatory definition of a "small business concern" under . . . 15 U.S.C. § 632 . . . . A Business can be eligible under the receipt-based size standard corresponding to its primary industry . . . . A business also can be eligible if it met both tests in SBA's alternative size standard as of March 27, 2020 . . . . *The alternative size standard is available only to for-profit borrowers, not non-profit organizations*.

SBA000503 at n.3 (emphasis added). Even though the Alternative Size Standard is not available to nonprofits, Crouse indicated that it was relying on the Alternative Size Standard to determine its eligibility. *See* SBA000503.

### C.  SBA's Final Loan Decision and Subsequent Appeals by Crouse

SBA issued its final loan review decision on October 6, 2022, finding that Crouse was ineligible for its PPP loan because it had 2,212 employees, in excess of the 500-employee size standard applicable to nonprofit organizations. SBA000498-500. The final loan review decision reiterated that Crouse, as a nonprofit, "is ineligible for the Alternative Size standard; therefore, ineligible for PPP funding." SBA000499.

On November 7, 2022, Crouse filed an administrative appeal to the SBA's Office of Hearings and Appeals ("OHA"), and, in support of that appeal, attached IRS Form 990s pertaining to the comparator nonprofit borrowers. SBA000001-471. Crouse argued, in the main, that the Alternative Size Standard applies to nonprofits, and that SBA's decision on Crouse's PPP loan was arbitrary given that other nonprofit hospitals received PPP loan forgiveness. SBA000004-07. In support of the latter point, Crouse attached to its appeal various public documents (such as annual reports and IRS Form 990s) purportedly evidencing that those nonprofit hospitals each employed over 500 employees. *See* SBA000029-471.

Opposing relief, SBA argued to OHA, *inter alia*, that nonprofits are not eligible for PPP loans under the Alternative Size Standard. *See* SBA003946-59. Additionally, SBA argued that Crouse's assertions about the forgiveness status of other borrowers provided no basis for OHA to reverse SBA's final decision as to Crouse. *See* SBA003958-59. SBA argued that Crouse had failed to "provide any evidence of the circumstances surrounding the alleged forgiveness of the alleged 'similarly situated' organizations, including but not limited to, whether SBA even reviewed the loan forgiveness applications of the alleged similar businesses to determine whether those entities should have received forgiveness." *Id.* SBA also noted there was no evidence about those purported comparators' internal documentation or status at the time they applied for a PPP loan, or whether they could qualify for a PPP loan on some other basis.  *See* SBA003959.

On January 10, 2023, OHA denied Crouse's appeal and affirmed SBA's final loan review decision. SBA003961-74. OHA found Crouse was ineligible for a PPP loan as a nonprofit with over 500 employees. SBA003973. OHA also found that Crouse was not eligible under the "alternative size standard" because it is not a "small business concern." *See id.* As for the purported

24

comparators, OHA noted that their loan forgiveness status was "not supported by any evidence in the record," and, in any event, lacked any precedential value for Crouse's appeal. *See* SBA003974.

Crouse then petitioned for reconsideration of OHA's decision. *See* SBA003975-90. In support of that petition, Crouse submitted—for the first time in the agency proceedings—a spreadsheet reflecting publicly available SBA PPP loan data, filtered by Crouse. *See* SBA003985, SBA003990. Crouse argued that the spreadsheet showed five nonprofit hospitals with over 500 employees each received loan forgiveness. *See* SBA003985. And Crouse speculated that those other hospitals qualified using the Alternative Size Standard for small business concerns. *See id.*

OHA denied reconsideration on February 16, 2023, reiterating that because Crouse is a nonprofit with over 500 employees it lacked initial PPP loan eligibility. SBA003992-4011. As for the purported comparators, OHA explained that Crouse's "argument that other 'similarly situated' entities have received loan forgiveness is not supported by evidence in the record other than its assertions," and (again) that "most significantly, decisions regarding appeals of other PPP loans are not binding in this matter, as they have no precedential value." SBA004010.

## X.    Crouse's Claims and Proceedings in this Court

Based on the certified administrative record, it is undisputed that Crouse is a nonprofit employing more than 500 employees, that there is no applicable employee-based size standard for its industry, and that it cannot benefit from ARPA's Per Location Rule. Nevertheless, Crouse challenges the denial for loan forgiveness under the APA, arguing nonprofits are eligible for PPP loans under the Alternative Size Standard. *See* Dkt. 67-1 at 26-38.[14]  Crouse further asserts that SBA's decision to deny it PPP loan forgiveness is arbitrary and capricious based on the loan

---

[14] Citations to filings on the Court's docket are to the pagination generated by CM/ECF.

decisions pertaining to nonprofit borrowers who, according to Crouse, are similarly situated to it. *See id.* at 38-46.

In connection with the latter argument, the Magistrate Judge permitted Crouse to engage in limited discovery regarding SBA's PPP loan decisions pertaining to certain nonprofit borrowers. *See* 12/20/23 Text Minute Entry. The authorized discovery generally pertained to two categories of borrowers: certain nonprofit hospitals identified by Crouse, and nonprofit borrowers referenced in the SBA Office of Inspector General's Inspection Report No. 20-21, entitled "Paycheck Protection Program Eligibility for Nonprofit Organizations," issued September 26, 2022 ("OIG Report"). *See* OIG Report, *available at* https://www.sba.gov/sites/default/files/2022-09/SBA%20OIG%20Report%2022-21.pdf; *see also* 12/20/23 Text Minute Entry.

Ultimately, Crouse was permitted discovery pertaining to over 30 different nonprofits who received loan forgiveness—yet the records generated in discovery revealed that only *two* of those borrowers appeared to have been deemed eligible solely on the Alternative Size Standard, without another basis for eligibility.[15] The circumstances regarding those other nonprofit borrowers' loans are described below.

### A.    The Purported Comparators Nonprofit Hospitals' Loans

Due to the streamlined loan origination process, which was necessitated by the pandemic and reliant on borrowers' self-certifications of eligibility to the *lenders*, the *lenders*—not SBA— maintained the borrowers' loan applications and entered information into SBA's electronic

---

[15] Although ██████████ out of the 32 borrowers' internal notes ████████ ██████████ Other nonprofit borrowers that were the subject of discovery were deemed eligible ████████ ██████████

26

transaction system (E-Tran) to generate a loan number. *See* Andrews Decl. ¶¶ 7, 8, 28. For each one of the five purported comparator nonprofit hospitals, its lender represented to SBA, via E-Tran, that the hospital employed 500 or fewer employees at the loan origination stage. *See id.* ¶ 28 (lender represented (a) Memorial employed 450; (b) Brooks employed 344; (c) ENH employed 480; (d) ECMC employed 500; and (e) Carthage employed 436).

Unlike Crouse, the loan forgiveness applications for Brooks, ENH, Carthage, and ECMC ███████████████████████████████████████ and underwent a manual review on that basis. Andrews Decl. ¶¶ 36, 41, 46, 52; *see also id.* ¶ 24. ██████████████████ ████████████████████████████████ *See id.* ¶¶ 38, 42, 48, 55. Whereas SBA incorrectly ████████████████████████████████, *see id.* ¶ 49, the rationale for forgiveness for ENH and Brooks was not specific, *see id.* ¶¶ 35-44. In the case of Carthage, ██ ████████████████████████████████ and thus it met the criteria for nonprofit entities. *See id.* ¶ 44. SBA remitted payment in full to the respective lenders for Brooks, ENH, Carthage, and ECMC. *See id.* ¶¶ 39, 44, 49, 56. In any event, SBA has indicated that, since the commencement of this lawsuit and the receipt of additional information from Crouse about, *inter alia*, those borrowers' numbers of employees, SBA is undertaking a post-payment review of the loans issued to Carthage, ECMC, ENH, and Brooks. *See id.* ¶¶ 39, 44, 50, 45. For each of those borrowers, SBA anticipates exercising its available remedies in the event those loans are deemed ineligible for forgiveness. *See id.* ¶¶ 39, 44, 51, 56.

The loan forgiveness application for Memorial was processed through auto-review, unlike Crouse. *See id.* ¶ 33. ████████████████████████████████████████ ████████████████████████████████████████████████. *See id.* ¶¶ 32-33. Given the information SBA received about this borrower in connection with this

litigation concerning, *inter alia*, employee size, SBA is undertaking a post-payment review of this loan and anticipates exercising its available remedies in the event this loan is deemed ineligible for PPP loan forgiveness. *Id.* ¶ 34.

### B. The OIG Borrowers

#### 1. The OIG Report Regarding Nonprofits' Eligibility

The purpose of the OIG Report was to determine whether PPP loans were made to potentially ineligible nonprofits. *See generally* OIG Report at 2. To accomplish its objective, the OIG Report "identified" 179 PPP loans made to potentially ineligible nonprofits and "reviewed" PPP loans for three large nonprofits: Planned Parenthood of Illinois, Goodwill of Southwestern Pennsylvania, and YMCA of the Rockies. *See id.* at 3. The OIG determined that Planned Parenthood of Illinois met PPP loan eligibility requirements as it had only 341 employees; that Goodwill became eligible for a PPP loan under the ARPA Per Location Rule; and that the YMCA of the Rockies did not appear eligible for a PPP loan. *See id.* The OIG recommended that SBA review the 179 PPP loans "for compliance with affiliation and size standards, and seek remedy or repayment for all loans deemed ineligible." *Id.* at 7. The OIG further recommended that SBA seek remedy or repayment of the YMCA's PPP loan. *Id.* Notably, throughout its analysis and reported findings, the OIG reiterated that "[t]o qualify for the PPP, a nonprofit must have (1) employed no more than 500 employees, or (2) met SBA's employee-based size standard for its primary industry." *Id.* at Executive Summary; *see also id.* at 1 (identifying the only two ways that nonprofits could qualify for a PPP loan, which does not include the alternative size standard), 4 (same), 5 (same).

In response, SBA partially agreed with the recommendation to review all 179 PPP loans identified by the OIG. *See id.* at 19-20. Citing its risk-based loan review process, SBA explained

that only 27 of the 179 identified loans were subject to a manual review, and so SBA agreed to re-review those 27 loans to confirm compliance with affiliation and size standards. *Id.* SBA stated it would not manually review the remaining loans because they were "considered low-risk under the loan review process, and, therefore, were not selected for manual review." *Id.* at 20. SBA further agreed to review the YMCA loan, and if appropriate, seek remedy or repayment. *Id.*

### 2. ARPA-Eligible OIG Borrowers

Four OIG Borrowers— ███████████████████████████ ███████████████████████████████████—are eligible for a PPP loan on a basis indisputably unavailable to Crouse: the ARPA Per Location Rule.[16] Andrews Decl. ¶¶ 67-87. ███████████████████████████████ ████████████████████████████████. *See id.* Consistent with SBA's rules, those borrowers were deemed eligible under ARPA's Per Location Rule. *See* FAQ #71 (stating that a "nonprofit organization that submits a forgiveness application on or after March 11, 2021, is eligible for forgiveness if the 501(c)(3) nonprofit organization meets the ARPA increased size eligibility standard and has otherwise complied with all applicable PPP rules").

### 3. Additional OIG Borrowers: ███████████████████ ██████████████

An OIG Borrower— ███████████████████████████████████

███████████████████████████████████████████████



---

███████████████████████████████████████████
*see* JA250, JA359,
███████████████████████████████████████████



█████████████████████████████. Andrews Decl. ¶ 57; JA219, JA224.[17] ██████████

███████████████████████████. Andrews Decl. ¶ 60. ██████████

███████████████████████████████.

█████████████████████████. *Id.* ¶ 65.

For both ████████████████, SBA anticipates undertaking a post-payment review of their loans and anticipates exercising its available remedies in the event either of the loans is deemed ineligible for PPP loan forgiveness. *See* Andrews Decl. ¶¶ 61, 66.

## STANDARD OF REVIEW

Under the APA, "courts review agency action to determine if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Friends of Animals v. Romero*, 948 F.3d 579, 585 (2d Cir. 2020) (quoting 5 U.S.C. § 706(2)(A)). The function of the reviewing court is to decide "as a matter of law" whether "the evidence in the administrative record permitted the

---

[17] Citations to "JA__" refer to the joint appendix of discovery materials, *see* Dkt. 62-2, and refer to the PDF pagination.

agency to make the decision it did." *Roberts v. United States*, 883 F. Supp. 2d 56, 62 (D.D.C. 2012), *aff'd*, 741 F.3d 152 (D.C. Cir. 2014). Summary judgment is the appropriate mechanism for resolving APA challenges to agency action because the question whether an agency action is supported by the administrative record and consistent with the APA standard of review is decided "as a matter of law." *See Residents for Sane Trash Sols., Inc. v. U.S. Army Corps of Engineers*, 31 F. Supp. 3d 571, 586 (S.D.N.Y. 2014). In resolving that question, "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority." *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2273 (2024). When the relevant statute confers discretionary authority on the agency, a court "fulfill[s] [its] obligations under the APA" by "identify[ing] and respect[ing]" that delegation. *Id.* at 2268; *see also id.* at 2273.

Under the "narrow" standard of review applicable in APA cases, a "court is not empowered to substitute its judgment for that of the agency." *Friends of Ompompanoosuc v. FERC*, 968 F.2d 1549, 1554 (2d Cir. 1992) (quoting *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 416 (1971)). Rather, a court may overturn an agency's action only if it finds that the agency has relied on factors which Congress "has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Karpova v. Snow*, 497 F.3d 262, 267-68 (2d Cir. 2007) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). The ultimate question is whether the agency's action was reasonable. *FCC v. Fox Television Stations*, 556 U.S. 502, 514-15 (2009). In general, "a court reviewing an agency decision is confined to the administrative record compiled by that agency when it made the decision." *Nat'l Audubon Soc. v. Hoffman*, 132 F.3d 7, 14 (2d Cir. 1997).

## ARGUMENT

### I.    SBA Reasonably Determined that Crouse Does Not Qualify for a PPP Loan.

#### A.    The Plain Language of the Statute and its Context Make Clear that Nonprofits Qualify for PPP Loans Only as Explicitly Provided by the CARES Act.

Crouse contends that SBA lacked the statutory authority to deny it PPP loan forgiveness because nonprofits qualify for PPP loans under the Alternative Size Standard set out in § 632(a), the statutory definition of "small business concerns." *See* Dkt. 67-1 at 26-38. But the plain language of the CARES Act—particularly read in context of the statutory scheme as a whole—makes clear that nonprofits were required to comply with the size standard identified in the CARES Act itself, which as applicable here, required that Crouse have 500 or fewer employees. It has four times that many.

"It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989). When considering issues of statutory interpretation, "a court's proper starting point lies in a careful examination of the ordinary meaning and structure of the law itself. Where, as here, that examination yields a clear answer, judges must stop." *Food Marketing Inst. v. Argus Leader Media*, 588 U.S. 427, 437 (2019) (internal citation omitted). Those two criteria—ordinary meaning and statutory structure—establish that nonprofits were only eligible for PPP loans "if" they satisfied the size standard established by the CARES Act in § 636(a)(36)(D)(i), either by having no more than 500 employees or by meeting the applicable size standard in number of employees for the nonprofit's industry. 15 U.S.C. § 636(a)(36)(D)(i).

Section 636(a)(36)(B) provides that SBA "may guarantee [first-draw PPP] loans under the same terms [and] conditions" as other Section 7(a) loans, "*[e]xcept as otherwise provided*" in the

other subparagraphs of § 636(a)(36) (emphasis added).  Section 636(a)(36)(D) then provides that "*in addition to* small business concerns" 501(c)(3) nonprofit organizations are eligible for PPP loans "if" the organization employs no more than 500 employees *or* meets the applicable size standard in number of employees for the nonprofit's industry.  *Id.* § 636(a)(36)(D)(i).  The plain text of the statute thus makes clear that nonprofits are only eligible if they satisfy one of the two components of the size standard set out in § 636(a)(36)(D)(i).

Crouse's claim that nonprofits may qualify for a PPP loan using the Alternative Size Standard set forth in § 632(a)(5), which has never applied to nonprofits, is flatly inconsistent with the statutory scheme.  Congress added the Alternative Size Standard to the definition of "small business concerns" in § 632(a).  *See* 15 U.S.C. § 632(a)(5).  And it explicitly added that provision as an "alternative to the use of industry standards," *id.*, which SBA had enacted pursuant to its power to "specify . . . standards by which a business concern may be determined to be a small business concern."  *Id.* § 632(a)(2); *see also* 13 C.F.R. §§ 121,101, 121.201.  Congress's decision to place the Alternative Size Standard in the definition of "small business concerns" and to enact it *as an alternative* to SBA's preexisting, industry-based standards for determining whether a business concern is "small" makes clear that the Alternative Size Standard is available only to business concerns that are otherwise eligible for traditional Section 7(a) loans, not to entities made eligible for PPP loans by § 636(a)(36)(D)(i).

SBA has long excluded nonprofits like Crouse from its definition of eligible "business concerns." *See* 13 C.F.R. §§ 121.105(a)(1) ("a business concern eligible for assistance from SBA as a small business is a business entity organized for profit."), 120.110(a) (stating that "non-profit businesses" are "ineligible"), *see also* 19 Fed. Reg. 5440, 5441; SOP 50-10(4), Subpart A, Chap. 2, ¶ 8(a), at 28.  The CARES Act authorized SBA to guarantee PPP loans for nonprofits that

33

qualified under the specific size standard "provided" in subparagraph 15 U.S.C. § 636(a)(36)(D)(i). It did not change what entities were understood to be eligible as small business concerns.

Crouse's reliance on the word "applicant" in § 632(a)(5) is misplaced. The Alternative Size Standard is not "agnostic" to whether the applicant is a "business concern," Dkt. 67-1 at 31: it appears *in the definition* of "small business concern." *See* 15 U.S.C. § 632(a) (defining "small business concern"), (a)(5) (setting out alternative size standard). Courts must "consider not only the bare meaning of [words] but also [their] placement and purpose in the statutory scheme." *Bailey v. United States*, 516 U.S. 137, 145 (1995). And the "words Congress chose" when it entitled § 632 as "Definitions" and § 632(a) as "Small Business Concerns" are a "useful"—and, in this case, definitive—"clue" that the Alternative Size Standard applies only to small business concerns. *See Dubin v. United States*, 599 U.S. 110, 120 (2023).

Moreover, when Congress enacted the Alternative Size Standard in 2010, only "qualified small business concern[s]" were eligible for loans under Section 7(a). 15 U.S.C. § 636(a). It would make no sense to infer from the word "applicant" that Congress silently intended to expand eligibility to the Section 7(a) program beyond business concerns when it enacted the Alternative Size Standard. "Congress does not 'hide elephants in mouseholes.'" *Cyan, Inc. v. Beaver County Employees Ret. Fund*, 583 U.S. 416, 431 (2018) (quoting *Whitman v. American Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001)). Nor would it make sense to infer that Congress, when it explicitly enumerated two size standards by which additional entities could qualify for the PPP, also intended to permit those entities to be eligible under a third size standard in another part of the statute. "When Congress includes particular language in one section of a statute but omits it from a neighbor, we normally understand that difference in language to convey a difference in meaning."

34

*Bittner v. United States*, 598 U.S. 85, 94 (2023).  If anything, Congress' decision to extend SBA's industry-specific *employee-based* size standards to newly eligible entities, *but not* SBA's industry-specific standards based on annual receipts, confirms that the size standards listed in the CARES Act itself are the exclusive mechanism for determining a nonprofit's size-eligibility.  *Compare* 15 U.S.C. § 636(a)(36)(D)(i)(I), *with* § 13 C.F.R. 121.201.

In sum, the starting point of the Court's interpretive inquiry—the text and structure of the statute—should also be its last, as those lead to only one conclusion: that nonprofits may qualify for a PPP loan only if they satisfy the conditions set forth in § 636(a)(36)(D)(i). *See Culbertson v. Berryhill,* 586 U.S. 53, 58 (2019) ("We 'begi[n] with the language of the statute itself, and that is also where the inquiry should end, for the statute's language is plain.'" (alteration in original) (quoting *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016)).

**B.      SBA's Consistent Interpretation of the CARES Act Reinforces that the Alternative Size Standard Does Not Apply to Nonprofits.**

Although "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority," "[c]areful attention to the judgment of the Executive Branch may help inform that inquiry." *Loper Bright*, 144 S. Ct. at 2273. Respect for that judgment is "especially warranted when an Executive Branch interpretation was issued roughly contemporaneously with enactment of the statute and remained consistent over time." *Id.* at 2247. That is the case here.  SBA has consistently maintained that the Alternative Size Standard is available only to entities that are eligible for Section 7(a) loans as small business concerns, not the additional entities made eligible by § 636(a)(36)(D)(i).  Although such rules and guidance were summarized in detail above, some illustrative examples from those sources are briefly set forth again below.

- The First PPP IFR emphasized that there is only one size standard for nonprofits: the one identified in the CARES Act itself. *See* 85 Fed. Reg. at 20,812 (stating nonprofits "authorized under the [CARES Act] are eligible").

- The Affiliation IFR stated, among other things, that the PPP would include "loans during the covered period for nonprofit organizations that employ not more than 500 employees or, if applicable, the size standard in number of employees established by the Administrator for the industry in which the nonprofit organization operates." It does not provide for eligibility under the Alternative Size Standard.

- The Electric Cooperatives IFR and the Telephone Cooperatives IFR provide additional evidence for the fact that the alternative size standard is available only to for-profit entities. Each one recognized the unique dual nature of those cooperatives—as typically exempt from taxation or organized under state nonprofit statutes, but operating as businesses—and therefore determined that these entities qualified as "business entit[ies] organized for profit" under 13 C.F.R. § 121.105(a)(1). *Only* by virtue of being deemed "business entit[ies] organized for profit" could those cooperatives use the Alternative Size Standard.

- The Consolidated IFR—like multiple IFRs before it, including the Electric Cooperatives and Telephone Cooperatives IFRs—reiterated that only a "business entity organized for profit," 13 C.F.R. § 121.105(a), may use the Alternative Size Standard.

- FAQ #2 and FAQ # 34 both highlighted that a business's status as a "business concern" was essential to being able to use the alternative size standard, explaining that a business could qualify "*as a small business concern* if it met both tests in SBA's 'alternative size standard' as of March 27, 2020." FAQ #2; FAQ #34.

- FAQ #3 explained that 501(c)(3) nonprofits may receive First Draw PPP loans if they "have 500 or fewer employees or meet the SBA employee-based size standards for the industry in which they operate." FAQ #3.

Thus, contrary to Crouse's assertions, *see, e.g.*, Dkt. 67-1 at 26, 34-36, SBA's IFRs and guidance are entirely consistent with the fact that the statute does not permit nonprofits to qualify using the Alternative Size Standard.

Even the form on which Crouse applied for a PPP loan made obvious that it could qualify only if it employed 500 or fewer employees, or if applicable, the size standard in number of employees established in 13 C.F.R. § 121.201 for its industry. *See* SBA003615 (requiring certification by Crouse of those employee-based size standards). If the statutory scheme and SBA

36

rules and guidance were not enough to alert Crouse to its ineligibility, the application form should have been. Crouse nevertheless proceeded beyond that clear statement, certified those statements to be true under penalty of perjury, and applied for a PPP loan, despite its ineligibility. *See id.*

### C. Crouse's Remaining Arguments are Meritless

#### 1. SBA's Litigation Positions are Consistent

Crouse argues that the position taken by SBA in this case is inconsistent with prior litigation, in which, according to Crouse, SBA has argued that § 636(a)(36) is not "exhaustive nor restrictive." *See* Dkt. 67-1. at 26. Contrary to Crouse's argument, there is no inconsistency. The question in those cases was whether SBA had the authority to impose *additional* conditions on PPP loans beyond those set forth in § 636(a)(36)(D)(i). The answer, as those courts found, is yes. *Pharaohs*, 990 F.3d at 226 ("[T]he CARES Act unambiguously gives the Administrator discretion to adopt the longstanding 'terms, conditions, and processes' of the 7(a) program."); *see also Diocese of Rochester v. U.S. Small Bus. Admin.*, 466 F. Supp. 3d 363, 378 (W.D.N.Y. 2020) (affirming SBA's authority to exclude debtors in bankruptcy from participation in the PPP); *U.S. Small Bus. Admin. v. Weather King Heating & Air, Inc.*, 648 B.R. 200, 203 (N.D. Ohio 2023) (same). The question here, by contrast, is whether the PPP silently displaced SBA's regulations regarding what it means to be a small business concern. For the reasons given above, it did not. SBA has not undertaken inconsistent positions.

#### 2. The Language of the "Credit Elsewhere" Provision is Inapposite

Crouse also relies heavily on the CARES Act's waiver of the "credit elsewhere" test in support of its argument. That is, Crouse argues that SBA's distinction between "small business concerns" and nonprofit organizations cannot hold because the CARES Act waived the "credit elsewhere" requirement that applied to small business concerns seeking traditional Section 7(a)

37

loans. *See* Dkt. 67-1 at 34. Under the CARES Act, "the requirement that a small business concern is unable to obtain credit elsewhere, as defined in section 632(h) of this title, shall not apply to a covered loan." 15 U.S.C. § 636(a)(36)(I). In Crouse's view, if the additional entities listed in § 636(a)(36)(D)(i) of the CARES Act are not automatically treated as "small business concerns," then none of those entities could "benefit from this 'credit elsewhere'" waiver. Dkt. 67-1 at 34. But that does not follow. The phrase "small business concern" appears in Congress' description of the "credit elsewhere" requirement itself, not the scope of the waiver. It was natural for Congress, in waiving a traditional requirement of the Section 7(a) program, to describe that requirement as a requirement of small business concerns. Prior to the CARES Act, only small business concerns could receive Section 7(a) loans, so only small business concerns were subject to the credit elsewhere requirement. But Congress waived the "credit elsewhere" requirement for "covered loan[s]," which means any loan made under the CARES Act, not just those to small business concerns. *See* 15 U.S.C. § 636(a)(36)(A)(ii) (defining "covered loan" as "a loan made under this paragraph [§ 636(a)(36)] during the covered period"). Nothing about the credit elsewhere waiver conflicts with, much less overrides, the exclusive size standard expressly "provided" for nonprofits by the CARES Act itself. *See id.* § 636(a)(36)(B), (D)(i).

## II.     The Court Should Not Consider the Extra-Record Materials Generated in Discovery.

The foregoing questions of statutory construction are dispositive in this matter. The certified administrative record amply supports the fact that Crouse meets neither one of the criteria in the size standard for nonprofits set forth in 15 U.S.C. § 636(a)(36)(D)(i). Accordingly, the Court need not go further and consider the extra-record materials generated in discovery that were not before the SBA when it denied Crouse's forgiveness application.

It is "black-letter administrative law that in an APA case, a reviewing court should have before it neither more nor less information than did the agency when it made its decision." *Hill Dermaceuticals, Inc. v. FDA*, 709 F.3d 44, 47 (D.C. Cir. 2013) (internal quotations and citations omitted); *see also Ad Hoc Metals Coal. v. Whitman*, 227 F. Supp. 2d 134, 136 (D.D.C. 2002) (noting that "[i]n cases brought under the APA, the Court's review is confined to the administrative record"). "This principle flows from the APA itself, which directs courts to review agency actions based on 'the whole record or those parts of it cited by a party." *Open Soc'y Instit. v. U.S. Citizenship & Immigr. Servs.*, Civ. A. No. 19-3620 (RDM), 2021 WL 4243403, at \*7 (D.D.C. Sept. 17, 2021) (quoting 5 U.S.C. § 706). Therefore, the Court's review is limited to the administrative record compiled by the agency, except for "certain narrow exceptions." *Id.* (quoting *Amfac Resorts, LLC v. Dep't of Interior*, 143 F. Supp. 2d 7, 11 (D.D.C. 2001)).

SBA relied on its thorough review of the evidence submitted by Crouse and determined that Crouse did not qualify for a PPP loan. On this basis, without any consideration of any extra-record evidence of other purported comparators, the Court can and should decide whether SBA's reasons for denying PPP loan forgiveness to Crouse comported with the statutory scheme and the APA. *See Open Soc y Inst.*, 2021 WL 4243403, at \*8. In sum, the Court should disregard the discovery materials as improper extra-record evidence.

## III.    SBA's Treatment of the Comparator Hospitals Does Not Render Crouse's Denial of PPP Loan Forgiveness Arbitrary and Capricious.

Even if the Court went beyond the administrative record and considered the discovery generated in this matter, it would not change the outcome in this case.  Crouse alleges that SBA behaved arbitrarily and capriciously in granting PPP loan forgiveness to 11 ostensibly similarly situated nonprofits while denying Crouse's application for PPP loan forgiveness. *See* Dkt. 67-1 at

39

38-46. Indeed, as a general matter, an agency must treat like cases alike. *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005) ("Unexplained inconsistency is . . . a reason for holding [agency action] to be . . . arbitrary and capricious . . . ."); *Burlington N. & Santa Fe Ry. Co. v. Surface Transp. Bd.*, 403 F.3d 771, 776 (D.C. Cir. 2005) ("An agency must provide an adequate explanation to justify treating similarly situated parties differently."). But here, none of the borrowers Crouse points to in its motion are similarly situated to Crouse, because, as explained below, they may have benefitted from loan forgiveness as the result of mistakes, or they were eligible on grounds unavailable to Crouse. *See MomonCon, LLC v. Small Bus. Admin.*, No. CV 21-2386 (RC), 2023 WL 8880335, at *11 (D.D.C. Dec. 22, 2023) (recognizing that SBA's acknowledgment of a mistake was itself legitimate justification for differential treatment, and on that basis, rejecting claim of arbitrary enforcement); *see also Monkey Jungle, Inc. v. United States Small Bus. Admin.*, No. CV 22-2537 (JDB), 2024 WL 3987016, at *10 (D.D.C. Aug. 29, 2024).

### A.    Any Mistake SBA May Have Made in Giving Other Nonprofits PPP Loan Forgiveness Distinguishes Them from Crouse and Does Not Entitle Crouse to a PPP Loan It Is Otherwise Ineligible to Receive.

As an initial matter, any mistake SBA may have made in awarding PPP loan forgiveness to ineligible nonprofits does not oblige SBA to make the same mistake for Crouse. As mentioned, the urgent need for SBA to extend billions of dollars of economic relief to small businesses without delay during an unprecedented global pandemic meant that SBA had to dispense with its usual loan-origination requirements and underwriting procedures in favor of a highly streamlined process that—unfortunately—created a heightened risk of loans being erroneously sought by borrowers and approved by lenders. This, coupled with the reality that SBA simply lacked the resources to manually review and scrutinize at the forgiveness stage each one of the nearly 12

million PPP loans, means that some PPP borrowers may have received forgiveness for loans that they were a not entitled to receive. But any mistake SBA may have made in giving other borrowers PPP loan forgiveness would not entitle Crouse to the benefit of the same mistake, in the form of millions of dollars it is not otherwise eligible to receive. Indeed, SBA has confirmed that it will re-review (or currently is re-reviewing) the loans of ECMC, ENH, Carthage, Memorial, Brooks, ███████████████—a process which may (or may not) reveal another basis for eligibility. If no other basis for eligibility exists for those purported comparator borrowers, then SBA will exercise its available remedies in the event this loan is deemed ineligible for PPP loan forgiveness.

That approach is consistent with the approach taken by other district courts who have considered what, if anything, should be done when an agency makes a mistake in administering a particular program. Indeed, the D.C. Circuit has long recognized that if an agency makes a mistake in administering a program as to one entity, it need not give other entities the benefit of the same mistake going forward. *See Chem-Haulers, Inc. v. Interstate Com. Comm'n*, 565 F.2d 728, 730 (D.C. Cir. 1977) ("The mere fact that the [agency] may have nodded on one occasion does not entitle a litigant to a repetition of its blunder."); *Tex. Int'l Airlines v. Civ. Aeronautics Bd.*, 458 F.2d 782, 785 (D.C. Cir. 1971) ("Assuming that the Government made a mistake as to [another entity] in the application of the [program], the law does not require the Government to perpetuate the mistake").

To the contrary, an agency need not "articulate the fact of change" in its actions "and underlying reason for it" when its prior action represented "at most, a mistake in the application of a continuing policy," *Tex. Int'l Airlines*, 458 F.2d at 785, which the agency is working diligently to correct. Any contrary rule would give Crouse a windfall benefit to which it is not otherwise

41

entitled, simply because SBA happened to make a mistake as to a completely separate applicant. "In administrative law, as elsewhere, two wrongs do not make a right." *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 928 (D.C. Cir. 2017).

The need for such a rule is clear. When an agency must apply eligibility criteria to *millions* of varied applicants, the possibility of inconsistency cannot be eliminated entirely. Even when acting diligently, an agency inevitably makes mistakes—and the chance of error only grows with a program's size. No wonder that routine programmatic determinations that agencies make by the *millions*, applying fixed criteria to specific facts, are not binding in future cases. *See United States v. Mead Corp.*, 533 U.S. 218, 233 (2001) ("Any suggestion that rulings intended to have the force of law are being churned out at a rate of 10,000 a year at an agency's scattered offices is simply self-refuting."); *see also* 13 C.F.R. § 134.1211(e) ("Neither initial nor final decisions rendered by OHA under this subpart are precedential."). Agencies should strive to correct their mistakes when circumstances and the law allow. But requiring an agency to compound a mistake by extending the benefit of that mistake to all others would make the administration of federal programs utterly unworkable. It would freeze an agency's mistake in place and enlarge it, transforming it from isolated errors into *de facto* policy.

This is especially true in the PPP context. SBA awarded more than $813 billion in PPP loans to nearly 12 million borrowers, all at "warp speed for regulatory action," *Gateway*, 983 F.3d at 1262. Requiring SBA to dole out potentially millions of dollars to ineligible PPP borrowers— like Crouse—solely because it may have mistakenly awarded funds to other ineligible borrowers would be a nonsensical waste of public dollars, especially when SBA is reconsidering those prior awards of loan forgiveness and will exercise its available remedies if it determines that the loans were improper and there is no other basis for eligibility. Indeed, "SBA may undertake a review"

42

of a PPP loan, of any size, "at any time in SBA's discretion." Business Loan Program Temporary Changes; Paycheck Protection Program, 85 Fed. Reg. 33,010, 33,012 (June 1, 2020).

Moreover, the D.C. Circuit has recognized that an agency's recognition that its past action was incorrect and commitment to rectify the past mistake through a recoupment process is itself a circumstance justifying differentiated treatment between applicants. *See Chem-Haulers, Inc.*, 565 F.2d at 730; *Tex. Int'l Airlines*, 458 F.2d at 785. Indeed, that principle—that an agency's recognition that an honest mistake was previously made can itself be a legitimate justification for differential treatment—has recently been applied by district courts in the context of other SBA programs. *See MomonCon*, 2023 WL 8880335, at *11; *see also Monkey Jungle, Inc.*, 2024 WL 3987016, at *10 (noting that a court 'may permit agency action to stand without elaborate explanation where distinctions between the case under review and the asserted [comparator] are so plain that no inconsistency appears' (quoting *Bush-Quayle '92 Primary Comm., Inc. v. FEC*, 104 F.3d 448, 454 (D.C. Cir. 1997)).

Consistent with that approach, this Court should reject any notion that SBA singled Crouse out for unfavorable treatment based on decisional mistakes as to other borrowers that SBA will take action to review and rectify. That rationale applies to multiple purported comparators, including the five nonprofit hospitals identified by Crouse, and at least two OIG Borrowers, ██████ ██████████████. For each of those borrowers, SBA relied in good faith (as it was permitted to do during the COVID-19 emergency pandemic) on the lenders, who certified to SBA that the borrower had made the necessary certifications and had submitted the needed documentation. The lenders, in turn, were permitted to rely in good faith on the self-certifications of the borrowers themselves. Obviously, the stated numbers of employees made by the various lenders at the loan origination stage stand in contrast to the IRS records that Crouse emphasizes, but SBA's

43

streamlined loan origination process during the COVID-19 emergency pandemic did not require SBA to analyze borrowers' size eligibility.  Nor are the IRS records dispositive of the number of employees each purported comparator has for SBA's purpose of calculating number of employees, *see* 13 C.F.R. § 121.106 (establishing method for calculating number of employees), or whether those borrowers may be eligible on a different basis yet to be considered, such as the ARPA Per Location Rule. Regardless, SBA is committed to reviewing those prior awards of loan forgiveness and will exercise its available remedies if it determines that they were improper.

## B.    Certain OIG Borrowers are Distinguishable Because They Are Eligible under the ARPA Per Location Rule.

Four OIG Borrowers— █████████████████████████████████ —are further not similarly situated to Crouse because they qualify for a PPP loan under the ARPA Per Location Rule, codified at 15 U.S.C. § 636(a)(36)(D)(i)(I) and (iii)(III)(aa)—a statutory provision under which Crouse indisputably does not qualify. During administrative proceedings, SBA gave Crouse a chance to establish its eligibility under the ARPA Per Location Rule, but Crouse could not do so because it disclosed that it has over 2,000 employees at one of its physical locations. *See* SBA002950.

As outlined above, the 500 employees per-physical-location rule stems from changes to the PPP brought about by the ARPA, enacted March 11, 2021. Whereas the CARES Act had provided that nonprofit organizations with a *total* of 500 or fewer employees could qualify for a PPP loan, ARPA then increased the size eligibility for nonprofit organizations from a total of 500 or fewer employees, to no more than 500 *per physical location* of the nonprofit organization ("ARPA Per Location Rule"). Following litigation in the *Appeal of Lawndale Christian Health Center*, Docket No. PPP-5819168004, an ALJ determined, via nonprecedential decision, that because the

applicability date set forth by SBA in the ARPA Interim Final Rule stated that the ARPA's changes

to PPP apply to "loans approved, and loan forgiveness applications submitted, on or after March

11, 2021," nonprofit organizations that received a PPP loan before March 11, 2021, but applied for

forgiveness on or after March 11, 2021, are entitled to forgiveness of their loan if they meet the

ARPA increased size eligibility standard. In an exercise of her broad discretion pursuant to 15

U.S.C. § 634(b)(7), the SBA Administrator has determined as follows:

> [A]ny 501(c)(3) nonprofit organization that received a loan before March 11, 2021, but submits a forgiveness application on or after March 11, 2021, will not be ineligible for forgiveness on the basis that they have more than 500 employees in multiple physical locations. As a result, ***a 501(c)(3) nonprofit organization that submits a forgiveness application on or after March 11, 2021, is eligible for forgiveness if the 501(c)(3) nonprofit organization meets the ARPA increased size eligibility standard and has otherwise complied with all applicable PPP rules.***

Consistent with that guidance, ████████████████████████████████████

████████████████████████████. Thus, each one of them is eligible under ARPA's Per

Location Rule.

Crouse makes much of the fact that ████████████████████████████

████████████████████████████████████████████████████████

████████████████████, characterizing SBA's actions as an impermissible "post-hoc"

rationalization under the ARPA Per Location Rule. *See* Dkt. 67-1 at 44. But, as explained above,

whether SBA made a mistake in initially approving these borrowers' forgiveness applications is

not dispositive. Indeed, "[i]t is black-letter law that an agency that takes superseding action . . . is

entitled to 'reexamine[ ] the problem, recast its rationale and reach[ ] the same result.'" *Biden v.

Texas*, 597 U.S. 785, 813 (2022)) (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)). The

fact that these borrowers could establish eligibility for forgiveness under the ARPA Per Location

Rule, while Crouse could not, is "an adequate explanation to justify" treating those borrowers differently. *Burlington*, 403 F.3d at 776 (D.C. Cir. 2005).

## IV.     Remand is the Only Appropriate Remedy.

Crouse asks the Court to issue an order (1) declaring that SBA's final agency action against Plaintiff was unlawful, arbitrary and capricious, and vacating that action; (2) declaring Crouse eligible for loan forgiveness; and (3) vacating "SBA's rules, regulations, and guidance upon which the challenged final agency action was based" as contrary to law. *See* Dkt. 67 at 1-2.  But a declaration that Crouse is entitled to forgiveness is not appropriate, and vacatur of SBA's actions is prohibited by the Small Business Act.  In addition, Crouse's request that the Court vacate the "rules, regulations, and guidance" underlying SBA's forgiveness decisions is not consistent with the APA or principles of equity.  If the Court determines that SBA's decision cannot be sustained, the proper course is to remand the case to the agency.

Where (as here) statutes place the matter for decision "primarily in agency hands[,]" a reviewing court "is not generally empowered to conduct a *de novo* inquiry into the matter . . . and to reach its own conclusions[.]" *INS v. Orlando Ventura*, 537 U.S. 12, 16 (2002). Rather, except in rare situations, "it [must] set aside the agency's action and remand the case—even though the agency . . . might later . . . reach the same result for a different reason." *FEC v. Akins*, 524 U.S. 11, 25 (1998).  Here, the appropriate remedy would be, *at most*, a remand.  *See, e.g.*, *Monkey Jungle, Inc.*, 2024 WL 3987016, at \*11 n.7 (noting that, even if the court concluded that SBA did not adequately detail its reason for distinguishing one entity from the comparators, the proper remedy "would not be to order SBA to issue a grant" to that entity, but rather, remand to the agency for further analysis).  In the decision under review, SBA came to only one decision: that Crouse was ineligible for loan forgiveness because it did not satisfy this size standard to be eligible for a PPP

46

loan. *See* SBA000498-500. It had no occasion to finally determine whether Crouse was eligible for the amount it received or had used those funds for authorized purposes. *See generally* SBA000001-4011. Remand is required to answer those questions.

Moreover, vacatur would not only be inappropriate, but contrary to the Small Business Act, which provides that "no . . . injunction . . . *or other similar process* . . . shall be issued against the [SBA] or [its] property." 15 U.S.C. § 634(b)(1). The Fourth and Fifth Circuits have both applied this provision according to its plain terms, concluding that "courts have no jurisdiction to award injunctive relief against the SBA." *J.C. Driskill, Inc. v. Abdnor*, 901 F.2d 383 (4th Cir. 1990) (citing *Duncan v. Furrow Auction Co.*, 564 F.2d 1107, 1109 (4th Cir. 1977)); *see also Expedient Servs., Inc. v. Weaver*, 614 F.2d 56, 57 58 (5th Cir. 1980) (15 U.S.C. § 634(b)(1) prohibits all relief against SBA that is "injunctive in nature"); *In re Hidalgo Cnty. Emergency Serv. Foun.*, 962 F.3d 838, 841 (5th Cir. 2020) (applying precedent against anti-SBA injunctions in PPP context). District courts in the Second Circuit agree. *See, e.g.*, *Keita v. U.S. Small Bus. Admin.*, No. 07-CV-4958 ENV/LB, 2010 WL 395980, at *4 (E.D.N.Y. Feb. 3, 2010) (dismissing claim for injunctive relief against the SBA under 15 U.S.C. § 634(b) and collecting cases interpreting § 634(b) to preclude injunctive or any similar relief against the SBA). Hence, even if the Court were to remand Crouse's application to SBA, under 15 U.S.C. § 634(b)(1), the Court should deny Crouse's request to vacate SBA's forgiveness decision and the rules, regulations, and guidance underlying it.

This is so even though Crouse casts its request for relief in terms of "vacatur" rather than an injunction. Vacatur is the "act of annulling or setting aside," *Vacatur*, Black's Law Dictionary (12th ed. 2024), exactly what § 634(b)(1) forbids. Indeed, § 634(b)(1), on its face, is not limited to injunctions. It "provides, *inter alia*, that no 'injunction . . . *or other similar process* . . . shall be issued against the Administrator." *Expedient*, 614 F.2d at 58 (emphasis added). That prohibition

47

easily encompasses judicial vacatur. Like an injunction, vacatur "restrict[s] or stop[s] official action," *Direct Mktg. Ass'n v. Brohl*, 575 U.S. 1, 13 (2015), by prohibiting officials from relying on the agency action under review. To be sure, vacatur is a "less drastic remedy" in some respects, *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010), but they are equivalent in the sense that both compel an agency to rescind or cease implementing a challenged action. Section 634(b)(1) does not permit relief of that kind against SBA.

Finally, even if the Small Business Act did not bar the relief Crouse seeks, an order vacating the rules, regulation, and guidance underlying SBA's forgiveness decision would be inconsistent with the APA and principles of equity. As an initial matter, Crouse does not identify in its motion the rules, regulations, or guidance it believes should be vacated, let alone develop an argument establishing its entitlement to that relief. Those arguments are therefore waived. *See United States v. Fayton*, 704 F. Supp. 3d 449, 453 (S.D.N.Y. 2023) ("[A] party may be deemed to have waived an argument through inadequate briefing."). Even if they were not waived, vacatur of those rules, regulations, and guidance would be inappropriate because equitable relief should be no broader than necessary to remedy the harm demonstrated by the plaintiff in a given case. *See Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994). Should the Court determine that SBA erred in this case, the agency can correct that error on remand. There is no need to vacate an indefinite set of "rules, regulations, and guidance" to achieve that result. Indeed, such vacatur would be especially unwarranted and harmful because many SBA "rules, regulations, and guidance" that touch on the size standards applicable to nonprofits also concern other, unrelated portions of the PPP to which Crouse does not object. In any event, the APA does not empower courts to "set aside" agency rules, in the sense of nullifying or revoking them. *See United States v. Texas*, 599 U.S. 670, 693-702 (2023) (Gorsuch, J., concurring, joined by Thomas and Barrett, JJ.). Universal

48

relief of the type Crouse requests "upset[s] the bedrock practice of case-by-case judgments with respect to the parties in each case." *Arizona v. Biden*, 31 F.4th 469, 484 (6th Cir. 2022) (Sutton, C.J., concurring).  The Court should therefore decline to order such relief.

In short, a declaration that Crouse is eligible for forgiveness is not appropriate and injunctive relief, however styled, is neither appropriate nor permitted. If the Court concludes that SBA violated the APA, remand is the only appropriate remedy.

## CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment should be granted, Crouse's motion denied, and judgment entered for Defendants as a matter of law.

Dated: November 8, 2024

CARLA B. FREEDMAN
United States Attorney

By:   *s/ Emer M. Stack*
Emer M. Stack
Assistant United States Attorney
Bar Roll No. 700843